# Chapter 2
# THE ACCOUNT OF WORLD TRADE CENTER 1

## 2.1    8:46:30 A.M. EDT

On the morning of Tuesday, September 11, 2001, a lot of people were going to be late for work in New York City, which for many started at 9:00 a.m. or later. It was the first day of school for many local children, and it also was a primary election day in New York. The weather was clear and comfortable with little wind to speak of, so some took time to do early morning errands. As a result, only about 8,900 of the typical 20,000 people were in World Trade Center (WTC) 1 shortly before 9:00 a.m.

At 8:46:30 a.m. EDT, five hijackers flew American Airlines Flight 11 (AA 11) with 11 crew and 76 passengers into the north face of WTC 1 (Figure 2–1).



**Figure 2–1. Simulated impact of American Airlines Flight 11 with WTC 1.**

What follows is the result of an extensive, state-of-the-art reconstruction of the events that accompanied and followed the aircraft impact. Numerous facts and data were obtained, then combined with validated computer modeling to produce an account that is believed to be close to what actually occurred. However, the reader should keep in mind that the building and the records kept within it were destroyed, and the remains of the towers were disposed of before congressional action and funding was available for this Investigation to begin. As a result, there are some facts that could not be discerned, and thus there are uncertainties in this accounting. Nonetheless, the National Institute of Standards and Technology (NIST) was able to gather sufficient evidence and documentation to conduct a full investigation upon which to reach firm findings and recommendations. The reconstruction effort, the uncertainties, the assumptions made, and the testing of these assumptions are documented in Part II of this report.

## 2.2     THE AIRCRAFT

The Boeing 767-200ER was a twin-engine, wide-body aircraft, 159 ft 2 in. long, with a wingspan of 156 ft 1 in. Empty, it weighed 183,500 lb. It could carry 181 passengers in its three-class seating configuration and 23,980 gal (158,200 lb) of jet fuel as it covered its maximum cruising range of 6,600 miles. The maximum total weight the plane could carry was specified at 395,000 lb; the typical cruising speed was 530 mph.

> The 767-200ER aircraft had two fuel tanks that extended through most of the interior of the wings and a center tank between the wings in the bottom of the fuselage. A full fuel load would have filled all three tanks.

On that day, AA Flight 11 was much lighter. Bound from Boston for Los Angeles, some 3,000 miles away, it carried only about half the full load of jet fuel. When it hit the north tower, it likely contained about 10,000 gal (66,000 lb), evenly distributed between the right and left wing tanks. Because of the tight maneuvers as the plane approached the tower, the baffles in both tanks had directed the fuel toward the inboard side of each wing. The passenger cabin was more than half empty. The cargo bay, carrying less than a full load of luggage, contained 5 tons of luggage, mail, electronic equipment, and food. The total weight of the aircraft was estimated to be 283,600 lb.

## 2.3     THE IMMEDIATE DAMAGE

The aircraft flew almost straight toward the north tower, banked approximately 25 degrees to the left (i.e., the right wing elevated relative to the left wing) and descended at an angle of about 10 degrees at impact. Moving at about 440 mph, the nose hit the exterior of the tower at the 96th floor. The aircraft cut a gash that was over half the width of the building and extended from the 93rd floor to the 99th floor (Figures 2–2 and 2–3). All but the lowest of these floors were occupied by Marsh & McLennan, a worldwide insurance company, which also occupied the 100th floor. Marsh & McLennan shared the 93rd floor with Fred Alger Management, an investment portfolio management company.

There was relatively little impact damage to the 93rd floor, hit only by the outboard 10 ft of the left wing. Containing no jet fuel, the wing tip was shredded by the perimeter columns. The light debris did minimal damage to the columns or to the thermal insulation on the trusses of the composite floor system supporting the 94th floor.[5] The trusses supporting the 94th floor were impacted by flying debris on the 93rd floor.

The 94th floor was more severely damaged. The midsection of the left wing, laden with jet fuel, and the left engine cut through the building façade, severing 17 of the perimeter columns and heavily damaging four more. The pieces of the aircraft continued inward, severing and heavily damaging core columns. The insulation applied to the floor trusses above and the columns was scraped off by shrapnel-like aircraft debris and building wall fragments over a wedge almost 100 ft wide at the north face of the tower and 50 ft wide at the south end of the building core.

---

[5]  The reader should bear in mind that the described damage to the building exterior was derived from eyewitness and photographic evidence. The described damage to the aircraft and the building interior was deemed most likely from the computer simulations and analysis carried out under the Investigation.



**Figure 2–2. Aircraft entry hole on the north side of WTC 1, photographed 30 s after impact.**

The aircraft did the most damage to the 95th and 96th floors. The fuel-heavy inner left wing hit the 95th floor slab, breaking it over the full 60 ft depth of tenant space and another 20 ft into the building core. The fuselage was centered on the 96th floor slab and filled the 95th and 96th floors top to bottom. The severity of the impact was clear. A wheel from the left wing landing gear flew through multiple partitions, through the core of the building, and became embedded in one of the exterior column panels on the south side of the tower. The impact severed the bolts connecting the panel to its neighbors, and the panel and tire landed on Cedar Street, some 700 ft to the south. A second wheel landed 700 ft further south. Within the two floors, 15 to 18 perimeter columns and five to six core columns were severed, and an additional one to three core columns were heavily damaged. A 40 ft width of the 96th floor slab was broken 80 ft into the building. The insulation was knocked off nearly all the core columns and over a 40 ft width of floor trusses from the south end of the core to the south face of the tower.



**Figure 2–3. South face damage of WTC 1 with key aircraft component locations marked.**

The right wing of the aircraft was fragmented by the perimeter columns on the 97th floor. In the process, 12 of those columns were severed. The debris cut a path through the west and center array of trusses and core columns, stripping the insulation over a 90 ft wide path. The insulation was stripped from a 50 ft wide path on the south side of the floor space.

On the 98th and 99th floors, the outboard 30 ft of the starboard wing was sliced by the perimeter columns, of which five were severed. The debris cut a shallow path through the west and center array of trusses, damaging the insulation up to the north wall of the building core.

This devastation took 0.7 s. The structural and insulation damage was considerable (Figure 2–4) and was estimated to be:

- 35 exterior columns severed, 2 heavily damaged.

- 6 core columns severed, 3 heavily damaged.

- 43 of 47 core columns stripped of insulation on one or more floors.

- Insulation stripped from trusses covering 60,000 ft$^2$ of floor area.



**Figure 2–4. Simulation of cumulative aircraft impact damage to floors 93 through 98 in WTC 1.**

*Even with all this damage, the building still stood.* The acceleration from the impact had been so severe that people even on lower floors were knocked down and furniture was thrown about. Some survivors reported fallen ceiling tiles throughout the building, all the way down to the Concourse Level. The pipes that fed the automatic fire sprinkler system were severed. At least 166 windows were broken. Damage to interior walls was reported from the Lobby to the 92nd floors. However, the building was designed with reserve capacity: it could support significantly more load than the weight of the structure and its people and contents. The building redistributed the load from the severed perimeter columns, mainly to their neighboring columns. The undamaged core columns assumed the remaining load, as well as the load from their damaged neighbors. WTC 1 still stood, and would have continued to do so, if not for the fires that followed.

NIST could not determine how many occupants were in the path of the aircraft as it entered the tower. Those in the direct collision path were almost certainly killed instantly. Many more would have lost their lives from the burst of heat from the burning jet fuel. Fatal injuries were reported on floors as low as the Concourse Level, where a fireball swept through the lobby.

In the impact region was further damage that would cost the lives of all the 1,355 people from the 92nd floor to the 110th floor. The crash and flying debris had collapsed the walls of all three stairwells and interrupted all elevator service to the upper 60 floors. All opportunity for escape had been eliminated.

## 2.4    THE JET FUEL

To the wings of the 767-200ER, the perimeter columns acted like knife blades, slashing the aluminum fuel tanks and atomizing much of the 10,000 gal of jet fuel liquid into a spray of fuel droplets. Atomized jet fuel is highly flammable (similar to kerosene), so both the hot debris and the numerous pieces of electrical and electronic gear in the offices were more than sufficient as ignition sources. A surge of combusting fuel rapidly filled the floors, mixing with dust from the pulverized walls and floor slabs. The pressure created by the heated gases forced the ignited mist out the entrance gash and blown-out windows on the east and south sides of the tower. The resulting fireballs could be seen for miles, precipitating many 9-1-1 calls.

Less than 15 percent of the jet fuel burned in the spray cloud inside the building. A roughly comparable amount was consumed in the fireballs outside the building. Thus, well over half of the jet fuel remained in the building, unburned in the initial fires. Some splashed onto the office furnishings and combustibles from the aircraft that lodged on the impacted floors, there to ignite (immediately or later) the fires that would continue to burn for the remaining life of the building. Some of the burning fuel shot up and down the elevator shafts, blowing out doors and walls on other floors all the way down to the basement. Flash fires in the lobby blew out many of the plate glass windows. Fortunately, there were not enough combustibles near the elevators for major fires to start on the lower floors.

## 2.5    8:47 A.M. TO 9:02 A.M. EDT

The burning of the jet fuel cloud had consumed much of the oxygen within the 94th and 96th floors, although photographs showing survivors indicated there were some zones with breathable air. The oxygen-starved fires died down, but didn't quite go out. Within the first 2 min after the impact, fires could be seen in the north side windows on the 93rd through 97th floors, the 96th floor of the south face, and the 94th floor of the east face. As fresh air entered the perforated facades, there began the steady burning of the office furnishings and the 13 tons of combustibles from the aircraft that would eventually overwhelm the already damaged building. By 9:00 a.m., these fires had grown and spread to the extent shown in Figure 2–5. In addition to burning around the aircraft entrance hole, there was intense burning on the north, east, and west faces of the 97th floor. Large fires burned on the south side of the 96th floor and the east side of the 94th floor. At 8:52 a.m., a stream of smoke emerged from the south side of the 104th floor, although there was no evidence of a significant fire there yet.

There was no way to fight the fires. The piping providing the water supply to the automatic sprinklers had been broken, and water was flowing down the stairwells. Even had this not happened, the system was designed to supply water to about 8 sprinkler heads at one time, enough to control the flames from as much as 1,500 ft² of burning material. The water supply was likely sufficient to control fires up to triple that size. The fires, however, had already grown far larger than that.



**Note:** Color coding—white, no fire; yellow, spot fire; red, fire visible inside; orange, external flaming.

**Figure 2–5. Representation of exterior views of the fires on the four faces of WTC 1 from 8:47 a.m. to about 9:02 a.m.**

There was also no way to abate the opaque, hot, and toxic smoke that quickly began accumulating. The manually activated smoke purging system was intended for smoke removal during fire department operations following a fire. Thus, it was not turned on during the 102 min that the tower would remain standing. It would not likely have helped anyway. Neither the World Trade Center Safety Director nor the arriving firefighters knew where the fires were located, so they could not have known how to direct the intake and exhaust flows. Furthermore, the integrity of the vent shafts on the upper floors had been compromised by the aircraft impact, making it unlikely that the system could have functioned as intended.

Most of the people in WTC 1 were aware of the possibility of an emergency. A quarter of them had been working in the building since before the 1993 bombing, and most of those had been in the building on that day. Half the people had been working in the building for at least two years; many had heard the stories and had participated in the emergency drills.

The building occupants knew that something serious had happened. A third of the survivors had heard the roar of the plane. Nearly two thirds reported feeling the violent movement of the building. Half sensed that they were in a life-threatening situation. At the Concourse Level, a fatal fireball filled the space from the elevators to the exit toward WTC 3. Almost immediately, people began calling 9-1-1, both for help and to find out more about what was going on.

Within 5 min to 8 min of the strike, most of the 7,545 people below the floors of impact began to evacuate. Their progress is tracked in Table 2–1. Water and debris were in the three stairwells. The air smelled of jet fuel and was becoming gray with smoke and pulverized gypsum, thermal insulation, and

concrete. Nonetheless, perhaps due to the guidance they had received since the 1993 bombing, for the most part the people moved in an orderly manner down the stairs, helping those who needed assistance. Within 15 min of the strike, nearly all of the people below the impact floors had descended about 10 floors from their original location.

**Table 2–1.  Locations of occupants of WTC 1.**

| Time | Evacuated | Lobby to 91st Floor | 92nd to 110th Floor |
|:---:|:---:|:---:|:---:|
| 8:46 | 0 | 7,545 | 1,355 |
| 9:03 | 1,250 | 6,300 | 1,355 |
| 9:59 | 6,700 | 850 | 1,355 |
| 10:28 | 7,450 | 107 | 1,355 |

Note:  The numbers in the rows do not add to the estimated total of 8,900 due to rounding errors in the less certain values.

At the time, there were some survivors from the 92nd through 99th floors. Most of those who were able moved to the areas where the fires had not yet spread. Some were seen looking out from the former window spaces and even standing on the deformed structural steel. At 8:52 a.m., the first of at least 111 people was observed falling from the building.

Hundreds of people were on the floors above the impact zone. They soon realized that they were unable to go downward to get away from the smoke and heat that were building up around them. At 8:54 a.m., occupants began breaking windows to provide access to fresh air. By 9:02 a.m., 26 calls, representing hundreds of people, had been made to 9-1-1, asking for help and seeking more information about what was happening. Some of the people went toward the roof. However, there was no hope because roof evacuation was neither planned nor practical, and the exit doors to the roof were locked.

> While the occupants were not advised in advance that roof evacuation was not a viable option, there was, and is, no requirement in the NYC Building Code for the roof to be accessible for emergency evacuation or rescue, and roof rescue was not contemplated in the WTC evacuation plans. Even had the roof been accessible, the helicopters could not have landed due to the severe heat and smoke.

Outside the building, a flurry of activity was beginning. Personnel of the Fire Department of the City of New York (FDNY) were several blocks away, investigating a gas leak at street level, and observed the aircraft impact. Within a minute, FDNY had notified its communications center and requested additional alarms for the WTC. A Port Authority Police Department (PAPD) unit had reported to its Police Desk that there had been an explosion with major injuries. By 8:50 a.m., the first fire engines had arrived, and an Incident Command Post had been established in the WTC 1 lobby. An Emergency Medical Service (EMS) Command was established 3 min later. More and more reports of damage, injuries, and deaths flooded the communications channels, and knowledge of the extent of the catastrophe was emerging. At 8:52 a.m., the first New York City Police Department (NYPD) aviation unit arrived to evaluate the possibility of roof rescue, but reported they were unable to land on the roof due to the heavy smoke. At 8:55 a.m., the firefighters entering WTC 1 began climbing the stairs (Figure 2–6). Their objectives were to evacuate and rescue everyone below the fires, then to cut paths through the fires and rescue all those above the fires.

At 8:59 a.m., a senior PAPD official called for evacuation of the entire WTC complex, although that call was not heard nor heeded by others. By 9:00 a.m., 66 FDNY units had been dispatched to the scene, and



**Figure 2–6. Firefighters on the scene at about 9:07 a.m.**

the FDNY had called a fifth alarm for the dispatch of additional department personnel and equipment to the WTC. Spectators had begun converging on the complex, but were advised to stand clear.

The aircraft impact also did damage to the communications in the tower. The capability for building-wide broadcast from the Fire Command Desk was knocked out. Emergency responder radio traffic peaked at about five times its normal traffic volume during the 20 min period after to the attack. This peak gradually tapered off, but still continued at a sustained level three times the normal traffic volume. The radio systems were not adequate to handle the high flow of emergency communications required for this scale of operations. Many of the radio messages were unintelligible because many individuals were trying to talk on the same radio channel at the same time.

## 2.6     9:02:59 A.M. EDT

At 9:02:59 a.m., five hijackers flew United Airlines Flight 175 with 9 crew and 51 passengers into the east side of the south face of WTC 2. For the most part, there was little awareness of this among the people below the 92nd floor of WTC 1. Almost one-fifth of these had already left the building, and nearly all the 6,300 others were already in the stairwells.

## 2.7     9:03 A.M. TO 9:57 A.M. EDT

A fire needs a continuing supply of both gaseous fuel and oxygen to keep burning, and the initially burning combustibles in WTC 1 were being consumed. The additional fuel came from the office furnishings next to those that were reaching the end of their burning life. The thermal radiation from the flames and from the hot gases heated the nearby combustibles, creating flammable vapors. These vapors needed a source of nearby air to continue the burning. The same flames and hot ceiling layer gases heated the windows and window frames in the vicinity. The hot gases pushed on the weakened aluminum

frames, sending some windows outward to fall to the Plaza below. Other windows were sucked into the building. The fires now had both new fuel and fresh air.

And so the fires continued to spread, likely aided by as-yet unburned jet fuel that had soaked into some of the furnishings and flooring. The coating of (non-combustible) gypsum and concrete fragments slowed the burning rate by as much as half, but could not halt the fire from spreading. The overall movement of the fires was toward the south side of the tower. By 9:15 a.m., the fires on the 97th floor had intensified and filled most of the floor. Large fires had erupted on the east sides of the 92nd and 96th floors.

Seventy-five minutes after the impact, approaching 10:00 a.m., the fire on the 97th floor had begun to burn itself out, but the fire on the 94th floor had intensified and filled much of the north half of the floor (Figure 2–7). Starting about 9:30 a.m., there were vigorous fires on nearly the full perimeter of the 98th floor. There was still almost no burning on the 99th floor or above.



Note: Color coding—white, no fire; yellow, spot fire; red, fire visible inside; orange, external flaming.

**Figure 2–7. Representation of exterior views of the fires on the four faces of WTC 1 from about 9:38 a.m. to 9:58 a.m.**

The hot smoke from the fires now filled nearly all the upper part of the tenant space on the impact floors. Aside from isolated areas, perhaps protected by surviving gypsum walls, the cooler parts of this upper layer were at about 500 °C, and in the vicinity of the active fires, the upper layer air temperatures reached 1,000 °C. The aircraft fragments had broken through the core walls on the 94th through the 97th floors, and temperatures in the upper layers there were similar to those in the tenant spaces.

The perimeter columns, floors, and core columns were immersed in these hot gases and began to weaken. Where the insulation was dislodged, the temperature of the steel rose rapidly, in contrast to steel members where insulation was intact (Figure 2–8). The heaviest core columns with damaged insulation heated slowly, as the absorbed heat was dissipated through their massive cross sections. The temperatures of the lighter columns and the floor slabs rose more quickly, and those of the stripped trusses even more so.



**Figure 2–8. Steel surface temperatures on the bottom chords of fire-exposed trusses, uninsulated and insulated with ¾ in. of BLAZE-SHIELD DC/F.**

As a steel column is heated, its ability to support gravity loads and resist lateral loads decreases. At temperatures of about 300 °C, steel loses about 20 percent of its yield strength (Figure 2–9). Under modest loads, steel is *elastic*, that is, it can compress, or shorten, but will recover when loads are removed. As the load increases, the steel becomes *plastic*, and the shortening is unrecoverable. At still higher loads, the column buckles. At temperatures above 500 °C, the steel further weakens, the loss of strength and stiffness become significant, and the column's ability to carry its share of the building loads decreases. It shortens due to a combination of plastic deformation and an additional, time-dependent deformation called *creep* that can increase column shortening and hasten buckling. Figure 2–10 indicates the rates at which structural steel could have been heated by the WTC fires and the effect of the thermal insulation in slowing the heating process.[6]

> Structural steels do not need to melt to lose strength. Their melting points are about 1,600 °C, well above the 1,100 °C typical peak value reached by fires of common building combustibles.

At this point, the core of WTC 1 could be imagined to be in three sections. There was a bottom section below the impact floors that could be thought of as a strong, rigid box, structurally undamaged and at almost normal temperature. There was a top section above the impact and fire floors that was also a heavy, rigid box. In the middle was the third section, partially damaged by the aircraft and weakened by heat from the fires. The core of the top section tried to move downward, but was held up by the hat truss. The hat truss, in turn redistributed the load to the perimeter columns.

---

[6] Chapter 6 contains an explanation of how these temperature profiles were developed.



**Figure 2–9. Temperature dependence of yield strength of structural steel as a fraction of the value at room temperature.**



**Note:** The red data are for structural steel components without insulation; the blue data are for steel components that are still insulated.

**Figure 2–10. Simulated temperatures of two adjacent trusses (left) and two adjacent perimeter columns (right) exposed to the fires in WTC 1.**

Simultaneously, the fires were creating another problem for the tower. The floors of the 93rd through the 97th stories were being heated both by the hot gases from below and by thermal radiation from the fires on the floor above (Figure 2–11). On the south side of the building, where the fires were heating the long-span trusses whose SFRM had been dislodged, the floors began to sag. In so doing, they began pulling inward on their connections to the south face and to the core columns. Pull-in forces due to the sagging floors did not fail the floor connections in most areas.



**Top surface**       **Bottom surface**

**Figure 2–11. Temperature contours (°C) on the top and bottom faces of the concrete slab (96th floor, WTC 1) at 100 min after impact. A portion of the concrete slab on the north face (top) was damaged by the impact of the aircraft.**

Meanwhile, the occupants from below the impact floors were moving steadily down the stairs at roughly a floor per minute. Although they encountered firefighters climbing upward, this did not slow the downward progress much. Within 75 min of the impact, 90 percent of the people who would survive had left WTC 1. At 9:37 a.m., a Port Authority official instructed all units to direct the evacuees over the bridge on West Street to the Financial Center. However, this change in evacuation route actually began with the collapse of WTC 2.

Conditions on floors 92 and above continued to deteriorate. The presence of the fires and the resulting high smoke and radiant heat levels made the 92nd floor through the 99th floor uninhabitable except in small areas. Above the impact zone, there were only seven calls to 9-1-1 between 9:03 a.m. and 9:10 a.m.; and then, more than a half hour later, three last calls from floors 104 and 105 between 9:43 a.m. and 9:57 a.m. More people jumped through windows they broke or that had been broken by the fires.

By 9:15 a.m., 30 FDNY units had signaled their arrival, and by 9:59 a.m., the number had grown to 74. They had been told to stop short of the site because of the large number of ambulances already there and the debris falling from the buildings. Many of the firefighters proceeded into WTC 1. Once inside, they found that only one of the 99 upward elevators was working, one that went as far as the 16th floor. Most of the firefighters then proceeded to ascend the three stairways, intending to help evacuate the occupants, cutting paths through the fires as necessary. Because the firefighters were carrying as much as a hundred pounds of bulky firefighting gear, their progress was slow and was impeded by the flow of evacuees coming down the stairs. A few reached as high as floors in the 40s and 50s.

> Since the Command Boards were destroyed in the collapse, it is unknown just how many firefighters went into WTC 1, when they went in, or, in most cases, what level they reached.

## 2.8    9:58:59 A.M. EDT

With no warning that could be discerned in WTC 1, WTC 2 collapsed. The shudder as the more than 250,000 tons of steel, concrete, and furnishings hit the ground was felt well beyond the site. Seismic sensors located 100 miles away recorded the time and intensity of the event.

The gigantic concussion was felt by some of the nearly 800 people still in the stairwells in WTC 1. The evacuation rate slowed to half its prior level as a new cloud of dust, smoke, and debris filled the Concourse and the stairwells, and the lights went out. Higher up, no more calls to 9-1-1 originated from above the 91st floor.

At 10 a.m., NYPD and FDNY ordered all emergency responders out of WTC 1 and away from the WTC site.

## 2.9    9:59 A.M. TO 10:28 A.M. EDT

For the next half hour, the last 690 of the eventual survivors worked their way down the last flights of stairs, across West Street to the west and across Vesey Street to the north and to safety. By 10:28 a.m., all but 107 of the roughly 7,500 people who had been below the impact floors were able to escape.

Having heard over their radios the orders that they should evacuate, some of the responders inside the tower headed down the stairwells and out of the building, telling their comrades on the way. Others did not, having not received the message, having climbed too high to now get out in time, or continuing on the missions to help others still in the building.

> At 10:06 a.m., an NYPD aviation unit advised that WTC 1 would come down and that all emergency vehicles should be moved away from it. At 10:20 a.m., observers in NYPD helicopters said that the top of the building was leaning; and at 10:21 a.m., they said that WTC 1 was buckling on the southwest corner and leaning to the south.

A pressure pulse generated by the collapse of WTC 2 appeared to intensify the fires in WTC 1. Within 4 s of the collapse of WTC 2, flames burst from the south side windows of the 98th floor. The fires on the north faces of the 92nd, 94th, and 96th floors brightened noticeably. Flames near the south end of the east face of the 92nd and 96th floors also flared. The fires on the east and south faces of the 98th floor already extended out the windows. Those in the WTC 1 stairwells felt a gush of wind.

At 10:01 a.m., flames began coming out of the south side of the west face of the 104th floor, three floors higher than any floor where fire had been previously observed and five floors above the highest floor with a major fire. After a rapid growth period, this fire burned intensely up to the time the tower collapsed.

By 10:18 a.m., a substantial pressure pulse inside the building ejected jets of smoke from the 92nd and 94th through 98th floors of the north faces and the 94th and 98th floors of the west face. Fires raged on the south side of the 96th through 99th floors.

The sagging of the floors had increased. Although the floors on the north side of the tower had sagged first, they contracted due to cooling when the fires moved toward the south. Now, the south side floors had sagged to the point where the south perimeter columns bowed inward (Figure 2–12). By 10:23 a.m., the south exterior wall had bowed inward as much as 55 in.



**Note:** Enhanced by NIST.

**Figure 2–12. South face of WTC 1 at 10:23 a.m., showing inward buckling (in inches) of perimeter columns.**

The tower was being overwhelmed. Three of the four major structural systems—the core, the floors, and the perimeter walls—were weakening. The south wall became unstable and tried to transfer its remaining load to the weakened core via the hat truss and to adjacent perimeter columns via the spandrels. The entire section of the building above the impact zone began tilting as a rigid block toward the south. The upper section of the building then collapsed onto the floors below. Within 12 s, the collapse of WTC 1 had left nothing but rubble.

## 2.10    THE OUTCOME

Seven major factors led to the collapse of WTC 1:

- Structural damage from the aircraft impact;

- Large amount of jet fuel sprayed into the building interior, that ignited widespread fires over several floors;

- Dislodging of SFRM from structural members due to the aircraft impact, that enabled rapid heating of the unprotected structural steel;

- Open paths for fire spread resulting from the open plan of the impact floors and the breaking of partition walls by the impact debris;

- Weakened core columns that increased the load on the perimeter walls;

- Sagging of the south floors, that led to pull-in forces on the perimeter columns; and

- Bowed south perimeter columns that had a reduced capacity to carry loads.

After the building withstood the initial aircraft damage, the timing of the collapse was largely determined by the time it took for the fires to weaken the core and to reach the south side of the building and weaken the columns and floor assemblies there.

There were no survivors among the 1,355 people who were on or above the 92nd floor. The aircraft had destroyed all egress paths downward, and roof rescue was impossible.

Of the roughly 7,545 building occupants who started that morning below the 92nd floor, all but 107 escaped the building. Those left behind were trapped by debris, awaiting assistance, helping others, or were just too late in starting their egress. For the most part, the evacuation was steady and orderly.

> Had the building been significantly more than one-third to one-half occupied, the casualties would likely have been far higher, since the exiting population would have exceeded the capacity of the stairwells to evacuate them in the time available.

Six percent (almost 500) of the survivors from WTC 1 had a limitation that impaired their ability to evacuate. Many of these were able to evacuate, often with assistance; others were less fortunate. About 40 to 60 mobility-impaired occupants were found on the 12th floor, where they had been placed in an attempt to clear the stairways. Just before the collapse of WTC 1, emergency responders were assisting about 20 of these people down the stairwell. It remains unclear how many of these people survived.

Those emergency responders who entered the building and the emergency personnel who were already in the building were helpful in assisting the evacuation of those below the impact floors. However, there was insufficient time and no path to reach any survivors on the impact floors and above. Any attempts to mitigate the fires would have been fruitless due to the lack of water supply and the difficulty in reaching the fire floors within the time interval before the building collapse. It is not known precisely how many

emergency responders entered the building nor how many of the 421 responder casualties occurred in WTC 1. NIST estimated that approximately 160 FDNY fatalities occurred outside the WTC towers.

This page intentionally left blank.

# Chapter 3
# THE ACCOUNT OF WORLD TRADE CENTER 2

## 3.1    8:46:30 A.M. EDT

The nature of the events leading to the collapse of World Trade Center (WTC) 2 had a number of important features distinct from those of WTC 1. Those contrasts led to a larger overall fraction of the occupants surviving despite the building collapsing in a shorter period. As was the case with WTC 1, what follows is the result of an extensive, state-of-the-art reconstruction of the events that accompanied and followed the aircraft impact. Numerous facts and data were obtained, then combined with validated computer modeling to produce an account that is believed to be close to what actually occurred. The reader should again keep in mind that the building and the records kept within it were destroyed and the remains of the towers were disposed of before this Investigation began. As a result, there are some facts that could not be discerned, and there are uncertainties in this accounting. Nonetheless, the National Institute of Standards and Technology (NIST) was able to gather sufficient evidence and documentation to conduct a full investigation upon which to reach firm findings and recommendations. The reconstruction effort, the uncertainties, the assumptions made, and the testing of these assumptions are documented in Part II of this report.

The ordeal for the occupants of WTC 2 began at the same time as it did for those in WTC 1, when American Airlines (AA) Flight 11 struck WTC 1 at 8:46 a.m. Nearly all of the roughly 8,600 people in WTC 2 were well aware that something serious had occurred in the other tower. Half the people heard the terrible sound of the aircraft hitting WTC 1, just a few hundred feet away. One-fifth of the people saw the flames, smoke, or the debris ejected from the south side of WTC 1, over 10 percent felt WTC 2 moving, and another fifth in WTC 2 were quickly alerted to the seriousness of what had happened by co-workers, phone calls, or the morning news. Over half believed they were personally at risk.

Many began talking to each other, gathering personal items, and helping others. Fortunately, they began to get out of the building. Within 5 min, half the people had left their floor, and that fraction grew rapidly. About one-sixth used the elevators, with more of these people starting on the higher floors. The remainder divided themselves evenly among the three stairways. NIST estimated that approximately 3,000 people escaped because of the actions they took in the 16 min following the aircraft impact on WTC 1, especially their use of the elevators.

At 9:00 a.m. came the first building-wide public address system announcement that there was a fire in WTC 1, that WTC 2 was secure, and that people should return to their offices. This added confusion to an already tense situation, a situation that became even more turbulent when at 9:02 a.m., a contradictory announcement said that people may wish to start an orderly evacuation if conditions on their floor warranted.

## 3.2      9:02:59 A.M. EDT

Sixteen and a half minutes after the first impact, five hijackers flew United Airlines (UA) Flight 175, with 9 crew and 51 passengers, into WTC 2 at about 540 mph, about 100 mph faster than AA Flight 11 (Figure 3–1). UA 175 was also a Boeing 767-200ER and had also left Boston, bound for Los Angeles. It flew into WTC 2 carrying about 9,100 gal (62,000 lb) of jet fuel, evenly distributed between the inboard portions of the left and right wing tanks. The cargo bay held about 9 tons of luggage, mail, electrical equipment, and food. Combining this with the combustible cabin materials and luggage, the plane brought about 14 tons of solid combustibles into the tower with it.



**Figure 3–1.  Imminent impact of United Airlines Flight 175 with WTC 2.**

## 3.3      THE IMMEDIATE DAMAGE

The aircraft completely disappeared into the building in a fifth of a second. In response to the force of the collision, the top of the tower swayed 27 in. to the north, taking 2.6 s to reach the maximum displacement. UA Flight 175 was heading approximately 15 degrees east of Plan North[7] when it hit the south face of WTC 2 about 23 ft east of the center. The off-center impact twisted the upper part of the tower in a counterclockwise movement. The building vibrated in the north-south direction, along with a twisting motion, with the amplitude decreasing steadily with each oscillation.

The center of the nose of the plane struck at the 81st floor slab. The plane was banked 38 degrees to the left (right wing upward) and was heading slightly (6 degrees) downward from the horizontal. Since the

---

[7] Plan North was approximately 29 degrees clockwise from True North.

bank angle was steeper than that of AA Flight 11, this entry wound stretched over nine floors, from 77 to 85, rather than eight in WTC 1 (Figure 3–2). The occupancy of those floors is shown in Table 3–1.



Damage in shaded area cannot be accurately determined.

**Figure 3–2. South face damage of WTC 2 with key aircraft component locations marked.**

**Table 3–1. Tenants on impact floors in WTC 2.**

| Floors | Tenant | Business |
|---|---|---|
| 85 | Harris Beach | Legal |
| 84 | Eurobrokers | Brokerage |
| 83 | Mitsui; IQ | Banking; Financial Software |
| 79 through 82 | Fuji Bank | Banking |
| 77 and 78 | Baseline | Investment Services |

The bulk of the impact damage was confined to six floors. Figure 3–3 shows the combined damage. Floors 77, 84, and 85 were struck only by the outer extent of the wings. Empty of fuel, the light framing

and aluminum sheet of the wing did little damage to the building structure or the SFRM on the columns and trusses on these floors. There were 433 broken windows on the north, east, and south facades.



**Figure 3–3.  Simulation of aircraft impact damage to the 78th through 83rd floors in WTC 2.**

The middle of the left wing hit the 78th floor, severing nine perimeter columns and breaking 19 windows on the south face. The SFRM was stripped from the floor trusses over the same width as the building core. The stripping of insulation from the trusses continued inward across the tenant space and about two thirds of the way into the core. There was no direct core column damage from the debris on this floor. However, the southeast corner core column was so damaged on the 80th floor that it broke at its splices on the 77th and 83rd floors.

There was heavier damage to the 79th floor. The left engine and the inboard section of the left wing shattered a 25 ft wide section of the center of the floor slab all the way to the core of the building and severed 15 perimeter columns. Reaching the building core, the debris severed nine columns, heavily damaged another, and abraded the SFRM from the eastern two thirds of the columns and trusses all the way to the north end of the core.

The damage was most severe on the 80th and 81st floors, hit directly by the fuselage. On the lower floor, a chunk of the floor slab was broken, just above the affected piece of the 79th floor. In addition, a 70 ft deep strip along the east side of the core floor was crushed. The north side floor slab sagged along its eastern end. Ten of the perimeter columns severed on the 79th floor were displaced here also. Within the building core, ten columns were severed, including many that were severed on the 79th floor. The SFRM was stripped not only from the eastern two thirds of the core structural elements, nearly to the north wall, but also from most of the trusses on the east tenant space, all the way to the north façade.

On the 81st floor, the fuselage pulverized a section of the floor 40 ft wide that extended into the southeast corner of the core. The SFRM and gypsum fire protection on the full depth of the east side of the core and in the entire east side of the tenant space was stripped. The structural damage to the core columns was limited to near the southeast corner, but as mentioned above, the impulses felt here caused damage to the key corner column all the way down to the 78th floor. The right engine passed all the way through the 81st floor, exited from the northeast corner, and damaged the roof of a building on Church Street, before coming to rest some 1,500 ft northeast of WTC 2 near the corner of Murray and Church Streets. The right landing gear assembly passed through the 81st floor at the east side of the north face and landed near the engine on the roof of a building on Park Place. (See Figure 1–1 for the street locations relative to the towers.)

The right engine hit the 82nd floor spandrels about 50 ft from the east edge of the building, crushing part of the 82nd floor slab. Along with the inboard section of the right wing, it severed eight to nine perimeter columns, including some to the east of those severed on the lower floors. The wing caused truss damage up to the southeast corner of the core and severed five columns. As on the 81st floor, the fire protection on the east side of the tenant space and the east side of the core was dislodged.

The 83rd floor caught the middle of the starboard wing. The east side floor slab appeared to be dislodged and sagged at least half of the way into the building.

The result of the core column damage was that the building core leaned slightly to the southeast above the impact zone. The tendency of the core to lean was resisted by the floors and the hat truss.

The direct impact of the aircraft was over in about 0.6 s. The structural and insulation damage, summed over all floors, was estimated to be:

- 33 exterior columns severed, 1 heavily damaged.

- 10 core columns severed, 1 heavily damaged.

- 39 of 47 core columns stripped of insulation on one or more floors.

- Insulation stripped from trusses covering 80,000 ft$^2$ of floor area

The tower swayed more than one foot back and forth in each direction on the impact floors, about one-third the sway under the high winds for which the building was designed. Nonetheless, just like WTC 1 across the Plaza, *WTC 2 absorbed the aircraft strike and remained standing.*

By 9:03 a.m., most of the people in WTC 2 had already left their usual work floors. Nearly 40 percent of all the occupants had left the building, (Table 3–2), and 90 percent of those who would survive had begun their evacuation. Many of those still on the east side of the impact floors were likely killed or seriously injured by the impact. The same was true for many of those on the 78th floor skylobby, who were deciding on a course of action, waiting for the express elevators to transport them to the ground floor, or attempting to return to their offices. Those on the west side of the building were less seriously affected. In calls to 9-1-1, they reported fallen ceiling tiles, collapsed walls, jet fuel, heat, smoke, and fire.

**Table 3–2. Location of occupants of WTC 2.**

| Time | Escaped | Lobby to 76th Floor | 77th to 110th Floor |
|------|---------|---------------------|---------------------|
| 8:46 | 0       | 5,700               | 2,900               |
| 9:03 | 3,200   | 4,800               | 637                 |
| 9:36 | 6,950   | 1,050               | 619                 |
| 9:59 | 8,000   | 11                  | 619                 |

Note: The numbers in the rows do not add to the estimated total of 8,600 occupants due to rounding in the less certain values.

This aircraft had also severed the pipes that fed the automatic sprinklers and destroyed all elevator service to the impact floors. But, unlike AA Flight 11, the off-center strike of UA Flight 175 had left one of the three stairways passable, Stairway A on the north side of the building core.

> Stairwell A remained passable because it was well west of the aircraft strike center and partially protected by elevator machinery and the long dimension of the building core.

When the aircraft struck WTC 2, emergency responders had already been dispatched to the WTC site, and the initial surge of emergency responder radio had subsided to a level approximately three times that of normal operations. However, the radio traffic volume was still at a level where approximately one-third to one-half of the radio communications was not understandable.

## 3.4    THE JET FUEL

Within about one half of a second, dust and debris flew out of windows on the east and north faces. Several small fireballs of atomized jet fuel burst from windows on the east face of the 81st and 82nd floors, coalescing into a single, large fireball that spanned the entire face. A tenth of a second later, fire appeared in the dust clouds ejected from the south face of the 79th, 81st, and 82nd floors. Almost simultaneously, three fireballs came from the east side of the north face. The largest came from the 80th through 82nd floors. A second, somewhat smaller one came from the same floors on the northeast corner of the building. The smallest emerged from the 79th floor. No dust or fireballs came from the west face.

As in WTC 1, less than 15 percent of the jet fuel burned in the spray cloud inside the building. Roughly 10 percent to 25 percent was consumed in the fireballs outside the building. Thus, well over half of the jet fuel remained after the initial fireballs.

The rapid burning of the jet fuel inside the building created an overpressure that was estimated at 2 psi to 3 psi for 0.5 s to 2 s. For a window and frame of over 10 $ft^2$, this amounts to over 3,000 pounds of force, more than enough to break windows. Photographs of the north and east faces appeared to show hanging floor slabs where the fireballs had been ejected from the building. Based on the failure of the truss seat connections, NIST estimated that the static capacity of an undamaged floor was 4.8 psi against uplift pressure and 4.4 psi against downward pressure over the entire floor. It is not unreasonable that a combination of physical damage from the impact and overpressure from the fireballs caused the partial collapse of these floor slabs.

## 3.5    9:03 A.M. TO 9:36 A.M. EDT

The fireballs burned for 10 s, extending almost 200 ft out from the north, east, and south faces. Having consumed the aerosol fuel, the flames then receded.

For the next half hour, small fires were burning in and near the aircraft impact cavity on the south side of the building. There were vigorous fires on the east side of the 80th through 83rd floors (Figure 3–4), especially on the northeast end of the 81st and 82nd floors, where the aircraft had bulldozed the office desks and chairs and added its own combustibles. In addition to the ample supply of fuel, these fires had access to plenty of air, as numerous windows on the east face had been blown out by the impact or fireball. They would continue to burn as long as the building stood.



Note: Color coding—white, no fire; yellow, spot fire; red, fire visible inside; orange, external flaming.

**Figure 3–4. Representation of exterior views of the fires on the four faces of WTC 2 at about 9:20 a.m.**

Between 9:30 a.m. and 9:34 a.m., there were several large bursts of smoke from the 79th and 80th floors of the north face, possibly resulting from the ignition of pools of jet fuel that had settled there, or from shifting of dislodged floor slabs elsewhere.

Dire structural changes were occurring in the building interior. Core columns, including the massive southeast corner column, had been severed by the aircraft. The loads from these columns had been redistributed to other, intact core columns and to the east exterior wall. The core leaned to the south and east, restrained from further movement by the east and south walls through the floors and the hat truss.

The fires were weakening the structure in a manner different from WTC 1. First, the severed core columns in the southeast corner led to the failure of some column splices to the hat truss. Nonetheless, the hat truss continued to transfer loads from the core to the perimeter walls. Second, the overall load redistribution increased the loads on the east wall. Third, the increasing temperatures over time on the long-span floors on the east side had led to significant sagging on the 79th through 83rd floors, resulting in an inward pull force. Fourth, within 18 min of the aircraft impact, there was inward bowing of the east perimeter columns as a result of the floors sagging. As the exposure time to the high temperatures lengthened, these pull-in forces from the sagging floors increased the inward bowing of the east perimeter columns.

Meanwhile, people continued their evacuation. By 9:36 a.m., almost 7,000 of the 8,600 occupants had left the building. From the impact floors and above, 18 occupants had discovered that the hot, smoke-filled, debris-laden Stairway A was not fully blocked and had made their way to survival. It is not known how many more of the 619 other people who had been on or above the impact floors became aware of this, but none made it out of the building. There are no records of information regarding this escape route having been collected and transmitted to others who might have been able to use it.

The PAPD, NYPD, and FDNY centers were now being inundated with calls from the two buildings. In the confusion, some of the callers did not identify which building they were in. At 9:12 a.m., PAPD was notified that the WTC 2 floor warden phones were not working. Other calls alerted them to trapped and injured people. At 9:18 a.m., FDNY reported that they had a single elevator working to floor 40. A simultaneous call indicated that FDNY was relocating its command post across West Street. At 9:30 a.m., EMS set up a triage desk in the lobby of WTC 2.

## 3.6    9:36 A.M. TO 9:58 A.M. EDT

By 9:58 a.m., all but eleven of the occupants who had been below the impact floors had left the building and crossed the street to safety.

The fires continued to burn in the east half of the building.

At 9:55 a.m., firefighters communicated that they had reached floor 55 of WTC 2, one of the few calls for which a record survived indicating how high the responders had reached. Before WTC 2 collapsed, firefighters had reached the 78th floor by using the single functioning elevator to the 40th floor and then climbing the stairs.

The physical condition of the tower had deteriorated seriously. The inward bowing of columns on the east wall spread along the east face. The east wall lost its ability to support gravity loads, and, consequently, redistributed the loads to the weakened core through the hat truss and to the adjacent north and south walls through the spandrels. But the loads could not be supported by the weakened structure, and the entire section of the building above the impact zone began tilting as a rigid block to the east and south (Figure 3–5). Column failure continued from the east wall around the corners to the north and south faces. The top of the building continued to tilt to the east and south, as, at 9:58:59 a.m., WTC 2 began to collapse.



© 2001 Mark Stetler

**Figure 3–5. Photograph of WTC 2 tilting to the southeast at the onset of collapse.**

## 3.7    THE OUTCOME

Seven factors led to the collapse of WTC 2:

- Direct structural damage from the aircraft impact, which included more severe damage to the core columns than in WTC 1;

- Jet fuel sprayed into the building interior, that ignited widespread fires over several floors;

- Dislodging of SFRM from structural members due to the aircraft impact and aircraft and building debris, which enabled rapid heating of the unprotected structural steel;

- Sustained fires on the east side of the tower and an ample air supply;

- Weakened core columns that increased the loads on the perimeter walls;

- Sagging of the east floors, that led to pull-in forces on the east perimeter columns; and

- Bowed east perimeter columns that had a reduced capacity to carry loads.

After the building withstood the initial aircraft damage, the timing of the collapse was largely determined by the time for the fires to weaken the perimeter columns and floors on the east and south sides of the building. That the aircraft impact damage to the core was more severe in WTC 2 than in WTC 1 contributed to the shorter time to collapse.

The loss of life in WTC 2 was significantly reduced by the prompt start of evacuation activity before the tower was hit by the aircraft. Only a quarter of those initially on or above the impact floors died when the building collapsed, as contrasted with 100 percent in WTC 1. Eighteen people on those upper floors found that one stairwell was passable in time to evacuate. Whether others found this escape route is unknown.

> As with WTC 1, had the building been more than one-third occupied, the casualties would have been far higher as the population would have exceeded the capacity of the stairwells to evacuate them in the time available.

Of the roughly 6,000 people who started the morning below the 77th floor, all but 11 evacuated the building, indicating sufficiently efficient movement within the three stairwells within the time available.

Even more than in WTC 1, those emergency responders who entered WTC 2 and the emergency personnel who were already in the building were helpful in assisting the evacuation of those below the impact floors. However, there was insufficient time to reach any survivors on the impact floors and above. Any attempts to mitigate the fires were fruitless due to the lack of water supply and the difficulty in reaching the fire floors within the time interval before the building collapse. It is not known precisely how many emergency responders entered the building nor how many of the 421 emergency responder casualties occurred in WTC 2.

# Chapter 4
# THE TOLL

By sunset on September 11, 2001, all seven buildings on the World Trade Center (WTC) site lay in ruins (Figure 4–1). Table 4–1 compiles the likely locations of the decedents.



**Source:** National Oceanographic and Atmospheric Administration.

**Figure 4–1.  The WTC site on September 17, 2001.**

**Table 4–1.  Likely locations of WTC decedents at time of impact.**

| Location[a] | Number |
|---|---:|
| **WTC 1 Occupants (Total)** | **1,462** |
| At or Above the Impact Floors | 1,355 |
| Below the Impact Floors | 107 |
| **WTC 2 Occupants (Total)** | **630** |
| At or Above the Impact Floors | 619 |
| Below the Impact Floors | 11 |
| **Confirmed Below Impact Zone in WTC 1 or WTC 2** | **30[b]** |
| **Unknown Location Inside WTC 1 or WTC 2** | **24[c]** |
| **Emergency Responders (Total)** | **421[d]** |
| FDNY | 343 |
| NYPD | 23 |
| PAPD | 37 |
| Hospital/Paramedic | 7 |
| Federal | 2 |
| Volunteer Responders | 9 |
| **Bystander/Nearby Building Occupant** | **18** |
| **American Airlines Flight 11** | **87[e]** |
| **United Airlines Flight 175** | **60[e]** |
| **No Information** | **17** |
| **Total** | **2,749** |

a. Where possible, NIST used eyewitness accounts to place individuals.  Where no specific accounts existed, NIST used employer and floor information to place individuals.

b. These individuals were typically security guards and fire safety staff who were observed performing activities below the floors of impact after the aircrafts struck.

c. These 24 individuals were largely performing maintenance, janitorial, delivery, safety, or security functions.

d. Emergency responders were defined to be people who arrived at the site from another location.  Thus, security staff and Port Authority staff (different from PA Police Officers) were not defined as emergency responders.

e. Does not include the five hijackers per aircraft.

# PART II: RECONSTRUCTING THE DISASTER

This page intentionally left blank.

# Chapter 5
# THE DESIGN AND CONSTRUCTION OF THE TOWERS

## 5.1    BUILDING AND FIRE CODES

Codes for the design, construction, operation, and maintenance of buildings are the blueprints by which a society manifests its intent to provide public safety and welfare. They incorporate the knowledge, experience, procedures and practices of the applicable engineering disciplines, the values of the contemporary society, the experiences from prior successes and failures, and knowledge of the commercial products, services, and technologies available for the tasks at hand.

In the United States, building and safety regulations of state and local jurisdictions are most frequently based on national "model" building codes (model codes). Developed under the auspices of private sector organizations in an open process, the model codes include minimum requirements for public health, safety, and welfare. The model codes are traditionally organized into volumes according to the official responsible for their enforcement and include a building code, fire code, plumbing code, electrical code, mechanical code, etc. The model codes adopt by reference voluntary consensus standards developed by a large number of private sector standards development organizations. These standards include measurement methods; calculation methods; data sets; and procedures and practices for design, construction, operation, and maintenance.

The model codes and referenced standards do not become law until they are adopted legislatively or administratively by a jurisdiction empowered to enforce regulations, for example, a state or city. These jurisdictions may modify specific provisions of the models codes and referenced standards to suit local conditions or traditional practices. Once legally adopted, the totality of the modified model codes and standards are referred to as building regulations.

Proposals to modify the model codes, offered by individuals or organizations, are discussed in open forums before being accepted or rejected by a voting process. Localities adopting model codes update their versions periodically as well, but typically not on the same schedule. To a lesser and decreasing extent, some jurisdictions have generated their own building codes to reflect specialized local conditions and preferences. The Federal government's role in determining specific codes is minimal and not mandatory (except for federally owned, leased, regulated, or financially assisted properties).

There are also key stakeholder groups that are responsible for or influence the practices used in the design, construction, operation, and maintenance of buildings in the United States through the code development process. These include organizations representing building owners and managers, real estate developers, contractors, architects, engineers, suppliers, and insurers. (Infrequently, members of the general public and building occupants participate in this process.) These groups also provide training, especially as it affects the ability to implement code provisions in practice, since lack of adequate training programs can limit the application of improved code provisions.

## 5.2      THE CODES AND THE TOWERS

### 5.2.1      The New York City Building Code

The New York City (NYC) Building Code was and is part of the Administrative Code of New York City.
Until recently, the various versions of the Code were not based on any model code, but rather were
written by local code development committees. However, there are many similarities between the
versions of the NYC Code and the model codes of the same time, since they all reflected accepted
practice.

The NYC Code has been amended from time to time by Local Laws to update safety requirements or to
incorporate technological advances. These Local Laws were enacted by the New York City Council. To
aid the implementation of and to clarify building code requirements, New York City issued mandatory
"rules" that were typically initiated by City Government offices and issued under authority of the
Building Commissioner.

At the time the WTC project began in the early 1960s, the 1938 NYC Building Code was in effect. In
1960, reflecting growing dissatisfaction with the failure of the Code to keep pace with changes that had
occurred in the building industry, the Building Commissioner requested the New York Building Congress
to form a working committee to study the problem. On December 6, 1968, Local Law 76 repealed the
1938 code and replaced it with the 1968 code. As is the general custom with changes to building codes,
the new provisions did not apply to buildings approved under the prior code, provided they did not
represent a danger to public safety and welfare, or until they underwent a major renovation or change in
primary use.

The 1968 NYC Building Code also included "Reference Standards." These included standard test
methods and design standards published by standards development organizations. Some of these
Reference Standards included modifications to the published standards, as well as stand-alone standards
developed by New York City.

Through 2002, 79 Local Laws had been adopted that modified the 1968 Building Code. The major Local
Law affecting the structural design of buildings dealt with seismic provisions. Five of the Local Laws
had provisions that pertained to fire protection and life safety that were of interest to the WTC
Investigation:

- Local Law 5 (1973) added, among other specifications, requirements for:

    – Compartmentation (subdivision) within upper story, unsprinklered, large floor areas. Its
       provisions applied retroactively to existing office buildings.

    – Signs regarding the use of elevators and stairs, also retroactive.

    – A fire alarm system for buildings more than 100 ft in height.

- Local Law 55 (1976) added a requirement for inspection of all sprayed fire protection,
   effective immediately but not retroactive.

- Local Law 33 (1978) added a requirement for trained fire wardens on each floor.

- Local Law 86 (1979), among other provisions, required full compliance with Local Law 5 by February 7, 1988, and exempted fully sprinklered buildings from compartmentation requirements.

- Local Law 16 (1984) added requirements for sprinklers in new and existing buildings taller than 100 ft. Since Local Law 5 only required compartmentation of non-sprinklered spaces, this negated the compartmentation requirements from Local Law 5.

The World Trade Center (WTC) was located in Manhattan and would normally have been designed and constructed according to the NYC Building Code of 1938. However, the WTC was constructed by The Port Authority of New York and New Jersey (The Port Authority or PANYNJ) on land that it owned. As an interstate agency established under a clause of the United States Constitution permitting compacts between states, The Port Authority's construction projects were not required to comply with any building code. Nonetheless, The Port Authority instructed its consultants to design the two towers to comply with the 1938 NYC Code. In 1965, The Port Authority directed the architect and consulting engineers to revise their designs for the towers to comply with the second and third drafts of what would become the 1968 NYC Code. The rationale for this step was that the new Code allowed the use of advanced techniques in the design of the WTC, as well as more lenient provisions regarding exit stairs and the reduced fire ratings. To reaffirm a "long standing policy" of The Port Authority that its facilities meet or exceed NYC Building Code requirements, a formal memorandum of understanding between The Port Authority and the New York City Department of Buildings was established after the bombing in 1993.

## 5.2.2    Pertinent Construction Provisions

To gain perspective on the conditions under which the WTC towers were constructed, the rationale for the design, and the building structures themselves, the National Institute of Standards and Technology (NIST) and its contractors reviewed tens of thousands of pages of documents provided by The Port Authority and its contractors and consultants, Silverstein Properties and its contractors and consultants, the Fire Department of the City of New York, the NYC Police Department, the NYC Law Department, the NYC Department of Design and Construction, the NYC Department of Buildings, the NYC Office of Emergency Management, the manufacturers and fabricators of the building components, the companies that insured the WTC towers, and the building tenants.

NIST deemed it important to understand how the provisions under which the WTC was constructed and maintained compared to equivalent provisions in place elsewhere in the United States at that time. The Investigation selected three codes for comparison:

- The 1964 New York State (NYS) Building Code, which governed construction outside the New York City limits

- The 1965 Building Officials and Code Administrators (BOCA) Basic Building Code, a model building code typically adopted by local jurisdictions in the northeastern region of the United States

- The 1967 Municipal Code of Chicago, under which the Sears Tower (110 stories) and the John Hancock Center (100 stories) were built

For the most part, the provisions in the various codes were similar, if not identical, indicating that there was a common understanding of the essentials of building safety and that the codes were at similar stages of evolution:

- There were only modest differences among the codes in the provisions for gravity loads.

- All three of the contemporaneous building codes had provisions for wind loads that were less stringent than those used for the tower design.

- None of the codes had provisions for design against progressive collapse.

- For alterations or additions to a building, there were criteria to determine whether the whole building or only the alterations needed to comply with the current code requirements. The "trigger" was either the fraction of the building cost involved in the renovation or the fraction of the building dimensions. The 1968 NYC Building Code was slightly less conservative than the Chicago Code and the BOCA Code. The NYS Code required that any addition or alteration conform to the contemporary code.

- The 1968 NYC Building Code required inspection of sprayed fire protection, but did not specify if testing was required.

- Only the NYC Building Code contained provisions for bracing (lateral support to prevent buckling of columns and walls) and stresses associated with transverse deflections of structural members.

NIST examined the 2001 edition of the NYC Building Code to determine the extent to which Local Laws had modified the code provisions between the times of construction and collapse of the towers. The 2001 edition of the NYC Building Code was essentially the same as the 1968 edition, as amended by the intervening Local Laws.

### 5.2.3    Tenant Alteration Process

With hundreds of tenants, The Port Authority realized that many would want extensive modifications to their space, both before they moved in and during the course of their occupancy. In anticipation, The Port Authority:

- Set up a special office to review and approve plans, issue variances, and conduct inspections.

- Developed a formal tenant alteration process for any modifications to leased spaces in WTC 1 and WTC 2 to maintain structural integrity and fire safety. The *Tenant Construction Review Manual*, first issued in 1971, contained the technical criteria, standards, and review criteria for use in planning alterations (architectural, structural, mechanical, electrical, and fire protection). Alteration designs were to be completed by registered design professionals, and as-built drawings were to be submitted to The Port Authority. The 1968 NYC Building Code was referenced. The review manual was updated four times and supplemented, in 1998, by the *Architectural and Structural Design Guidelines, Specifications, and Standard Details*.

The interiors of the towers had been heavily modified over the years due to tenant turnover, same-tenant space usage changes, the addition of sprinklers, and asbestos abatement.

## 5.3    BUILDING DESIGN

### 5.3.1    Loads

The NYC Building Code specified minimum design values for both dead and live gravity loads and for lateral (wind) loads.

- Each tower was designed to support dead loads (its own weight) consistent with the provisions in the 1968 NYC Building Code. The dead loads included the weight of the structural system and loads associated with architectural, mechanical, plumbing, and electrical systems.

- Each tower was designed to support live loads (the combined weights of the people and the building contents) exceeding those specified in the 1968 NYC Building Code.

- The design wind loads used in the towers were higher than those required by the 1968 NYC Building Code and the three other codes identified earlier.

### 5.3.2    Aircraft Impact

The accidental 1945 collision of a B-25 aircraft with the Empire State Building sensitized designers of high-rise buildings to the potential hazards of such an event. However, building codes did not then, and do not currently, require that a building withstand the impact of a fuel-laden commercial jetliner. A Port Authority document indicated that the impact of a Boeing 707 aircraft flying at 600 mph was analyzed during the design stage of the WTC towers. However, the investigators were unable to locate any documentation of the criteria and method used in the impact analysis and were thus unable to verify the assertion that "…such collision would result in only local damage which could not cause collapse or substantial damage to the building and would not endanger the lives and safety of occupants not in the immediate area of impact."[8]  Since the ability for rigorous simulation of the aircraft impact and of the ensuing fires are recent developments and since the approach to structural modeling was developed for this Investigation, the technical capability available to The Port Authority and its consultants and contractors to perform such an analysis in the 1960s would have been quite limited.

### 5.3.3    Construction Classification and Fire Resistance Rating

Building codes classify building constructions into different "Types" or "Classes." The Class pertinent to the WTC towers was Class 1 (fire resistive). The 1938 NYC Building Code had no subdivisions of Class 1 construction, which required a 4 hour fire resistance rating for columns and a 3 hour rating for floors. The 1968 version of the Code subdivided Class 1 for office occupancies into 1A, with requirements identical to the 1938 Class 1, and 1B. Class 1B specified a 3 hour rating for columns and

---

[8] Letter with an attachment dated November 13, 2003, from John R. Dragonette (Retired Project Administrator, Physical Facilities Division, World Trade Department) to Saroj Bhol (Engineering Department, PANYNJ).

girders supporting more than one floor and a 2 hour rating for floors including beams. There were no height or area requirements that differentiated between Class 1A and Class 1B, and the towers could have been classified as either one. The Port Authority elected to provide the fire protection in the WTC towers with Class 1B standards.

Achieving a specified rating for a truss-supported floor using a sprayed fire-resistive material (SFRM) was an innovation at the time of the WTC design and construction. NIST was not able to find any evidence that there was a technical basis to relate SFRM thickness to a fire resistance rating, nor was there sufficient prior experience to establish such thickness requirements by analogy. NIST did find documentation that the Architect of Record and the Structural Engineer of Record had each written to The Port Authority, stating that the fire rating of the WTC floor system could not be determined without testing. NIST was unable to find any indication that such tests were performed nor any technical basis for the specification of the particular SFRM product selected or its application thickness.

The NYC Building Code required inspection at the time of application of the SFRM, to be conducted under the supervision of a building inspector or a licensed design professional who assumed responsibility for compliance. This inspection included verification of the thickness of the material, its density, and its adhesion, each using a specific ASTM test method. The Code contained a requirement that SFRM installed in areas where it was subject to mechanical damage be protected and maintained in a serviceable condition.

> There were no code requirements nor general practice by which sprayed fire-resistive material was to be inspected over the life of the building.

### 5.3.4    Compartmentation

Both the 1968 NYC Building Code and The Port Authority practice required partitions to separate tenant spaces from each other and from common spaces, such as the corridors that served the elevators, stairs, and other common spaces in the building core. These were intended to limit fire spread on a floor and to prevent the spread of a fire from one tenant space to that of another.

- The Port Authority specified partitions separating tenant spaces from exit access corridors to have a 2 hour rating. This allowed dead end hallways to extend to 100 ft (rather than 50 ft with 1 hour partitions), which permitted more flexibility in tenant layouts. Above the ceiling, penetrations for ducts or to allow for return airflow were fitted with rated fire dampers to preserve the fire rating. This 2 hour rated construction was not used in the original design, but was specified later by The Port Authority as tenant spaces were altered.

- For walls separating tenant spaces to achieve a 1 hour rating, they needed to continue through any concealed spaces below the floor and above the ceiling. The Port Authority chose to stop these demising walls at the bottom of the suspended ceiling and use 10 ft strips of 1 hour rated ceiling on either side of the partition. There was no precedent for this approach and, after a warning from the general contractor, the tenant alteration guidelines required that tenant partitions have a continuous fire barrier from top of floor to bottom of slab.

- There were no requirements in the 1968 NYC Building Code or in The Port Authority guidelines for partitions wholly within tenant spaces. As mentioned in Section 1.2.2, these

gypsum board walls generally ran from the floor slab to just above the suspended ceiling, although some extended to the slab above when the tenant desired additional sound attenuation. For these partitions to be fire rated, the ceiling would have had to be rated as well but were not required to be so.

- Enclosures for vertical shafts, including stairways and transfer corridors, elevator hoistways, and mechanical or utility shafts were required to be of 2 hour fire rated construction. These innovative walls are further described below.

There was a conflict regarding the number of partitions within a tenant space. On the one hand, the design of the WTC towers was intended to provide about 30,000 ft$^2$ per floor of nearly uninterrupted space and access to views of the Manhattan panorama. On the other hand, Local Law 5 dictated compartmentation into no more than 7,500 ft$^2$ areas for unsprinklered spaces. These areas could be increased to 15,000 ft$^2$ if protected by 2 hour fire resistive construction and smoke detectors. The compartmentation limit was removed when complete sprinkler protection was provided. Following a 1975 fire, The Port Authority began installing sprinklers at the time a new tenant moved in. By September 11, 2001, the installations had been completed throughout the towers, and, in general, the tenants on the impact floors had few internal partitions except for those surrounding conference rooms and executive offices.

Firestopping materials are used to fill gaps in walls and floors through which smoke and flames might pass. Such passage could negate the fire endurance value of the wall or floor. The 1968 NYC Building Code included comprehensive requirements identifying when and where firestopping was required. The 1964 New York State Building Code addressed the issue in less detail, and the Chicago Building Code had no requirements. The National Fire Protection Association (NFPA) Life Safety Code had firestopping requirements for exterior and interior partitions at floor levels, and did allow a trade-off for sprinklered concealed spaces. In the towers, unlike many buildings, the exterior wall was connected with the floors without gaps.

## 5.3.5    Egress Provisions

The primary egress system for the office spaces was the three stairways located in the building core. There were four main requirements for these stairways: number, width (including separate width requirements for the doors), separation of the doors to the stairways, and travel distance to the stairway doors.

The number of stairways and the width of the doors resulted from the implementation of the 1968 edition of the NYC Building Code, whose provisions were less restrictive than those in the 1938 edition. The 1968 code eliminated a fire tower (an enclosed staircase accessed through a naturally ventilated vestibule) as a required means of egress and reduced

> The NYC Building Code used the "units of exit width" method for specifying exit capacity, in which each 22 in. unit of exit width provided the capacity for 60 people. Thus each 44 in. stairwell provided for 120 people and the 56 in. stairwell provided 2½ units, or 150 people, for a total occupant load per floor of 390.

the number of required stairwells from six to three[9] and the width of the doors leading to the stairs from 44 in. to 36 in.

Of the three staircases, two (designated A and C) were 44 in. wide; stairway B was 56 in. wide. The largest occupant load in the office spaces was 365 people per floor (36,500 ft² on the largest floor, with 100 ft² per person). Neither the 1968 NYC Building Code nor any of the contemporaneous codes mandated consideration of the number of building stories in determining the number and widths of the stairwells.

For the floors classified in the office use group (all floors except the observation deck and restaurant/meeting spaces), a minimum of two stairwells would have been required to serve the occupants, each equally sized. The three modern building codes considered in this report [International Building Code (IBC) (2000), NYC Building Code (2003), and NFPA 5000 (2003)], as well as the 1968 NYC Building Code, were consistent in this requirement, each regardless of building height. However, the resulting width of these minimum requirements would differ. Two 44 in. stairwells would have satisfied IBC minimum requirements, two 65 in. stairwells would have satisfied NFPA 5000 requirements, and two 78 in. stairwells would have satisfied the 1968 and 2003 NYC Building Code requirements. Alternatively, as was built at WTC 1 and WTC 2, three stairwells of narrower construction, but equivalent or greater total required width, would also satisfy the egress requirements in the modern building codes.

The 1968 NYC Building Code contained a requirement that the stairwells be "as far apart as practicable." Since the stairwells on the impact floors of WTC 1 were substantially closer together than those on the impact floors of WTC 2, it certainly was possible to have designed a greater separation in WTC 1. Local Law 16 (1984) added a quantitative requirement that the separation between exit door openings be at least one-third of the maximum travel distance of the floor. For the WTC towers, this maximum distance was 180 ft, and the smallest separation of stairwell doors was 70 ft. The towers were consistent with this requirement.

NFPA 5000 (2003) and IBC (2000) incorporate a requirement that the separation of the stairwells be no less than one-third the overall diagonal length of the building. For the towers this length was 294 ft, and one-third was 98 ft. Thus, the stairwell separations on some floors would have been inconsistent with the later codes (with which the buildings in New York City were not required to comply).

At the top of the two towers were floors that were classified as public assembly floors: the Windows on the World restaurant complex in WTC 1 (floors 106 and 107) and the Top of the World observation deck in WTC 2 (floor 107). The design number of occupants on each of these floors was over 1,000. On September 11, 2001, there were about 188 people in the Windows on the World and few in the Top of the World since it was before the opening hour. Thus, had the stairwells remained passable through the impact region, the capacity would have been sufficient for the occupant load observed on that morning. Nonetheless, the egress requirements for assembly occupancy were more stringent than for business occupancy in both the NYC Building Code in 1968 and in 1996, when the Windows on the World re-opened after refurbishment following the 1993 bombing in the basement. NIST found documentation that, in 1996, The Port Authority created areas of refuge consistent with the provisions of the 1968 NYC

---

[9] See discussion of the required number of stairwells later in this section.

Building Code, but NIST was unable to find evidence indicating that the requirements for the number of exits for the evacuation of over 1,000 people from each of these floors had been considered in the design or operation of the buildings. In 1995, the NYC Department of Buildings, however, had reviewed the egress capacity from these floors and apparently concurred that the proposed remodel to these spaces would meet the intent of the NYC Building Code.

Subsequently, NIST communications in 2005 with The Port Authority and the NYC Department of Buildings identified a difference of interpretation regarding the number of exits required to serve these floors. The Port Authority stated that a fourth exit was not required since the assembly use space in question constituted less than 20 percent of the area of principal use, with principal use area defined as the entire building. The Department of Buildings stated that the 20 percent rule did not apply to assembly spaces such as restaurants and observation decks that are open to the public, and therefore exit reduction cannot be applied and a fourth exit was required.

The Department further clarified that areas of refuge and horizontal exits are not to be credited for required means of egress (unless the spaces are used non-simultaneously) and that for places of assembly, with occupant load in excess of 1,000, the floor shall have a minimum of four independent means of egress (stairs) to street. If the floor were divided into areas of refuge with rated walls, as was the case for the WTC towers, each area is to be considered an independent place of assembly that needs its own access to two means of egress (stairs) without going through another assembly space if they have an occupant load of less than 500 each (or three means of egress if the area of refuge had an occupant load between 500 and 999). Further, since the only means of egress from the roof-top deck was through the space on the observation floor, the Department clarified that occupant load from the deck would need to be added to the occupant load of the observation floor and that the travel distance from the roof deck along the connecting stairs to the required means of egress at the observation floor shall be within the maximum permitted by the NYC Building Code. The Department, however, did not raise the issue of a fourth stairwell in its December 1994 meeting with The Port Authority and when it subsequently concurred with The Port Authority's proposal to remodel the spaces.

Given the low occupancy level on September 11, 2001, NIST found that the issue of egress capacity from these places of assembly, or from elsewhere in the buildings, was not a significant factor on that day. It is conceivable that such a fourth stairwell, depending on its location and the effects of aircraft impact on its functional integrity, could have remained passable, allowing evacuation by an unknown number of additional occupants from above the floors of impact. If the buildings had been filled to their capacity with 20,000 occupants, the required fourth stairway would likely have mitigated the insufficient egress capacity for conducting a full building evacuation within the available time.

The elevator system was described in Chapter 1. These were not to be used for emergency evacuation except under the control of the fire department. Roughly 3,000 of the people who were initially at or above the impact floors in WTC 2 and were warned by the attack on WTC 1 survived, however, in large part by taking the elevators downward before the aircraft struck WTC 2.

Following the 1993 bombing, The Port Authority instituted the following changes to reduce egress time, in addition to those stairwell improvements mentioned in Section 1.1.2:

- Construction of new egress corridors, north (to Church Street and Vesey Street) and south (to Liberty Street) for faster evacuation from the Concourse (mall), and of two escalators from

the Concourse (mall), one to the plaza at WTC 5 and one up to WTC 4 and onto Church Street.

- Semiannual fire drills in conjunction with the FDNY.

- Appointment of Fire Wardens, specially trained and equipped with flashlights, whistles, and identifying hats.

## Building Communications

WTC emergency procedures specified that all building-wide announcements were to be broadcast from the Fire Command Desk (FCD), located in the lobby of each WTC tower (Figure 5–1), using prepared text. A situation requiring evacuation for any reason, including fire or smoke, would have led to the following announcement, enabling a phased evacuation:

> A Fire Command Desk (Figure 5–1) was located in the lobby of each tower. The computer screen monitored the fire alarms, smoke sensors, sprinkler water flow, elevator lobby smoke detectors, fire signal activation, air handling fans, status of elevators, and troubles with the fire systems.

"Your attention please. We are experiencing a smoke condition in the vicinity of your floor. Building personnel have been dispatched to the scene and the situation is being addressed. However, for precautionary reasons, we are conducting an orderly evacuation of floors ___ ___. Please wait until we announce your floor number over the public address system. Then follow the instructions of your fire safety team. We will continue to keep you advised. We apologize for the inconvenience and we thank you for your cooperation."[10]

The announcement to be used when a particular floor required an evacuation was:

"Your attention please. It is now time for your floor to be evacuated. In accordance with the directions from your fire safety team, please take the exit stairs nearest to your location. We remind you that communications, emergency lighting and other essential services are in service. We will continue to keep you advised. We apologize for the inconvenience and we thank you for your cooperation."[10]

At the discretion of the Fire Safety Director, the information and instructions broadcast to the building occupants could be modified to suit the nature of the emergency.

---

[10] The Port Authority of New York and New Jersey. World Trade Center Emergency Procedures Manual 2001.



**Figure 5–1. Fire Command Desk in WTC 1, as seen from a mezzanine elevator, looking west.**

## 5.3.6    Active Fire Protection

The provision of fire safety in the WTC towers revolved around a Fire Safety Plan that provided direction for fire emergency response and was organized around a hierarchy of staff trained in its implementation. In charge in each tower was the Fire Safety Director, who oversaw emergency response until the arrival of the Fire Department of the City of New York (FDNY), gathered necessary information, and relayed it to the Fire Chief upon arrival. In an emergency, the Fire Safety Director proceeded to the FCD or the fire scene. He/she had one or more Deputy Fire Safety Directors located at the FCD and at the sky lobbies. The front line was a set of Floor Wardens and Deputy Floor Wardens who were responsible for assessing conditions and assisting the evacuation of occupants on their respective floors. The Floor Wardens had their own communications system.

Built into each tower were four resources to mitigate the effects of a fire: an alarm system to alert people to the presence of the fire, an automatic sprinkler system and a standpipe system for controlling the fire by the application of water, and a smoke venting system to improve visibility as people proceeded toward exits. The primary documentation of the design, installation, maintenance, and modification of these systems was stored on the 81st floor of WTC 1 and was lost when that building collapsed. Contractors to the Investigation Team were able to re-create descriptions of the physical systems and their capabilities from limited duplicate information provided by The Port Authority, Silverstein Properties, Inc, and contractors, consultants, and operators involved with the systems.

The original fire alarm system used the technology current at the time and was engineered exclusively for the World Trade Center towers. The 1993 bomb explosion in WTC 1 destroyed the communications to the Operations Control Center, and the alarm system was revealed to be vulnerable to a single point of failure. Repair was problematic, since spare parts for the 25-year-old system were unavailable, and the software was no longer supported. The Port Authority immediately commissioned a new state-of-the-art system for WTC 1, WTC 2, WTC 4, WTC 5, and the subterranean levels. This retrofit involved the installation of over 10,000 detectors, pull stations, and monitors; 30,000 notification devices (speakers

and strobe lights); 150 miles of conduit; and 1,000 miles of wiring. Redundant Operations Control Centers were located in the basements of both towers.

The primary monitoring and control of the fire alarm system was performed at the FCD located in the lobby of each building. The new system included:

- Numerous interconnected microprocessors located in each of the four WTC buildings.

- Smoke sensors located throughout the tenant spaces, at each elevator landing, in return air ducts, and in electrical and mechanical rooms.

- At least one manual fire alarm station installed in each story in the evacuation path.

- Emergency voice and alarm speakers for notification and communication in all areas within the buildings, designed to ensure system function in the event 50 percent of the system became inoperable.

- Automatic notification of the fire department upon fire alarm activation.

- Two-way communications stations at the remote fire panels, at the Floor Warden stations, and at the standpipes.

- A two-way telephone system for the firefighters to make announcements.

- Emergency voice and alarm communication capability, both under manual control at the FCD.

- Strobe lights to provide alarm indications for the hearing impaired.

- Water flow indicators for the fire sprinkler system, including indicators for disabled systems.

No documentation of the status of the replacement system survived the 2001 attack. However, a 2002 analysis estimated that over 80 percent of the towers had been retrofitted and that about 25 percent of the original system was still in use.

Although there were localized carbon dioxide and halon systems within the towers, the Safety Plan predominantly relied on water for containing and suppressing a fire (Figure 5–2). By September 11, 2001, automatic sprinklers had been installed throughout WTC 1 and WTC 2.[11] The New York City water distribution system supplied water to the complex from two independent connections located under Liberty Street to the south and Vesey Street to the north. Within each tower were six 5,000 gal water storage tanks, three located on the 110th floor and one each on the 20th, 41st, and 75th floors. These were filled from the domestic water supply in the building. In the event of a fire, the gravity-fed water would flow to as many of the thousands of installed sprinklers as had been activated. The WTC engineering staff would supply additional water upward from the city mains using manually

---

[11] The exceptions to this were the computer rooms (protected with halon and carbon dioxide systems), kitchens (protected with dry chemical and steam smothering systems), mechanical spaces on the 108th through 110th floors, and the electrical rooms throughout the buildings, for which the application of water would have been inappropriate.

started pumps located in the towers; the FDNY could augment the supply using fire department connections and truck-based pumps. While there were redundant vertical supply pipes, there was only a single connection to the array of sprinklers on any given floor.



**Figure 5–2. Schematic of sprinkler and standpipe systems.**

The WTC towers were constructed with a manually activated (by Port Authority staff at the direction of FDNY) smoke purge system, use of which was integrated into The Port Authority's WTC Fire Safety Plan. The system was designed to meet the 1968 NYC Building Code and was functional by September 11, 2001. The non-dedicated system used the existing building ventilation system, in contrast with an alternative dedicated system that would have been used only for smoke management. Each tower was divided into three zones, with the blowers located on the mechanical equipment floors (7, 41, 75, and 108). In the smoke purge mode, the mechanical system was aligned so that an entire zone was vented; there was no provision to vent an individual floor. The smoke from the impact floors in WTC 1 would have been drawn upward to the 108th floor, while the smoke from the impact floors in WTC 2 would have been drawn downward to the 75th floor. The system was designed to clear the zone of smoke after the fire was extinguished, perhaps during post-fire cleanup operations, lest the forced air increase the burning intensity.