## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DR. JUDY WOOD on behalf of the
UNITED STATES OF AMERICA,
      Plaintiff/Relator,

vs.


APPLIED RESEARCH ASSOCIATES, INC.;
SCIENCE APPLICATIONS INTERNATIONAL
CORP., BOEING, NuSTATS; COMPUTER
AIDED ENGINEERING ASSOCIATES, INC.;
DATASOURCE, INC.; GEOSTAATS, INC.;
GILSANZ MURRAY STEFICEK LLP;
HUGHES ASSOCIATES, INC.; AJMAL
ABBASI; EDUARDO KAUSEL;
DAVID PARKS; DAVID SHARP; DANIELE
VENEZANO; JOSEF VAN DYCK; KASPAR
WILLIAM; ROLF JENSEN & ASOCIATES,
INC.; ROSENWASSER/GROSSMAN CONSULTING
ENGINEERS, P.C.; SIMPOSON GUMPERTZ &
HEGER, INC.; S.K. GHOSH ASSOCIATES,
INC.; SKIDMORE, OWINGS & MERRILL, LLP;
TENG & ASSOCIATES, INC;
UNDERWRITERS LABORATORIES, INC.;
WISS, JANNEY, ELSTNER ASSOCIATES, INC.;
AMERICAN AIRLINES; SILVERSTEIN
PROPERTIES; and UNITED AIRLINES,
      Defendants.

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§

**Case No. 07CV3314 (GBD)**

**DEFENDANT SIMPSON, GUMPERTZ, & HEGER, INC. AND COMPUTER AIDED ENGINEERING ASSOCIATES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 9(b), 12(b)(6) AND 12(h)(3)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   INTRODUCTION ......................................................................................................... 1

III.  FACTUAL BACKGROUND ........................................................................................ 3

    A.   Facts Alleged In The First Amended *Qui tam* Complaint .............................................. 3

    B.   Facts Alleged In Dr. Wood's March 16, 2007 Request For Clarification ..................... 6

    C.   Facts Alleged In Dr. Wood's March 29, 2007  Supplement #1 to RFC ....................... 8

    D.   Facts Alleged In Dr. Wood's April 20, 2007  Supplement #2 to RFC ......................... 8

IV.   ARGUMENT ................................................................................................................... 8

    A.   The First Amended Qui Tam Complaint Should Be Dismissed Because
        The District Court Lacks Subject Matter Jurisdiction .................................................. 8

    B.   The Complaint Should Be Dismissed Because It  Fails To Plead Fraud With
        Particularity Under Rule 9(b) ...................................................................................... 17

    C.   The Complaint Should Be Dismissed Because The Information Quality
        Act ("IQA") Provides An Exclusive Administrative Process For Challenging
        The Quality Of Information Disseminated By Federal Agencies ............................... 21

III   CONCLUSION .............................................................................................................. 25

TABLE OF AUTHORITIES

**Cases**

Americans For Safe Access v. U.S. Dep't of Health & Human Serv.,
  2007 U.S. Dist. Lexis 55597, * 8-9 (N.D. Cal. 2007) ............... 23

APWU v. Potter,
  343 F.3d 619 (2d Cir. 2003) ............... 9

Aurechione v. Schoolman Transp. System, Inc.,
  426 F.3d 635 (2d Cir. 2005) ............... 8, 9

Bly-Magee v. California,
  236 F.3d 1014 (9th Cir. 2001) ............... 18

Carlson v. Principal Fin. Group,
  320 F.3d 301 (2d Cir. 2003) ............... 9

Decker v. Massey-Ferguson, Ltd.,
  681 F.2d 111 (2d Cir. 1982) ............... 21

Eisenstein v. Whitman,
  4 Fed. Appx. 24 (2d Cir. 2001) ............... 19

Gold v. Morrsion-Knudson Co.,
  68 F.3d 1475 (2d. Cir. 1995) ............... 15, 18, 19

Harrison v. Westinghouse Savannah River Co.,
  176 F.3d 776 (4th Cir. 1999) ............... 18

In re Operation of the Missouri River Sys. Litig.,
  363 F. Supp. 2d 1145 (D. Minn. 2004),
  *vacated in part and aff'd in part on other grounds*,
  421 F.3d 618 (8th Cir. 2005) ............... 23

Madonna v. U.S.,
  878 F.2d 62 (2d Cir. 1989) ............... 21

Mills v. Polar Molecular Corp.,
  12 F.3d 1170 (2d Cir. 1993) ............... 20

Rockwell Int'l Corp. v. United States,
  127 S. Ct. 1397, 167 L. Ed. 190 (2007) ............... 9, 15

Salt Inst. v. Leavitt,
  440 F.3d 156 (4th Cir. 2006) ............... 22, 23

Salt Inst. v. Thompson,
    345 F. Supp. 2d 589 (E.D. Va. 2004) ................................................................... 22, 23

United States ex rel. Alcohol Found. v. Kalmanovitz Charitable Found., Inc.,
    186 F. Supp. 2d 458 (S.D.N.Y. 2002) ........................................ 8, 15, 17, 19

United States ex rel. Anti-Discrimination Center v. Westchester County,
    2007 U.S. Dist. Lexis 50589, * 7 (S.D.N.Y. 2007) ............................................. 9, 13

United States ex rel. Bain v. Georgia Gulf Corp.,
    208 Fed. Appx. 280 (5th Cir. 2006) ..................................................................... 24

United States ex rel. Clausen v. Lab Corp. of Am., Inc.,
    290 F.3d 1301 (11th Cir. 2002),
    cert. denied,
    537 U.S. 1105 L. Ed. 2d 774  S. Ct. 870 (2003)....................................................... 18

United States ex rel. Dick v. Long Island Lighting Co.,
    912 F.2d 13 (2d Cir. 1990) ........................................................................ 11

United States ex rel. Doe v. John Doe Corp.,
    960 F.2d 318 (2d Cir. 1992) ................................................................. 11, 14

United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,
    360 F.3d 220 (1st Cir. 2004)........................................................................ 18, 19

United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,
    985 F.2d 1148 (2d Cir. 1993) ..................................................... 13, 14, 16, 17

United States ex rel. LaCorte v. SmithKline Beechan Clinical Labs, Inc.,
    149 F.3d 227 (3rd Cir. 1998) ............................................................................ 18

United States ex rel. Mikes v. Straus,
    274 F.3d 687, 705 (2d Cir. 2001) ......................................................................... 25

United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp,
    152 F. Supp. 2d 443 (S.D.N.Y. 2001) .................................................................. 25

United States ex rel. Sarafoglou v. Weill Med. College,
    451 F. Supp. 2d 613 (S.D.N.Y. 2006) ............................................................. 19, 20

United States ex rel. Smith v. New York Presbyterian Hosp.,
    2007 U.S. Dist. Lexis 53826, * 20-22 (S.D.N.Y. 2007)............................... 19, 20, 21

United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,
    944 F.2d 1149 (3d Cir. 1991) ......................................................................... 16

United States ex rel. Thompson v. Columbia/HCA Heathcare Corp.,
  125 F.3d 899 (5th Cir. 1997) ................................................................. 18

United States ex rel. Totten v. Bombadier Corp.,
  351 U.S. App. D.C. 30,
  286 F.3d 542 (D.C. Cir. 2002) ................................................................. 18

United States v. Baylor Univ. Med. Center,
  469 F.3d 263 (2d Cir. 2006) ..................................................................... 10

United States v. New York Med. College,
  252 F.3d 118 (2d Cir. 2001) ..................................................................... 17

United States v. Space Hunters, Inc.,
  429 F.3d 416 (2d Cir. 2005) ....................................................................... 9

Walburn v. Lockheed Martin Corp.,
  431 F.3d 966 (6th Cir. 2005) ................................................................. 10

Yuhasz v. Brush Wellman, Inc.,
  341 F.3d 559 (6th Cir. 2003) ................................................................. 18

**Statutes**

15 U.S.C. § 281 .................................................................................................. 24

15 U.S.C. § 281a ................................................................................................ 24

15 U.S.C.S. § 7301 ............................................................................................... 3

31 U.S.C. § 3729 .................................................................................................. 9

31 U.S.C. § 3729(a) ........................................................................................ 9, 17

31 U.S.C. § 3729(a)(1) ......................................................................... 1, 2, 18, 21

31 U.S.C. § 3729(a)(2) ............................................................................ 2, 18, 21

31 U.S.C. § 3729(a)(7) ............................................................................ 2, 18, 21

31 U.S.C. § 3730(a) .............................................................................................. 9

31 U.S.C. § 3730(b)(1) ................................................................................... 9, 10

31 U.S.C. § 3730(b)(2) ................................................................................... 9, 10

31 U.S.C. § 3730(d)(4) ............................................................................ 1, 24, 25

31 U.S.C. § 3730(e)(4) ........................................................ 9, 10, 11, 13, 16, 17

31 U.S.C. § 3730(e)(4)(A) ..................................................................... 2, 10, 11, 14, 17

31 U.S.C. § 3730(e)(4)(B) ..................................................................... 15, 17

31 U.S.C. §§ 3729-33 ..................................................................... 1

31 U.S.C. 3730(b)(4)(B) ..................................................................... 10

## Other Authorities

67 Fed Reg. at 8458-59 ..................................................................... 22

67 Fed. Reg. 8452 ..................................................................... 22

Pub. L. No. 106-554, § 1(a)(3) [Title V, § 515] (Dec. 21, 2000)
   (published at 44 U.S.C. § 3516 note)..................................................................... 6, 22, 23

## Rules

Fed. R. Civ. P. 12(b)(1)..................................................................... 1, 2, 3, 8, 9, 17

Fed. R. Civ. P. 12(b)(6)..................................................................... 1, 2, 8

Fed. R. Civ. P. 12(h)(3)..................................................................... 1, 2, 3, 9

Fed. R. Civ. P. 9(b) ..................................................................... 1, 2, 3, 17, 19, 20, 21, 24

Local Rule 7.1..................................................................... 1

## I.    PRELIMINARY STATEMENT

Pursuant to Local Rule 7.1, Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(6) and 12(h)(3), the

defendants, Simpson Gumpertz & Heger, Inc. ("SGH") and Computer Aided Engineering

Associates, Inc. ("CAE") submit the following Memorandum of Law in Support of their Motion

to Dismiss.  As set forth below, this Court should dismiss the *qui tam* Complaint filed by

Dr. Judy Wood because the Court lacks subject matter jurisdiction, the Complaint fails to plead

fraud with the particularity required by Rule 9(b), and fails to state a claim upon which relief can

be granted.  Additionally, defendants should be awarded their legal fees and costs under 31

U.S.C. § 3730(d)(4).  Defendants incorporate by reference their Notice of Motion and

Affirmation of David M. Pollack, filed herewith.

## II.    INTRODUCTION

On April 25, 2007, the relator in this case, Dr. Judy Wood ("Wood") commenced this *qui*

*tam* action under the False Claims Act, 31 U.S.C. §§ 3729-33, by filing a *qui tam* Complaint (the

"Complaint") under seal in the United States District Court for the Southern District of New

York against twenty-seven defendants[1] including Simpson Gumpertz & Heger, Inc. ("SGH")

and Computer Aided Engineering Associates, Inc. ("CAE").   On September 12, 2007, the Court

(George B. Daniels, U.S.D.J) entered an Order stating that the United States has declined to

intervene in the action and the First Amended *qui tam* Complaint should be unsealed.  The

unsealed Complaint alleged seven causes of action against all defendants, as follows:  (1) False

Claims Act, 31 U.S.C. § 3729(a)(1) (Presentation of False Claims); (2) False Claims Act, 31

---

[1] The defendants are as follows:  (1) Applied Research Associates, Inc.; (2) Science Applications International Corp.; (3) Boeing; (4) NuStats; (5) Computer Aided Engineering Associates, Inc.; (6) Datasource, Inc.; (7) Geostaats, Inc.; (8) Gilsanz Murray Steficek LLP; (9) Hughes Associates, Inc.; (10) Ajmal Abbasi; (11) Eduardo Kausel; (12) David Parks; (13) David Sharp; (14) Daniele Venezano; (15) Josef Van Dyck; (16) Kaspar William; (17) Rolf Jensen & Associates, Inc.; (18) Rosenwasser/Grossman Consulting Engineers, P.C.; (19) Simpson Gumpertz & Heger, Inc.; (20) S.K. Ghosh Associates, Inc.; (21) Skidmore, Owings & Merrill, LLP; (22) Teng & Associates, Inc.; (23) Underwriters Laboratories, Inc.; (24) Wiss, Janney, Elstner Associates, Inc.; (25) American Airlines; (26) Silverstein Properties; and (27)United Airlines.

U.S.C. § 3729(a)(2) (Making or Using False Record or Statement); (3) False Claims Act, 31

U.S.C. § 3729(a)(7) (Reverse False Claims); (4) Unjust Enrichment; (5) Payment by Mistake; (6)

Recoupment of Overpayments; (7) Common Law Fraud.

On December 28, 2007, Dr. Wood filed a First Amended Complaint against all of the 27

named defendants. The First Amended Complaint alleges the same three causes of action under

the False Claims Act: (1) False Claims Act, 31 U.S.C. § 3729(a)(1) (Presentation of False

Claims); (2) False Claims Act, 31 U.S.C. § 3729(a)(2) (Making or Using False Record or

Statement); (3) False Claims Act, 31 U.S.C. § 3729(a)(7) (Reverse False Claims). The First

Amended Complaint differs from the original Complaint because it does not contain any of the

above-mentioned common law causes of action that were initially asserted by Wood in the

original Complaint.[2]

Defendants SGH and CAE have moved to dismiss this *qui tam* action pursuant to Fed. R.

Civ. P. 9(b), 12(b)(1), 12(b)(6) and 12(h)(3). Specifically, Wood's FCA claims should be

dismissed pursuant to Rules 12(b)(1) and (h)(3) for lack of subject matter jurisdiction under the

FCA's Original Source Rule, 31 U.S.C. § 3730(e)(4)(A), because Wood has provided no factual

basis in her Complaint to support the FCA statutory requirement that she must be the original

source of the information forming the basis for her FCA claims. Additionally, Wood's

Complaint should be dismissed under Rule 12(b)(6) because she has failed to provide sufficient

detail about her theory of FCA liability, or about any specific fraudulent claim, and has therefore

failed to provide the requisite particularity under the heightened pleading standard of Rule 9(b),

which applies to suits under the FCA. Although Dr. Wood's Complaint provides a rough sketch

---

[2] Dr. Wood's original *qui tam* Complaint filed on April 25, 2007 is nearly identical to a *qui tam* Complaint filed by Dr. Morgan Reynolds on May 30, 2007. The complaints are filed against the same defendants, by the same attorney and both are based upon the Requests For Correction (RFC's) filed with NIST in March 2007. Dr. Reynolds was first to file his RFC (Reynolds filed his RFC on March 8, 2007 while Wood filed her RFC on March 16, 2007). However, all of the information which forms the basis of these RFC's was *already* in the public domain.

of her theory of FCA fraud, and alleges improper billing in a conclusory manner, she has failed

to identify even a single specific instance of the defendants SGH or CAE submitting a fraudulent

bill to the government, and therefore the Complaint lacks the detail and specificity required by

Rule 9(b). Additionally, Dr. Wood's FCA claims should be dismissed under Rule 12(b)(1) and

(h)(3) because they are based upon the same information which is pending before the National

Institute of Standards and Technology, in the form of a Request for Correction ("RFC"), and

Wood has failed to exhaust the administrative process established by NIST for challenging the

quality of information disseminated by that federal agency.

## III.    FACTUAL BACKGROUND

### A.    Facts Alleged In The First Amended *Qui tam* Complaint

Dr. Wood's allegations revolve primarily around a report issued by the National Institute

of Standards and Technology ("NIST"), an agency of the United States Department of

Commerce. NIST was authorized under the National Construction Safety Team Act ("NCST"),

15 U.S.C.S. § 7301, to investigate the destruction of the World Trade Center complex ("WTC").

First Amended Qui Tam Complaint, ¶¶ 3, 4. Wood alleges that NIST had a budget of sixteen

million ($16,000,000) and contracted with each of the twenty-seven defendants to assist in the

investigation of what caused the destruction of the Twin Towers of the WTC ("WTC 1, 2"). Id.

On October 26, 2005, NIST issued a report entitled "Final Reports of the Federal Building and

Fire Investigation of the World Trade Center Disaster" ("NCSTAR 1"). Id. Dr. Wood

complains that the statutory purpose of the NIST investigation was to "determine why and how

WTC1 and WTC2 collapsed following the initial impacts of the aircraft," but due to defendants'

fraud and deceit, NIST changed the focus of NCSTAR 1 to a study of the "probable collapse

sequence." Id. ¶¶ 5-6. Wood alleges that NIST first described its mandate as "determining

3

what caused the destruction of WTC 1,2" but then "NIST openly declined to carry it out" by "intentional and admitted modification and narrowing of the scope of that stated objective and mandate." Id. ¶ 52. Although NIST is not named as a defendant, Wood accuses NIST of being aware that "it did not carry out its statutory madate," id. at ¶ 6, and she states that NCSTAR 1 is fraudulent on its face, stating "[i]t is also clear and apparent on its face that NIST's explanation of the destruction of WTC 1, 2 issued in … September, 2005, is blatantly false, incomplete, misleading and fraudulent." Id. ¶ 52 (emphasis added). Thus, she accuses NIST of intentionally presenting a "false and misleading, fraudulent and illegal report," id. and states that the "admission that NIST did not carry out its statutory function or mandate . . . is the subject of this Qui Tam lawsuit." Id. at ¶ 6.

Wood alleges that NIST and the defendants knowingly participated in a "scheme" to cover up the truth that the "destruction of the WTC on September 11, 2001 was caused … by the use of Directed Energy Weapons consisting in High Energy Lasers and … other secret weapons." Id. at ¶¶52-55. She asserts that defendants Science Applications International Corporation ("SAIC) and Applied Research Associates, Inc. ("ARA") have a primary expertise in the "development of Directed Energy Weapons (DEW) and psychological operations (psy ops)" and that it is a "small wonder, then, that NIST did not investigate what caused the destruction of WTC 1, 2; namely DEW, carried out in the manner of a psy op." Id. ¶ 9, 24. Wood alleges that in January 2006, the defendant Boeing was awarded an Air Force Contract for Directed Energy and Space Surveillance Research & Development, and is presently developing an "Airborne Laser (ABL) that serves as a platform for the use of High Energy Lasers (HEL) that … have the capacity to pulverize steel [and] destroy buildings in mere seconds, as happened to WTC 1, 2 on 9/11/01." Id. ¶ 25.

Wood alleges that NIST purposefully contracted with defense contractors such as SAIC, ARA and Boeing because these defendants could produce a report that would conceal or divert attention from the fact that directed energy weaponry destroyed the WTC complex. Complaint ¶ 51. Specifically, the Complaint alleges NIST's intent to conceal the use of directed energy weapons as follows:

> In other words, NIST contracted with those who have the greatest familiarity with directed energy weapons in order to produce a report that sought to go to any length necessary to avoid, disguise, omit and otherwise divert attention away from the actual, real and intended destruction of the WTC complex by use of one device, namely directed energy weaponry, while pretending that the cause was the result of conditions that would be impossible based on the extent to which the NIST report, NCSTAR 1 violated both the laws of physics and common sense.

Id. ¶ 53.   She states that the NSTAR 1 report found "no piece of steel that had been subjected to a temperature higher than 600 degrees C . . . yet that NIST offered no explanation whatsoever for the visual confirmation that most of the steel of the WTC complex turned to dust." Id. ¶ 53. She contends there is proof of directed energy weapons because steel that was "melted, warped . . . and in other respects deformed . . . or utterly disintegrated and turned to dust" and this "could not have reasonably resulted from the effects of gravity, kerosene and/or crash impact damage." Id. ¶ 15. She complains that "NIST has not offered any explanation whatsoever as to what caused the . . . dustification . . . of WTC1,2." Id. 21, 32.

The First Amended Complaint alleges that the defendants knowingly submitted cost reports, requisitions, and billing statements from 2002 through September 2005 that contained false claims for reimbursements concerning their work, id. ¶ 56, because the defendants "knew they included costs that the actual cause of the destruction of the WTC complex was the result of the use of directed energy weapons." Id. ¶ 60. Wood's First Amended Complaint does not identify any specific conduct by defendant Computer Aided Engineering Associates, Inc.

("CAE") or Simpson Gumpertz & Heger, Inc. ("SGH"). She alleges that CAE "should have [known] that . . . the residue from [WTC1,2] was consistent with the use of DEW." Id. ¶ 27. She alleges that SGH "chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly."[3] Id. ¶ 35.

Wood alleges that she is an "original source" of the allegations of fraud set forth in her First Amended Complaint. Id. ¶¶ 15, 19, 55. She says that on March 16, 2007, she submitted a Request for Correction ("RFC") to NIST which challenged NCSTAR "in its entirety" Id. ¶ 7, and that her March 16th RFC, together with a "Supplement No. 1" she filed with NIST on March 29, 2007 and a "Supplement No. 2" filed with NIST on April 20, 2007, id. ¶ 8, contain the "original source" information. Id. ¶¶ 15, 55. In particular, she alleges that her March 16, 2007 RFC "placed NIST on notice that false claims had been submitted to the government" and that she is "the original source of that claim." Id. ¶ 55.[4]

**B.    Facts Alleged In Dr. Wood's March 16, 2007 Request For Clarification**

On March 16, 2007, Dr. Wood filed a "Request for Correction per Section 515 of Public Law 106-554" with NIST. The March 16, 2007 RFC is 43 pages long and is attached to her First Amended Qui Tam Complaint as Exhibit "A." Dr. Wood alleges that she obtained a copy of NCSTAR 1-2 on the NIST website, and provides references to the specific NIST web site addresses where she found the purportedly "fraudulent" information. Specifically, she states, "The source of the said NCSTAR 1, meaning the point at which it can be and has been accessed, is: http://wtc.nist.gov/reports october05.htm." Ex. A, p. 1. Wood contends that NCSTAR 1 is "so fundamentally flawed . . . that the entire document should be corrected, starting with its very

---

[3]  Wood repeats this same general statement against nearly ever defendant.
[4] This statement is inaccurate because Dr. Morgan Reynolds filed an RFC with NIST approximately one week earlier, on March 8, 2007. Dr. Reynolds' earlier-filed RFC criticizes NIST for relying on fraudulent data, and points out what he contends are the scientific flaws in the NCSTAR report.

title, down through and including its thirtieth (30th) and final recommendation." Id., p. 2.  She

argues that the NIST report violates two laws of physics  --  The Law of Conservation of

Momentum; and The Law of Conservation of Energy."  Id.

Wood's March 16, 2007 RFC  sets forth a table of "Issues Confirming that NCSTAR 1 is

Fraudulent" which she alleges confirm that NCSTAR is fraudulent,  as follows:

1.    The Towers did not collapse.

2.    Tipping of the south tower falsifies the NIST "inevitable collapse" scenario.

3.    Particularized destructive effects that NIST ignored, thus rendering NCSTAR 1's conclusions incomplete, inadequate, misleading and/or fraudulent:

> A.    Empty Holes indicative of Unusual Energy Impacts
>
> B.    Almost complete lack of rubble that is likewise indicative of Unusual Energy Impacts.
>
> C.    Evidence of vehicular burn effects, damages effects and literal Toasting of Cars that are indicative of Unusual and Unexplained by NIST Energy Impacts.
>
> D.    Degree of destruction of material that resulted in "Dustification" of the massive Twin Tower and WTC complex structures . . .indicative of Unusual Energy Impacts that are Unexplained by NIST.

Id., p. 6.   These so-called issues are supported by Figures 1 through 66 --   information already

in the public domain when she filed her RFC  --  such as photographs taken by other people; a

satellite image of the WTC by The National Oceanic and Atmospheric Administration (NOAA);

videos from September 11, 2001 which can be seen on-line at various web-site addresses; a

seismic signal from Columbia University's seismographic recording station; and a "billiard ball"

free-fall explanation which Wood had published on her website before she filed the RFC.  She

argues that all of this public information provides visual evidence of her theories. Id., p. 15.  She

notes additionally that "the public domain contains a wealth of information on the development and current status of DEW," and she lists at least six web sites where the public information can be found. <u>Id.</u>, p. 32.

C.    **Facts Alleged In Dr. Wood's March 29, 2007 Supplement #1 to RFC**

On March 29, 2007, Wood filed a Supplement #1 to the March 16, 2007 RFC which is attached to the First Amended Qui Tam Complaint as Exhibit "A." Supplement #1 requests the correction of NCSTAR 1 "to disclose the extent to which ARA is a manufacturer of directed energy weapons." Ex. B, p. 1.

D.    **Facts Alleged In Dr. Wood's April 20, 2007 Supplement #2 to RFC**

On April 20, 2007, Wood filed a Supplement #1 to the March 16, 2007 RFC which is attached to the First Amended Qui Tam Complaint as Exhibit "A." Supplement #2 attaches as exhibits various witness statements. She alleges that NIST ignored eyewitness testimony that is consistent with her claim that "directed energy weaponry are a causal factor in the destruction of the Twin Towers." Ex. C.

## IV.    ARGUMENT

A.    <u>**The First Amended Qui Tam Complaint Should Be Dismissed Because The District Court Lacks Subject Matter Jurisdiction**</u>

Federal courts are of limited jurisdiction and must "police jurisdictional issues promptly and closely." <u>United States ex rel. Alcohol Found. v. Kalmanovitz Charitable Found., Inc.</u>, 186 F. Supp. 2d 458, 461 (S.D.N.Y. 2002). A district court must dismiss a case for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) if it "lacks the statutory or constitutional power to adjudicate it." <u>Aurechione v. Schoolman Transp. System, Inc.</u>, 426 F.3d 635, 638 (2d Cir. 2005). The question whether subject matter jurisdiction exists under Rule 12(b)(1) is distinct from the question whether the plaintiff can state a claim for relief under Rule 12(b)(6). <u>Carlson</u>

v. Principal Fin. Group, 320 F.3d 301, 306 (2d Cir. 2003). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), "'the plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.'" United States ex rel. Anti-Discrimination Center v. Westchester County, 2007 U.S. Dist. Lexis 50589, * 7 (S.D.N.Y. 2007) quoting Aurechione v. Schoolman Transp. Sys., Inc., 426 F.3d at 638. A court must "'accept as true all material factual allegations in the complaint," but refrain from "drawing from the pleadings inferences favorable to the party asserting jurisdiction." Anti-Discrimination Center, supra at * 7 quoting APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003). The court may consider evidence outside of the pleadings in resolving factual challenges to subject matter jurisdiction. United States v. Space Hunters, Inc., 429 F.3d 416, 425-26 (2d Cir. 2005). As discussed below, Wood's FCA claims in Counts One, Two and Three should be dismissed pursuant to Rules 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction because Woods has provided no factual basis in her First Amended Complaint for concluding that she is the original source of the information forming the basis of her FCA claims, and therefore, the Court lacks jurisdiction under the FCA's Original Source Rule. See 31 U.S.C. § 3730(e)(4).

The False Claims Act, 31 U.S.C. § 3729 et seq, as amended in 1986, prohibits false or fraudulent claims for payment to the United States, see 31 U.S.C. § 3729(a), and authorizes civil actions to remedy such fraud to be brought by the Attorney General, see § 3730(a), or by private individuals in the Government's name, see § 3730(b)(1), as a "qui tam" relator. See Rockwell Int'l Corp. v. United States, 127 S. Ct. 1397, 167 L. Ed. 190, 201 (2007). The government may either intervene and prosecute the action, see § 3730(b)(2), or allow the original plaintiff – the

*qui tam* relator – to proceed with the suit under § 3730(b)(4)(B).[5]  In the present case, the United

States has declined to intervene in Dr. Wood's lawsuit.

Dr. Woods purports to be a *qui tam* relator, and therefore the focus of this proceeding is

upon the *qui tam* provisions of the Act.  "*Qui tam*" is part of the longer Latin phrase "*qui tam pro*

*domino rege quam pro se ipso in hac parte sequitur*," which means "who pursues this action on

our Lord the King's behalf as well as his own."  Walburn v. Lockheed Martin Corp., 431 F.3d

966, 970 (6th Cir. 2005).  As discussed below, Dr. Woods does not have standing to bring this *qui*

*tam* action as a relator under the False Claims Act because the District Court lacks subject matter

jurisdiction, under the jurisdictional bar set forth in 31 U.S.C. § 3730(e)(4).  Specifically,

§ 3730(e)(4)(A) divests this Court of subject matter jurisdiction because Wood's claims are

based upon information of which she was not the original source.

Section 3730(e)(4) of the False Claims Act defines the jurisdiction of a federal court over

*qui tam* actions, and bars jurisdiction if the information giving rise to the *qui tam* claim was

subject to public disclosure through an administrative report or investigation, unless the

individual bringing suit is the "original source" of the information.  See 31 U.S.C. § 3730(e)(4).

Section 3730(e)(4) sets out a two-part test to determine whether a court has subject matter

jurisdiction over the plaintiff's *qui tam* action, as follows:

> (e)      Certain actions barred.
>
> (4)(A) No court shall have jurisdiction over an action under this section based
> upon the public disclosure of allegations or transactions in a criminal, civil, or
> administrative hearing, in a congressional, administrative, or Government
> Accounting Office report, hearing, audit, or investigation, or from the news
> media, unless the action is brought by the Attorney General or the person
> bringing the action is an original source of the information.

---

[5] Under 31 U.S.C. § 3730(b)(1), the *qui tam* complaint must be filed *in camera* and must remain under seal for at
least sixty days, see id. § 3730(b)(2), unless the government decides to intervene.  After the sixty-day seal period
expires, the government may "notify the court that it declines to take over the action," in which case the relator has
the "right to conduct the action."  Id. § 3730(b)(4)(B).  See United States v. Baylor Univ. Med. Center, 469 F.3d
263, 269 (2d Cir. 2006).

(B) For purposes of this paragraph, "original source" means an individual who
has direct and independent knowledge of the information on which the
allegations are based and has voluntarily provided the information to the
Government before filing an action under this section which is based on the
information.

31 U.S.C. § 3730(e)(4). This provision was part of the 1986 amendments to the FCA, and was

an "attempt to strike a balance between encouraging private citizens to expose fraud and

avoiding parasitic actions by opportunists who attempt to capitalize on public information

without seriously contributing to the disclosure of the fraud." United States ex rel. Doe v. John

Doe Corp., 960 F.2d 318, 321 (2d Cir. 1992). Because qui tam plaintiffs are entitled to a portion

of the proceeds of successful suits, there is the potential for "parasitic lawsuits by those who

learn of the fraud through public channels." Id. The term "parasitic" actions is used to

characterize qui tam suits by individuals seeking quick cash without assisting in exposing the

fraud. Id.

    In deciding whether the statutory bar to jurisdiction applies, a court must first determine

whether there has been a "public disclosure" of the wrongdoing which occurred in one of the

ways set forth in the statute. Section 3730(e)(4)(A) provides an exclusive list of the modes by

which a public disclosure must occur for the jurisdictional bar to apply. Id. The public

disclosure must occur in a "criminal, civil, or administrative hearing, in a congressional,

administrative, or Government Accounting Office report, hearing, audit, or investigation, or from

the news media." 31 U.S.C. § 3730(e)(4). See United States ex rel. Dick v. Long Island

Lighting Co., 912 F.2d 13, 16 (2d Cir. 1990). Here, there is no serious question that the mode of

disclosure was through a source enumerated in the statue – i.e., the administrative report of a

federal agency.

The gravamen of Wood's First Amended Complaint is that all of the defendants have engaged in fraud by supplying NIST with false information and data that was included in a NIST report.  Specifically, the First Amended Complaint challenges the validity of scientific information included in the final report of the NIST investigation of the collapse of the World Trade Center (WTC) towers, conducted under the National Construction Safety Team Act, commonly known as NCSTAR 1-2.  The First Amended Complaint alleges that NCSTAR 1-2 is fraudulent "on its face."  See First Amended Complaint ¶ 52 ("[i]t is also clear and apparent on its face that NIST's explanation of the destruction of WTC 1, 2 issued in … September, 2005, is blatantly false, incomplete, misleading and fraudulent") (emphasis supplied).  The First Amended Complaint challenges the credibility of NCSTAR 1 because NIST changed the focus of the investigation to a study of the "probable collapse sequence," see id. ¶¶ 5-6, NIST found "no piece of steel that had been subjected to a temperature higher than 600 degrees C . . . yet that NIST offered no explanation whatsoever for the visual confirmation that most of the steel of the WTC complex turned to dust," id. ¶ 53, ¶¶ 21, 32,   NIST failed to properly assess information such as  the . . . "tipping" of WTC2," id. ¶ 57, the lack of debris, id., the "holes" that are "consistent with the use of DEW," id., and vehicles that were "inexplicably burned as if toasted." Id.  In short, the allegations in Wood's First Amended Complaint consist of a list of the specific aspects of NCSTAR 1-2 which she contends are fraudulent.

NCSTAR 1-2 is an administrative report within the meaning of the FCA, and the jurisdictional bar applies because it was publicly disclosed.  Indeed, the allegations of Wood's own *qui tam* Complaint state explicitly that NCSTAR 1-2 is publicly disseminated by NIST on its website.  See First Revised Complaint, Ex. A, March 16, 2007 RFC, p. 1.  Woods alleges that she obtained a copy of NCSTAR 1-2 on the NIST website, and provides references to the

specific NIST web site address where she found the purportedly "fraudulent" information. Id. ("the source of the said NCSTAR 1, meaning the point at which it can be and has been accessed"). Thus, the so called wrongdoing was publicly disclosed because NCSTAR 1-2 was, and still is, available to anyone who wishes to consult the NIST website. As explained by the Second Circuit in United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1158 (2d Cir. 1993), the § 3730(e)(4) jurisdictional bar "was designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." Id.

In the recent case of United States ex rel. Anti-Discrimination Center v. Westchester County, the District Court for the Southern District of New York explained the rationale for the jurisdictional bar in the specific context of an administrative report, as follows: "[i]f the information is derived from a federal government report, then the federal government has the information and can act appropriately, and barring FCA actions in such situations serves the legislative purpose of the 1986 amendments to 'avoid[] parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud.'" United States ex rel. Anti-Discrimination Center v. Westchester County, 2007 U.S. Dist. Lexis 50589, * 22 (S.D.N.Y. 2007).

Additionally, Wood cannot be heard to argue that her allegations are not derived "solely" from the publicly disclosed NCSTAR 1-2 report and/or that the jurisdictional bar should not apply because she obtained some of the information through her own independent investigation. Although Wood faults NCSTAR 1-2 for not disclosing that "directed energy weapons" were the cause of the destruction of the WTC complex, see First Amended Complaint ¶¶ 52-55, she has provided no proof that directed energy weapons were, in fact, used on 9/11, and she

acknowledges that her suspicions are based primarily upon news and other media reports that

"describe the . . . current status of development of DEW." Id. ¶ 20; Ex. B, p. 7-9.  For example,

she wrote a letter, dated April 7, 2007, to Susan J. Thornton of the Directed Energy Directorate,

asking for written confirmation that the damage to WTC 1,2 is "consistent with the destructive

effects . . . of DEW." Id., Ex. C.  This letter states that "I am aware . . . that as of the year 2000,

weapons having the capacity to destroy the WTC were deployed." Id.  The letter references a

document about directed energy weapons that is posted on-line and Wood provides the web site

address where it can be found. Id.  She contends that several of the defendants such as  SAIC,

ARA and Boeing are researching, developing and/or manufacturing directed energy weapons,

and provides the web site addresses where she accessed this information.  See id. ¶ 24 (SAIC); ¶

25 (Boeing); Ex. A, Supplement #1 to RFC, p. 1 (ARA).    Thus, it appears that Wood obtained

all of her information either from an administrative report, the news media, or another mode

listed in the statute, so that the jurisdictional bar still applies, even if the NCSTAR report is not

the "sole" source of her information.  The Second Circuit has clarified that the phrase "solely" is

not included in § 3730(e)(4)(A), and that the statutory bar applies to "a *qui tam* action ... based

in any part upon publicly disclosed allegations or transactions." Kreindler, 985 F.2d at 34.  See

also, John Doe, 960 F.2d at 324 ("public disclosure of the allegations divests district courts of

jurisdiction over *qui tam* suits, regardless of where the relator obtained his information").

       In this case, there is no serious dispute that Wood's lawsuit is based upon publicly

disclosed "allegations or transactions."  Therefore, Wood's  *qui tam* suit is barred unless she can

prove that the "original source" exception applies because she is an "original source" of that

information. See 31 U.S.C. § 3730(e)(4)(A).  In her *qui tam* Complaint, Wood alleges that she is

an "original source" of her allegations because on March 16, 2007, she submitted a Request for

Correction letter to NIST which challenged NCSTAR "in its entirety." See First Amended Complaint ¶ 7. To be an "original source," however, the relator must have "direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B). In Rockwell Int'l Corp. v. United States, 127 S. Ct. 1397, 167 L. Ed. 2d 190, 205 (2007), the Supreme Court clarified that the term "information" in subparagraph (B) refers to the relator's allegations – i.e., Wood must have "direct and independent knowledge of the information upon which [her] allegations are based." Id. at 208. Here, Wood acknowledges in her pleadings that she gleaned the information underlying her allegations directly from NCSTAR 1-2. As noted above, Wood provides references to the specific NIST web site addresses where she found the purportedly "fraudulent" information. See First Amended Complaint, Ex. A, March 16, 2007 RFC, p. 1, 4-5. These web-site addresses include "The August Fact Sheet (Answers to Frequently Asked Questions) by NIST." Id., p. 8. Because Wood had "no direct and independent knowledge of any of this publicly disclosed information, [she] was not an original source of that information, and [her] suit is barred." Gold v. Morrsion-Knudson Co., 68 F.3d 1475, 1477 (2d. Cir. 1995)

The recent case of United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc., 186 F. Supp. 2d 458 (S.D.N.Y. 2002) aff'd 53 Fed. Appx. 153 (2d Cir. 2002) is also instructive. In Alcohol Foundation, the defendants were makers and purveyors of alcoholic beverages. Id. The relator, Alcohol Foundation, alleged that defendants caused misrepresentations and false claims to be presented to the government for treatment of alcohol-related disease, because the "alcoholic beverage industry has been selling, encouraging and inducing people to buy in quantities sufficient to damage body and brain." Id. at 460. Similar to the "conspiracy" among the NIST contractors alleged by Wood in the present case, Alcohol

Foundation alleged that there was a conspiracy among the alcoholic beverage producers and marketers to defraud the public and Government. Id. Alcohol Foundation did not dispute that the factual information on which it based its *qui tam* action was gleaned from "third parties' published articles," and was therefore publicly disclosed information. However, it maintained that it was an "original source" within the meaning of the FCA, because "while the facts were publicly disclosed, the allegation of fraud is entirely new." Id. It argued that its allegations arose out of the "'perspective' that [its] members obtained by spending hundreds of hours compiling facts into a 'mosaic,'" Id. at 461, and that it had direct and independent information based on its "creation of the 'mosaic' of information." Id. at 463 (emphasis supplied). It argued that "the scientific and scholarly works from which it developed its Submission are too technical for the average member of the public to understand," Id. at 464, and "an average member of the public could neither understand the [publicly available] information … nor perceive a fraud absent Alcohol Foundation's compilation." Id. at 463. Thus, the district court was required to determine whether Alcohol Foundation's efforts in explaining and synthesizing the information transformed it into an "original source." Id. at 461.

The district court found that the decision and analysis of subject matter jurisdiction in Kreindler v. Kreindler, 985 F.2d 1148 (2d. Cir. 1993) was binding authority, because the Second Circuit adopted the Third Circuit's reasoning, as expressed in United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1155-56 (3d Cir. 1991), that § 3730(e)(4) was "'designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.'" Id. quoting Kreindler, 985 F.2d at 1158-59. The court concluded that the relator, Alcohol Foundation, was merely a perceptive third-party and did not have first-hand

16

knowledge of a wrong and/or its perpetrators. Id. at 464. Moreover, the district court concluded

that it lacked subject matter jurisdiction for the additional reason that Alcohol Foundation had

not specified what claims deriving from defendants were submitted to the government for

payment or approval, and thus its theory sought to expand the definition of a "false claim" to

"address a generic definition of 'fraud,' without direct link to specific claims submitted to the

government for approval or payment." Id.

As the Alcohol Foundation court noted, Congress enacted the § 3730(e)(4) jurisdictional

bar in order to prevent opportunistic persons from abusing the *qui tam* procedure for self

aggrandizement, Alcohol Foundation, *supra* at 464, and there is no indication that Congress

intended for the *qui tam* procedure to be available to "those pursuing a less pecuniary and more

expansive social agenda." Id. Here, the court should rule that Wood's *qui tam* action is barred

because she has based her lawsuit on publicly disclosed information in violation of §

3730(e)(4)(A) and she is not the original source of that information under § 3730(e)(4)(B). Like

the relator in Kreindler, the fact that Dr. Wood conducted some "collateral research and

investigations" does not establish "direct and independent knowledge of the information on

which the allegations are based" within the meaning of § 3730(e)(4)(B). See also United States

v. New York Med. College, 252 F.3d 118, 121 (2d Cir. 2001) (affirming dismissal of complaint

because a third party was the core source of information underlying the claim). Accordingly,

Counts One, Two and Three should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of

subject matter jurisdiction.

**B.   The Complaint Should Be Dismissed Because It Fails To Plead Fraud With Particularity Under Rule 9(b)**

Not all fraudulent conduct gives rise to liability under the FCA. Under the three

subdivisions of 31 U.S.C. § 3729(a) invoked by Wood, liability is imposed, *inter alia*, on one

who "knowingly presents, or causes to be presented, to … the United States Government … a false or fraudulent claim for payment or approval," see 31 U.S.C. § 3729(a)(1); "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; see 31 U.S.C. § 3729(a)(2); or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." See 31 U.S.C. § 3729(a)(7) (commonly called the "Reverse False Claims Act"). Thus, the statute "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004).

The Second Circuit, as well as the federal courts in every jurisdiction in the country, have emphasized that a defendant's presentation of a false or fraudulent claim to the government is a central element of every False Claims Act case. Gold v. Morrison-Knudson Co., 68 F.3d at 1476-77. See also Yuhasz v. Brush Wellman, Inc., 341 F.3d 559 (6th Cir. 2003); United States ex rel. Clausen v. Lab Corp. of Am., Inc., 290 F.3d 1301, 1308-09 (11th Cir. 2002), cert. denied, 537 U.S. 1105, 154 L. Ed. 2d 774, 123 S. Ct. 870 (2003); United States ex rel. Totten v. Bombadier Corp., 351 U.S. App. D.C. 30, 286 F.3d 542 (D.C. Cir. 2002); Bly-Magee v. California, 236 F.3d 1014 (9th Cir. 2001); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (4th Cir. 1999); United States ex rel. LaCorte v. SmithKline Beechan Clinical Labs, Inc., 149 F.3d 227 (3rd Cir. 1998); United States ex rel. Thompson v. Columbia/HCA Heathcare Corp., 125 F.3d 899 (5th Cir. 1997); see also John T. Boese, Civil False Claims and Qui Tam Actions § 5.04 (2d ed. 2000 & Supp. 2003)("Every major federal court of appeals has held that

because the essence of a False Claims Act claim is fraud, Rule 9(b) applies to FCA cases ....
The applicability of Rule 9(b) to qui tam actions is by now beyond dispute.").

Here, as in Alcohol Foundation, the relator's theory seeks to expand the definition of
"false" claim or record to address "a generic definition of 'fraud' without direct link to specific
claims submitted to the Government for approval or payment." Alcohol Foundation, *supra* at
464. Dr. Wood's First Amended *qui tam* Complaint and Exhibits are hundreds of pages in
length, but fail to identify a single specific instance of either SGH or CAE submitting a
fraudulent bill to the government. The First Amended Complaint and RFC submittals consists
instead of a discussion of what she perceives to be the scientific shortcomings of NCSTAR 1-2,
including numerous conclusory allegations about a "scheme" between NIST and the defendants
to cover up the fact that directed energy weapons felled the WTC complex. Compare United
States ex rel. Smith v. New York Presbyterian Hosp., 2007 U.S. Dist. Lexis 53826, * 20-22
(S.D.N.Y. 2007) ("[a]mended complaint ... consists solely of conclusory allegations ... and ...
fails to state a single specific instance of a defendant submitting a fraudulent bill to the
government"); see also Karvelas v. Melrose-Wakefield Hosp., 360 F.3d at 233 ("as Karvelas
himself concedes ... his complaint "did not set forth the specifics ... of any one single cost
report, or bill, or piece of paper that was sent to the Government to obtain funding").

The Second Circuit has clarified that FCA claims must comply with Rule 9(b). See
Eisenstein v. Whitman, 4 Fed. Appx. 24, 26 (2d Cir. 2001); Gold v. Morrison-Knudson Co., 68
F.3d 1475 (2d Cir. 1995; United States ex rel. Sarafoglou, 451 F. Supp. 2d 613 (S.D.N.Y. 2006).
Fed. R. Civ. P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances
constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Thus, to
meet the requirements of Rule 9(b), a complaint must "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993). In short, a plaintiff must "set forth the who, what, when, where and how of the alleged fraud." <u>United States ex rel. Sarafoglou v. Weill Med. College</u>, 451 F. Supp. 2d 613, 621 (S.D.N.Y. 2006). These requirements promote three purposes of Rule 9(b), "namely: (1) ensuring that defendants have sufficient notice of plaintiff's claims; (2) discouraging strike suits; and (3) preventing the filing of suits that simply hope to uncover the basis for some previously unspecified wrongdoing." <u>Id</u>.

In the present case, Wood has failed to link the defendants' allegedly fraudulent practices to the submission of even a single fraudulent claim. Although she presents a shadowy sketch of the "who, what, when, where and how," her theory of FCA fraud is based solely upon conjecture, surmise and innuendo. Her allegations of fraudulent billing are merely conclusory assumptions and are devoid of the type of detail and specificity that a relator is required to allege under Rule 9(b) because she has failed to allege even a single example of, or details about, a fraudulent claim. <u>Smith v. New York Presbyterian Hosp.</u>, *supra* at * 20-22 (S.D.N.Y. 2007). She has not identified a specific amount of charges that were submitted by a particular defendant, or provided the date when a false claim was submitted, or provided a copy of a single invoice or bill that was paid. These deficiencies in Wood's pleadings unfairly deny SGH and CAE notice of the alleged fraud. <u>See Smith v. New York Presbyterian Hosp.</u>, *supra* at * 20-22. ("[w]ithout a description of any actual fraudulent billing, [d]efendant is forced to search its records for evidence to prove it did not commit fraud, releasing [relator] from the burden of proving that fraud was actually committed"). Since none of Wood's allegations or exhibits provides any information about a specific, fraudulent bill sent to and paid for by the government, her First

Cause Of Action (31 U.S.C. § 3729(a)(1)), Second Cause Of Action (31 U.S.C. § 3729(a)(2)),

and Third Cause Of Action (31 U.S.C. § 3729(a)(7)) must be dismissed.

Furthermore, Wood should not be permitted to plead generally at the outset and then fill

in the blanks with discovery.  As noted recently in Smith v. New York Presbyterian Hosp.,

"[o]ne of the purposes of Rule 9(b) is to discourage the filing of complaints 'as a pretext for

discovery of unknown wrongs.'"  Smith v. New York Presbyterian Hosp., *supra* at * 21 citing

Madonna v. U.S., 878 F.2d 62, 66 (2d Cir. 1989).  See also Decker v. Massey-Ferguson, Ltd.,

681 F.2d 111, 116 (2d Cir. 1982)("Rule 9(b) [fails] in its purpose if conclusory generalizations

… permit a plaintiff to set off on a long and expensive discovery process in the hope of

uncovering some sort of wrongdoing …").  Wood's *qui tam* Complaint does not even come

close to providing the type of detail required by Rule 9(b), and therefore, this Court should

dismiss the *qui tam* action with prejudice.  Smith v. New York Presbyterian Hosp., *supra* at * 25

("[a] with-prejudice dismissal is appropriate under Rule 9(b) where there is a 'good reason' to

deny the plaintiff leave to amend, including where it appears that any amendment would be

futile").

**C.**     **The Complaint Should Be Dismissed Because The Information Quality Act ("IQA") Provides An Exclusive Administrative Process For Challenging The Quality Of Information Disseminated By NIST**

Wood's lawsuit should also be dismissed because it violates the intent of the Information

Quality Act ("IQA"), also known as the Data Quality Act, which establishes an administrative

process for information correction requests and appeals.  Wood's *qui tam* Complaint states that

she has filed a Request for Correction ("RFC") dated March 16, 2007; a Supplement #1 to RFC

submitted March 29, 2007, and a Supplement # 2 to RFC submitted April 20, 2007.  These

documents are attached to the First Amended *qui tam* Complaint as Exhibit A.

The language of the IQA reflects Congress's intent that "any challenges to the quality of information disseminated by federal agencies should take place in administrative proceedings before federal agencies and not in the courts." Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 601 (E.D. Va. 2004) aff'd Salt Inst. v. Leavitt, 440 F.3d 156 (4th Cir. 2006).    The IQA is located at Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106-554) and directs the Office of Management and Budget ("OMB") to issue government-wide guidelines that "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility and integrity of information … disseminated by Federal agencies." Pub. L. No. 106-554, § 1(a)(3) [Title V, § 515] (Dec. 21, 2000)(published at 44 U.S.C. § 3516 note). OMB complied by issuing guidelines on February 22, 2002. See 67 Fed. Reg. 8452. The OMB Guidelines direct each Federal agency to: (1) "adopt specific standards of quality that are appropriate for the various categories of information they disseminate;" (2) "develop a process for reviewing the quality … of information before it is disseminated;" (3) "establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines;" and (4) provide OMB with reports regarding the agencies' information quality guidelines and any information quality complaints they receive. 67 Fed Reg. at 8458-59. OMB guidelines state that agencies should correct information only "where appropriate" and must also "establish an administrative appeal process to review the agency's initial decision." Id. at 8459.

NIST has issued the National Institute Of Standards And Technology Guidelines, Information Quality Standards, And Administrative Mechanism ("NIST Guidelines") which implements Section 515 and fulfills the OMB and Department of Commerce (DOC) information

quality guidelines.  <u>See</u> National Institute Of Standards And Technology Guidelines, Information

Quality Standards, And Administrative Mechanism, <u>http://www.nist.gov/director/quality</u>

<u>standards.htm</u>.  The NIST Guidelines establish a process for submission of Requests for

Correction, and state that "The Chief, NIST Management and Organization Division will attempt

to communicate either a decision on the request, or a statement of the status of the request …

within 60 calendar days."  <u>Id.</u>

      The gist of the First Amended Complaint is contained in her RFC submissions, which are

attached to the Complaint as Exhibit A.   Wood alleges she is an "original source" because of the

March 16, 2007 RFC, <u>see</u> First Amended Complaint, ¶¶ 15, 19, 55, which "challenged NCSTAR

1 in its entirety."  <u>Id.</u> ¶ 7.  Wood's lawsuit should be dismissed for the additional reason that on

January 10, 2008, NIST denied Wood's August 22, 2007 appeal which had asked for

reconsideration of NIST's July 27, 2007 denial of her RFC.  The NIST decision denying Wood's

appeal states "the NIST WTC Investigation reports need no correction . . ." Pollack Aff. 30.

Additionally, NIST clarified that "[t]he reported findings and conclusions in the NCSTAR

reports are NIST's alone." Pollack Aff. ¶¶ 11, 30.  Every court which has been presented with an

IQA claim has recognized that there is no private right of action under the IQA, and has

dismissed the lawsuit due to lack of a right to judicial review of IQA information correction

requests.  <u>See</u> <u>Americans For Safe Access v. U.S. Dep't of Health & Human Serv.</u>, 2007 U.S.

Dist. Lexis 55597, * 8-9 (N.D. Cal. 2007); <u>In re Operation of the Missouri River Sys.  Litig.</u>, 363

F. Supp. 2d 1145, 1174 (D. Minn. 2004), *vacated in part and aff'd in part on other grounds*, 421

F.3d 618 (8th Cir. 2005).  In the <u>Salt Institute</u> decision, the Fourth Circuit affirmed the district

court's dismissal of the suit, stating that "the IQA … does not create any legal right to

information or its correctness."  <u>Salt Inst. v. Leavitt</u>, 440 F.3d at 159.  Accordingly, the IQA

provides an administrative remedy for persons like Wood who feel that an administrative report

is inaccurate.   Finally,   the language of 15 U.S.C. § 281a provides:

> The National Institute of Standards and Technology . . . may initiate and
> conduct investigations to determine the causes of structural failures in
> structures which are used . . . by the general public.  <u>No part of any report
> resulting from such investigation</u> shall be admitted as evidence or used in
> any suit or action for damages arising out of any matter mentioned in such
> report.

<u>See</u> 15 U.S.C. § 281a.   In short, Wood is precluded by 15 U.S.C. § 281 from using any part of

the NCSTAR report as evidence in this suit under the FCA, which is apparently seeking damages

arising out of matters mentioned in such report.  <u>Id.</u>

## D.   <u>The Court Should Award Attorney's Fees To Defendants SGH and CAE</u>

Defendants SGH and CAE seek an award of attorney's fees and costs under 31 U.S.C.

§ 3730(d)(4).  Section 3730(d)(4) provides reasonable attorney's fees to a prevailing defendant in

a *qui tam* action if the court "finds that the claim of the person bringing the action was clearly

frivolous, clearly vexatious, or brought primarily for the purposes of harassment."  31 U.S.C.

§ 3730(d)(4).  A claim is frivolous if it has "no arguable support in existing law or in any

reasonably based suggestion for its extension."  <u>United States ex rel. Bain v. Georgia Gulf Corp.</u>,

208 Fed. Appx. 280, (5th Cir. 2006)(a single jurisdictional or procedural defect may merit a

ruling on frivolousness or vexatiousness).  A claim is "vexatious when the plaintiff brings the

action for an improper purpose, such as to annoy or harass the defendant ... and either of these

grounds is independently sufficient to support an award of attorney's fees under § 3730(d)(4)."

<u>Id.</u>  The Second Circuit has clarified that a relator's subjective bad faith is not an element under

§ 3730(d)(4) and that there can be an award of attorney's fees upon a finding that the relator's

claims are objectively frivolous, despite his subjective intent.  <u>United States ex rel. Mikes v.</u>

Straus, 274 F.3d 687, 705 (2d Cir. 2001) ("[s]ince plaintiff's allegations were bereft of any objective factual support, they clearly had no chance of success … [h]ence, an award of attorneys' fees to defendants was fully justified").  Here, Wood's overwhelming failure to establish subject matter jurisdiction and to satisfy the heightened pleading requirements of Rule 9(b) warrants a finding that her suit is frivolous and vexatious, and that an award of attorney's fees to the defendants is appropriate.  Id.  See also United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp, 152 F. Supp. 2d 443, 451-52 (S.D.N.Y. 2001) (allowing defendants to submit an application for attorney's fees, together with supporting arguments and backup documentation).

### III    CONCLUSION

For all of the above reasons, this Court should dismiss Wood's *qui tam* lawsuit against the defendants Simpson Gumpertz & Heger, Inc. and Computer Aided Engineering Associates.

Respectfully submitted,

**SIMPSON GUMPERTZ & HEGER, INC. and COMPUTER AIDED ENGINEERING ASSOCIATES, INC.**

By its attorneys,


/s/ David M. Pollack _____
David M. Pollack (DP6143)
DONOVAN HATEM LLP
One Penn Plaza
250 W. 34th Street, Suite 3324
New York, NY 10119
(212) 244-3333

David J. Hatem, P.C.
William D. Gillis, Jr., Esq.
Patricia B. Gary, Esq.
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Dated:  February 28, 2008

01140495//25550.144

26