Jerry V. Leaphart #JL4468
Jerry V. Leaphart & Assoc., P.C.
8 West Street, Suite 203
Danbury, CT 06810
(203) 825-6265 – phone
(203) 825-6256 – fax
jsleaphart@cs.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DR. JUDY WOOD, on behalf of | : | |
| The United States of America | : | |
| | : | |
| Plaintiff, | : | <u>ECF CASE</u> |
| | : | |
| vs. | : | February 29, 2008 |
| | : | |
| APPLIED RESEARCH ASSOCIATES, INC., | : | 07 CIV 3314 (GBD) |
| et al | : | |
| | : | |
| Defendants. | : | |

## <u>AFFIRMATION OF ATTORNEY – JERRY V. LEAPHART</u>

1.      I, Jerry V. Leaphart, am an attorney at law, duly licensed to practice before this and other

courts, and am attorney of record and Lead Counsel for the plaintiff, Dr. Judy Wood (plaintiff),

in the above-captioned matter.  This affirmation is in support of plaintiff's opposition to the

motions to dismiss submitted by some defendants.

2.      It is respectfully submitted that the narrowly tailored review that can occur at this

preliminary stage of this case, prior to any discovery at all, cannot properly result in its dismissal.

Plaintiff has demonstrated full compliance with the requirements for being an "original source"

under and pursuant to the qui tam relator provisions of the False Claims Act, all as more

thoroughly elaborated in the Memorandum of Law submitted simultaneously herewith.  The

jurisdictional basis underlying this case appears to be closely approximated in the case entitled U.S. ex rel. Scott Winslow v. Pepsico Inc., et al., (copy annexed as Exhibit 1), that is one of the first cases decided to have been decided *after* the U.S. Supreme Court's decision in Rockwell Intern. Corp. v. U.S., 127 S. Ct. 1397, 1402, 167 L. Ed. 2d 190 (2007), that, in turn, relies upon the now clarified definition of what "information" means for purposes of satisfying the jurisdictional requirements of 31 U.S.C. § 3730(e)4, as a qui tam relator.  It is respectfully submitted that Dr. Judy Wood, like the relator in Winslow (Exhibit 1), initiated the claim of fraud informing this case and either does not have to qualify under the "original source" exception; or, at a minimum, is an original source.  In her Requests for Correction (RFC) dated March 16, March 29 and April 20, 2007, respectively (Exhibits A, B and C of plaintiff's affidavit), plaintiff alleged the defendants herein committed fraud.  In its response to plaintiff dated July 27, 2007, (Exhibit D of plaintiff's affidavit), NIST did not even deny plaintiff's allegations of fraud, nor could NIST.  Instead, the whistle blowing that plaintiff had done in demonstrating and proving that the Twin Towers of the World Trade Center (WTC) were destroyed by directed energy weaponry (DEW), served to get NIST to admit that it had not even investigated those actual collapse events.  See Exhibit D., pg. 1.  Moreover, NIST then defined "collapse" to include the actual destructive event that meant that further confirmed fraud by virtue of defining an event that contained the following particulars that refer to events that NIST excluded from its investigation:

> "To facilitate communication, the term "collapse" as used in this letter and in NCSTAR 1 means a falling in, loss of shape, or reduction to flattened form or rubble of a structure."

> See RFCresponse, plaintiff's affidavit, Exhibit D pg. 1.

3.      In addition, plaintiff also cautioned NIST that in its fraudulent report entitled "Final

Report on the collapses of the Twin Towers of the World Trade Center (NCSTAR 1)" issued in

October, 2005, NIST also admitted that it did not know that among the companies that it had

contracted with, supposedly for the purpose of determining what caused the destruction of the

WTC, were companies whose primary expertise is in weaponry, including directed energy

weapons; to wit:  Applied Research Associates Inc. (ARA), and Science Applications

International Corp. (SAIC):

> "You further claim that ARA is a significant manufacturer of directed energy weapons
> and/or components thereof. Since there is no factual evidence to support this claim, NIST
> has no basis for accepting your proposed corrections to NCSTAR 1."

> See RFCresponse, plaintiff's affidavit, Exhibit D pg. 2

4.      In determining whether and how to represent a client, it behooves counsel to engage in

due diligence in order to determine that a client has a viable claim or cause of action or defense.

More on this subject with respect to defendants improper references to plaintiff will follow later.

5.      A starting point for due diligence consists in understanding the qualifications and the

experience of the client.  There is no doubt that the plaintiff, Dr. Judy Wood, is a qualified

materials scientist who has precisely the kind of education, training and experience to research

what caused the unusual destruction of the WTC on 9/11/01.  In fact, and as further articulated in

the accompanying memorandum of law, plaintiff's educational background is similar to that of

defendant ARA's Lead Investigator assigned to the NIST NCSTAR 1 investigation, Steven

Kirkpatrick.  Separate and apart from qualifications, it actually does not take a materials scientist

to know that kerosene cannot have caused this:



Many people still have the impression the WTC left a huge mound of debris.  It did not.  The

buildings were dissolved to dust:



The elevation shown above reveals the pile was less than one story in height.  This factor is confirmed by seeing the ground level of the remnant of the WTC in the background.  Dr. Wood's RFC provided significant additional confirmation of this fact; namely, that GZ was flat.

6.    And, there is no doubt defendant ARA is a military contractor who makes, develops, tests, stores and otherwise works with the full range of only the most lethal and/or most sophisticated and advanced weapons that are in existence and/or being developed, including this:



ARA is, then, at the epicenter of the "military industrial complex" (MIC)[1].  In fact, ARA

displays its "capabilities" at its own website as consisting in the following capabilities:



Contrast the above with this actual photo of the destruction of the WTC:

---

[1] "In the councils of government, we must guard against the acquisition of unwarranted influence, whether sought or unsought, by the **military-industrial complex**. The potential for the disastrous rise of misplaced power exists and will persist."  President Dwight D. Eisenhower, January 17, 1961.





ARA does not say what message or information it seeks to impart in the above depictions found on their website.

6.     Most people who saw the event were shocked by what happened and not a little taken aback by the sudden destruction of two ¼ mile high skyscrapers that were completely obliterated in less than 10 seconds each.

7.     Dr. Wood, unlike most, did not simply accept the newspaper and television version or accounts, much less the initial official explanations given, without at least giving the matter some critical thought from a scientific, materials science, perspective.  After all, she is a materials scientist.

8.     As a part of my due diligence, I concluded that critical thinking is what scientists and other people who work in a reason-based environment, such as the legal profession, for instance, would naturally do and be expected to engage in; not slurs and innuendo, and/or assumptions that are untested.  So, at the outset, I had no reason to doubt the efficacy of Dr. Wood's findings and conclusions.

9.     I also painstakingly reviewed Dr. Wood's website: http://drjudywood.com and made the determination, as a lawyer, that her research work could pass muster as admissible evidence, provided the process of authentication was followed, with respect to its content; and it is content rich.  I also determined that her information was capable of authentication, by and large, and that even that which was not capable of being authenticated could, nonetheless, serve to refresh recollections and in other respects lead to the discovery of admissible evidence.

10.     It is fair, accurate and candid to say that I had the privilege of providing legal counsel to Dr. Wood that led to her filing her RFCs with NIST; and it is also fair to say that the expectation was that the filing of RFCs could provide a basis for invocation of a qui tam lawsuit.

11.     After the month of March, 2007, when the U.S. Supreme Court issued its decision in Rockwell, I also knew that the law on how the word "information" would be defined was

clarified favorably towards having a valid basis for claiming that Dr. Wood was, at a minimum, an original source for qui tam relator purposes.  The <u>Winslow</u> decision goes even further in this respect by confirming that Dr. Wood's RFCs are not a public disclosure, even though NIST published them.  They did so only after she wrote and submitted them to NIST, who then published them.[2]

12.    Next, I caused to be submitted to the U.S. Directed Energy Directorate (DED), a letter dated April 7, 2007, that posed the following question:  "Is the evidence of destruction shown and amassed by Dr. Judy Wood consistent with destruction that would be caused by directed energy weaponry?"

13.    A few days later, a telephone call was received from a representative of the DED named Juventino (Rich) Garcia who spoke at some length with me and with Dr. Wood.  The conversation was noteworthy, to us, in that Mr. Garcia, despite being given ample opportunity to do so, did not ever deny that DEW had destroyed the WTC.  To be perfectly candid, he did not admit it either.  He was noncommittal, vague, though polite and he invited us to send him additional information.  We did.

14.    On May 3, 2007, we sent Mr. Garcia a more comprehensive depiction of the proof that DEW destroyed the WTC.  See Exhibit 3.

15.    On May 7, 2007, Mr. Garcia responded in writing (copy annexed as Exhibit 5) in which he again neither denied nor confirmed that DEW destroyed the WTC, but in which he said the claim was "interesting" and in which he cited "budgetary constraints" for not being able to investigate further.  Note:  We had not asked DED to investigate the matter.  Hence, Mr. Garcia's reply contained an inference, at least, that he considered the matter worthy of investigation.  Again, the primary significance of the May 7th communication from the DED

---

[2] The website address is:  http://www.ocio.os.doc.gov/ITPolicyandPrograms/Information_Quality/PROD01_002619.

(Exhibit 5) and signed by Mr. Garcia is that it by no means denied that DEW destroyed the WTC.

16.    Frankly, and as a lawyer, I considered Exhibit 5 to be sufficient for prima facie proof that DEW destroyed the WTC.  Were this a criminal matter, I here assert that Exhibit 5 would be sufficient for "probable cause" purposes, standing alone.  When Exhibit 5 is added to the following additional facts, this case is viable:

- NIST admitted in writing that its voluminous NCSTAR 1 report did not investigate the collapses.  See Exhibit D of plaintiff's affidavit and quotations in the annexed memorandum of law.

- ARA and SAIC are, in fact, charter and/or sustaining members of the Directed Energy Professional Society, an organization with the primary purpose of furthering the deployment and refinement of directed energy weaponry, of testing their lethality, of calibrating them for a variety of lethal purposes.  Annexed hereto as Exhibit 6 is the list of sponsors of DEPS clearly showing and naming SAIC and ARA.

- In its 2000 newsletter, aptly named "WAVE FRONT" DEPS asserted that:

    "Lasers in space, lasers in the stratosphere, lasers on and over the battlefield - we're at the beginning of an evolutionary new wave of weaponry."

16.    I did much more than that set out above to determine the validity of Dr. Wood's findings and their viability as a legal claim.  In fact, the process of discovery is ongoing.

17.    We now know, for instance, that the same unusual appearance of smoke that characterized the WTC clean up for many months is still taking place to the present.



We know, too, that what was thought to be smoke, as seen above, really is fuming and is not smoke.  The startling photograph shown above, and the one immediately below, were taken in January, 2008, confirming that dousing of fuming at Ground Zero (GZ) continues to the present:



Among actual witnesses to the event of the WTC destruction, there are those who were baffled by what they thought was smoke, but which was not smoke.  See, for instance the testimony of Firefighter Robert Byrne, who states:

"Basically, I got as far as the third floor, where I ran into -- it looked like there was a collapse down there.  It was pretty bad.  It was all smoky and dusty.  I thought it was  smoke, and I got a little nervous.  I was at the point where I was going to go up and get another  Scott tank, but <u>I realized it wasn't smoke</u>."

"It was a good thing I had my flashlight on still, because it was pitch-black.  I followed  a pitch-black hallway, and that's where I ran into a group of civilians.  When we got to the point, I think it was the lobby, and that's where we had -- we had a little overhead protection there, and then we had to run across to the next overhead protection it was about a 75 foot run.  There were jumpers and debris that was falling.  We had to pretty much take our chance when we made the run."

"There were bodies littering the courtyard**.**  Everything was on fire."

We know, too, that in the unusual and lethal fire that took place at the Bankers Trust building in August, 2007, resembled those that occurred on 9/11 involving automobiles and rescue vehicles that spontaneously burst into flames even though they were blocks away from GZ and were not seen to have been hit by debris.



Compare:



18.    We do not at this point of the exact extent to which any of the defendants herein are involved in the ongoing GZ clean up, but we do assert that we have seen information confirming that one non-appearing thus far defendant, SAIC, controls the GZ site by virtue of managing the "security" there.  See Affidavit of Andrew Johnson.  One reason for not knowing is that the contractual situation for the current clean up is shrouded in secrecy and misrepresentation.  A shell company called "John Galt" was the primary contractor for a period of time until it was determined the company basically did not exist.  While I have reason to believe that ARA and SAIC and/or other MIC companies are involved in the ongoing GZ DEW cleanup, I do not know that for certain and, in any event, that issue is somewhat tangential to this qui tam case.

19.    I have also reviewed the information on the contracts entered into by each of the defendants who are involved in this case and for whom such information is available.  Annexed hereto as Exhibit 7 is a complete summary of the contract work performed by each of the defendants, including all who have filed motions to dismiss citing F.R.Civ.P. Rule 9(b).

20.    It is submitted that the complaint and amended complaint herein adequately put the defendants on notice of what they did and of why it was fraudulent for them to have done so.  At

most, these defendants might be legally entitled to receive a more definite statement or an amended complaint. That is the remedy frequently invoked when a complaint alleging fraud is deemed to lack specifics. Certainly, there is no lack of specifics; and, instead, it is contended that defendants herein are being disingenuous in claiming entitlement to Rule 9(b). We have said they engaged in the fraud of covering up the true cause of the destruction of the WTC, which was destroyed by DEW. We have also said each and every defendant had expertise that should have been sufficient for them to see that no amount of kerosene could have flattened those skyscrapers and that it was absurd to put forth a 10,000 page report that did not even investigate the collapses, as they called the destructive process, and then lend their prestige to the claim that it was the "final report" on the collapses of the Twin Towers. That is an outrage and it is fraud.

21.    This is a case that is ripe for discovery. There exists a variety of ways of proving that DEW destroyed the WTC, including firsthand witness accounts.

22.    We know, from some sources who will only respond to court orders that they appear and testify, that the towers dissolved in midair, with little material actually hitting the ground. Dr. Wood's information confirms the fact that GZ was flat. I can say to this tribunal that there are people who are literally afraid to say what they know for fear of reprisal, but that they know the buildings did not collapse and that, instead, they were dissolved by an unseen 'force.'

23.    And, there are several who had, in fact, described that force, which's accounts we have reviewed, systematically in confirmation of Dr. Wood's DEW assertions. One such witness is EMT Rene Davila, who is one of the over 500 first responders who provided a written account of his experience that day. EMS Davila stated:

> "Something knocked me down. I don't know if something hit my helmet or whether it was a force. I got down, and I thought I've

got to get up.  By the time I got up, it was like [sound] I'm overcome
by black and I'm running and I'm running...In this room there's nothing
but computers, maybe five, six computers, and phones.  As I'm in
there, this force is still coming through the cracks of the door….I see my
vehicle.  The seats are covered.  I've still got my bag.  I hold it like a
trophy.  Like people collect basketballs.  I haven't touched – whatever
the force was, it was so strong that it went inside of the bag".

Mr. Davila's statement is noteworthy for the additional reason that he describes the spontaneous

destruction of vehicles that was common on 9/11 at up to several blocks away from GZ.  Mr.

Davila, when asked if his fire truck caught fire stated with uncommon candor:

"Fire  We saw the sucker blow up."

24.    There is another reason why Mr. Davila's witness statement is noteworthy and that is, it

is redacted.  At this point in this case, we do not know why there are so many redacted

statements among the 500 or so first responder accounts.  NIST was asked about the redacted

statements in Dr. Wood's RFC Supp No. 2, Exhibit C, but NIST did not reply directly to that

issue.  Annexed hereto as Exhibit 8 is a compilation showing there are over 100 redacted

statements among the 500 statements that are maintained at

http://www.nytimes.com/packages/khtml/2005/08/12/nyregion/20050812_WTC_GRAPHIC.htm

l.

25.    Another important witness to the effects of DEW is Patricia Ondrovic who has given

rather dramatic testimony, among that part that we can see, since significant portions of her

statement are redacted and looks like this:

13

P. ONDROVIC

and all of a sudden, I couldn't breathe. I was trying to get back in the swing of things, 

His statements to two of my co-workers, as well

as a lieutenant was, it's part of the job. If I can't handle the job, I shouldn't have it. I

don't think what any of us responded to that day was part of anyone's job, let alone ours.

That was a military operation. Of course, what are you gonna do? It could have been my

day off. I could have been shopping at Border's Books.

I don't think anyone's ever been exposed to

something like this before here. Of course not, but we all know EMS has a high rate of

suicide. Not saying that that's gonna be my case cause no, I refuse, I wouldn't let

anybody push me to that corner.

    Q:    I'm glad to hear that.

In her above excerpted statement, she proclaims "that was a military operation." It is unclear

what she meant by that and the portion that might have provided context is redacted.

26.    In another part of EMT Ondrovic's statement she points out:

    "A.    ...I kept running North.

Q.    Through North Park?

A.    I guess that's North Park…two or three more cars exploded on me. They weren't near any buildings at that point, they were just parked on the street…there were still cars parked on the street that were completely independent of that ['this thing happening']. Three cars blew up on me, stuff was being thrown…".

In still another part of her statement, EMT Ondrovic clearly describes unusual aircraft, visible in the sky:

"I just ran into this park along with a bunch of other people, and stuff was still blowing up, I don't think I looked back, but you couldn't see anything, everything was just black. I was running and I was falling over people, cause people were crawling on the ground cause they couldn't see anymore. I just kept on running north,. I could smell water, so I just kept on running towards the water, cause I knew that my coat was on fire, and I figured well, if I can see a boat over the water, I'm just gonna jump onto the boat and take that thing to Jersey, cause no one wants to blow up Jersey. Stuff is still blowing up behind me, as I'm running. I can hear stuff exploding. I could hear rumbling, the street under me was moving like I was in an earthquake. I've been in those, so I know what they feel like. It felt like an earthquake. There was no where safe to go. As I was running north in this park, and then I could start seeing again a little bit, and I just kept looking in the sky. Cause the captain was saying there's another plane heading in our direction, I was looking for another plane. I saw something in the sky, it was a plane, but it was way out. It looked like it was over Jersey or something, then it wasn't there anymore. I saw a small fireball, and it was gone. I saw two other planes. One came in one way, and the other came in the other way, and there was a plane in the middle that was way far off in the distance. Then the plane in the middle just disappeared into a little fireball. It looked like the size of a golf ball from where I could see it. And the other two planes veered off into opposite directions. I just kept on running north."

27.    Another witness, Firefighter Fernando Camacho actually describes people disappearing. Granted, he could mean they disappeared into the clouded darkness; but, then again, we have no reason not to take him at his literal word because, after all, most victims are totally unaccounted for. He states:

"The firefighters that were ahead of us and the civilians that were ahead of us totally disappeared."

28.     At some point, even the most skeptical of observers will be forced to acknowledge that the case for DEW as a causal factor in the destruction of the WTC is rather overwhelming.

29.     It might not have taken a PhD. materials scientist to know that kerosene cannot do this to solid structural steel, but the defendants herein include those who are experts in metallurgy and in the manner in which steel performs when subjected to all sorts of stresses.  That is what defendant UL actually does.  This could not have been caused by kerosene, and they know it:



30.     In contrast to the specific information, vetted and verified in a variety of ways, defendants, in their memorandum of law seek to improperly castigate plaintiff and her claims using, repeatedly, words like the following:

       delusional              [used at least twice]

       conspiracy theory     [no fewer than eight (8) times]

       conspiracy           [twenty-six (26) instances]

Defendants ARA's brief also contains the highly misleading and inappropriate characterization of plaintiff's contention that betrays a desire to continue misrepresenting what she has actually said and what fraud she has in fact uncovered.  Defendants state:

> "Relator alleges that the Defendants conspired with the United States Government to demolish the World Trade Center Towers using lasers orbiting in space and then created an elaborate cover story including the lie that aircraft struck the World Trade Center. As part of this supposed conspiracy."

That is not what plaintiff contends, for purposes of this qui tam case and that characterization has nothing whatever to do with her complaint; other, that is, than virtually every part of it can be traced to either a witness statement, such as that of EMT Patricia Ondrovic or a statement from WAVE FRONT, as published by the Directed Energy Professional Society, of which defendants herein are founding and/or sustaining members.  So, even if the claims were a part of plaintiff's allegations of fraud, they are fact-based.  Defendants concluded their brief with still more abusive obfuscation:

> "Finally, Relator's allegations are nothing more than a delusional conspiracy theory and are egregiously frivolous.  This alone justifies dismissal of Relator's claims."

The quoted statements merit a Rule 11 motion.  They also merit a bit more information about plaintiff.

31.    Dr. Wood, in addition to her technical acumen, was bestowed with considerable athletic skill and willingness to engage in strenuous physical fitness.  She had logged over 200,000 miles on bicycles and had won numerous cycling races, gender and non-gender specific by June of 1985 when she was victimized by a vicious hit and run accident that left her nearly dead.  At the time, she was in her PhD. Program and aspired to combine her engineering expertise with her physical fitness in order to enroll in NASA's astronaut program.  The accident prevented her

from continue towards becoming an astronaut and delayed completion of her doctorate.  Her

doctors thought she would most likely be wheelchair bound for the rest of her life.  But, her

commitment to fitness enabled her to achieve a far greater recovery than her medical team

thought possible.  She still suffers some adverse effects from the accident; however, and this is

for ARA's benefit, being "delusional" is not one of them.  This is a record of the pre-accident Dr.

Wood:



Dr. Wood is the one in front.



Dr. Wood is the one in the yellow jersey.

31.     Defendants have been properly cautioned and provided with documentation confirming the prima facie validity of plaintiff's claims.  An email letter was sent to all counsel on February 20, 2008, in ample time for a retraction of the abusive language contained in defendants' memorandum of law.  A further admonition was sent on February 22, 2008, that elicited a reply, albeit one of defiance from defendants.  In turn, this office responded once again and that is where matters presently stand with respect to plaintiff's contentions that defendants are engaging in improper characterizations of plaintiff's claims and are otherwise ignoring her claims, thereby placing their clients at risk of exposure that they should be addressing rather than ridiculing.  By ignoring the actual information contained in the complaint, defendants' further confirm that their

claim to entitlement to "more particulars" under the guise of an F.R.Civ.P Rule 9(b) challenge

lacks good faith.


<u>/s/ Jerry V. Leaphart</u>
Jerry V. Leaphart

Dated: Danbury, CT
        February 29, 2008