UNITED STATES OF AMERICA, EX REL. SCOTT WINSLOW, Plaintiff,-against- PEPSICO, INC., PEPSICO BEVERAGE NORTH AMERICA, PEPSICO INTERNATIONAL,INC., PEPSI-COLA SALES & DISTRIBUTION, INC., VANDEGRIFT FORWARDING, INC.,Defendants.

05 Civ. 9274 (CLB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OFNEW YORK

2007 U.S. Dist. LEXIS 40024

May 30, 2007, Decided
May 31, 2007 Page, Filed

CORE TERMS: concentrate, customs, classification, beverage, preparation, imported, odoriferous, import, manufacture, public disclosure, primary jurisdiction, non-alcoholic, classified, knowingly, shipment, importation, heading..., plant, false statement, soda, alcoholic, qui tam, allegations of fraud, pleading requirements, certification, fraudulent, importing, requisite, publicly, manufacturing

COUNSEL: [*1] For United States of America, Ex Rel Scott Winslow, Plaintiff: Mark Paul Carey, LEAD ATTORNEY, Carey & Associates P.C., Southport, CT.

For PepsiCo, Inc., PepsiCo Beverage North America, PepsiCo International, Inc., Pepsi-Cola Sales & Distribution, Inc., Defendants: Jonathan H. Beemer, Karen M. Asner, Todd A. Gluckman, LEAD ATTORNEYS, White & Case LLP (NY), New York, NY; George James Terwilliger, White & Case LLP, (DC), Washington, DC.

For Vandegrift Forwarding, Inc., Defendant: Eva Lopez-Paredes, Richard M. Zuckerman, LEAD ATTORNEYS, Sonnenschein Nath & Rosenthal LLP (NY), New York, NY.

JUDGES: Charles L. Brieant, U.S.D.J.

OPINION BY: Charles L. Brieant

OPINION

Memorandum and Order

Brieant, J.

Before the Court is a motion by defendants PepsiCo, Inc., PepsiCo Beverage North America, PepsiCo International, Inc., and Pepsi-Cola Sales & Distribution, Inc., (collectively "PepsiCo") n1 to dismiss the qui tam Relator's complaint, pursuant to *Federal Rules of Civil Procedure 12(b)(1), 12(b)(6)*, and *9(b)*. (Doc.19).

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Relator also named as defendants two unincorporated management divisions of PepsiCo, Inc.: PepsiCo Beverage North America, which is no longer a management division of PepsiCo, Inc., and PepsiCo International. As is stated below, the PepsiCo defendants are the only defendants remaining in this action.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*2] Relator Scott Winslow (the Relator) brought this reverse qui tam action on November 1, 2005 pursuant to the False Claims Act, *31 U.S.C. § 3729 et seq.* ("FCA"). The Relator claims that PepsiCo knowingly and fraudulently mis-classified soft drink concentrate that it imported from the Republic of Ireland, in order to avoid United States import duties.

PepsiCo classified its substance under customs classification HTS 3302.10.1000, which is entitled "Mixtures of Odoriferous Substances used in the Manufacture of Non-Alcoholic Beverages." Imports under a § 3302 classification are not subject to any customs duties. The Relator claims that the concentrate properly should have been classified under HTS §

1

2106.90.99, entitled "preparations for the manufacture of beverages." Imports under this classification are subject to an ad valorem duty of 6.4%. The Relator's Amended Complaint alleges that PepsiCo knew that the proper classification should have been under § 2106.90. The Amended Complaint claims that, in knowingly mis-classifying the imported concentrate, PepsiCo violated the "reverse false claim" provision of the FCA, which imposes liability on "any[*3] person" who "knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay... to the Government." *31 U.S.C. § 3729(a)(7).*

The facts below are taken from Relator's Amended Complaint, unless otherwise specified, and are assumed to be true for the purposes of this motion only.

All goods imported into the United States are taxed according to the Harmonized Tariff Schedule of the United States ("HTS"). The system includes more than 10,000 possible legal classifications. United States Customs and Border Protection (CBP), the agency responsible for interpreting the HTS, states on its website that the HTS "provides duty rates for virtually every item that exists. Experts spend years learning how to properly classify an item in order to determine its correct duty rate." http://customs. gov/xp/cgov/import/duty_rates/determining.xml.

As the Government explained in its Statement of Interest submitted in this case, "CBP relies on importers to supply accurate information about imported merchandise-including the applicable HTS classification." The importer is required to declare under oath that, among[*4] other things, "all statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct." *19 U.S.C. § 1485(a)(3).*

The imported substance in this case is a "concentrate product." In or about January 2003, PepsiCo began to manufacture its soda concentrate at a new facility at Cork, Ireland. This plant was, according to the complaint, part of a large initiative by PepsiCo called GCS:

"'GCS' stands for Global Concentrate Sourcing and represented the largest capital expenditure ever made by PepsiCo in the Ireland Concentrate Manufacturing Plant to the tune of $150 million []. The PepsiCo Ireland Manufacturing Plant in Cork, Ireland produces Pepsi, Diet Pepsi, Pepsi Free and Mug Root Beer concentrate. All other concentrate is produced in other manufacturing plants located in the United States and worldwide." Am. Compl. P 84.

From January 2003 until March 2005, PepsiCo imported and declared to Customs more than $1 billion worth of concentrate. Relator alleges that imported Concentrate is "sold to independent bottlers at a very high cost (between $15M-$20M per 55 gallon drum) as the.... formula for PepsiCo[*5] products." Am. Compl. P 66.

Relator's Amended Complaint, while over seventy pages long, does not convey an easily discernable narrative of events and allegations. n2 Nevertheless, Relator's allegations with regard to PepsiCo's concentrate operations can be summarized as follows:

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 The Amended Complaint is littered with innuendo and bizarre, irrelevant statements that appear to serve no purpose other than to convey a former employee's resentment. In describing a PepsiCo Senior VP, Relator reports that "'Big Lou' was known for his dapper dress and flashy cars." P 113. Relator makes clear to the reader that he felt underappreciated: "The entire GCS project was shoved down everybody's throat, with a do or die attitude, that was born from the top starting with the CFO Indra Nooyi who took full credit for the project." P 167. "Although the concentrate business was making billions and billions of dollars, raises were unheard of in the concentrate bullpen." P 168. "The women in the office had control of the inventory and felt their jobs secure, taking as many days off as they wished, calling in sick when business was tough, and showing up late when they felt like it." P 168.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*6] Relator Mark Winslow is a former employee of Defendant PepsiCo, Inc. He was hired by PepsiCo in 2002 to a position at its "Worldwide Concentrate Headquarters" in Valhalla, N.Y. During the period from July 2002 to mid-2004, when Winslow changed jobs within PepsiCo, Winslow was one of the PepsiCo employees responsible for PepsiCo's importation of its concentrate from the Cork facility. Am. Compl. P 60.

Winslow was terminated in early 2005 for alleged poor performance. The Complaint describes PepsiCo's concentrate operations as shrouded in secrecy, while at the same time riddled with incompetence:

"Relator found that concentrate operations were isolated from the rest of PepsiCo with its own policy and procedures. Despite other colleagues mentioning downsizing and cutbacks, Relator was told that Concentrate was immune to ups and downs of other areas of PepsiCo. The Concentrate executives appeared to have unlimited spending accounts and used Research and Development warehouse to store personal items and even used the concentrate supply chain to delivery [sic] wine to friends. There was a club like atmosphere on the second floor of the concentrate operations building. Doors to[*7] the Concentrate Boardroom and executive offices were always kept shut, few people ever saw or heard from the concentrate executives. When Relator met with his managers in the first floor concentrate operations office, they would usually ask him to close the door behind him." P 131.

Relator claims that he came to be aware of the alleged concentrate importation fraud through a series of events. When the decision to move production of all Pepsi concentrate products to the Ireland plant was made, Relator was told that there would be a lot of "grunt" work to do, but that production in Ireland would secure "massive production tax advantages and duty free importation." P 117. Around this time, Relator alleges that Michael Masucci, Relator's direct superior and at that time the Transportation Manager, told him "Scott, in concentrate operations we have the ability to shut down PepsiCo." P 126.

During the first weeks of November 2002, Relator was informed that Vandegrift Forwarding Incorporated n3 had been selected as the customs broker for the concentrate. P 132. Relator and Masucci were told to prepare an "import manual" for their meeting with Vandegrift President Mitch Scher. In that[*8] meeting, held on December 11, 2002, Relator claims that Customs classifications and import duties were discussed, and that Scher made the following statements: "The repetitive nature of this business is very helpful." "Please put together an import and compliance manual." P 135. "Listen guys Customs is like the IRS-they only look at the top 1000." P139. "Do not rock the boat." P140. "Do not draw attention." P 141. "Your delays will begin at the FDA and then followed at Customs." P 142. "Scott you realize that this is all dutiable including not only the concentrate but the plant machinery, USA staff and Cork staff involved in the process." P 147. "Your FDA coding

will be odiferous substance." P 150. "Your problem is you can not [sic] prove you are paying a small office in Ireland $30 million a week." P 153. "If you get a US Customs audit you will need to show a transfer-debit-transaction-bank draft." P 155. "You guys need to understand CUSTOMS 101 SHOW PROOF OF PAYMENT." P 157.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 Vandegrift was originally named as a Defendant in this action. By stipulation dated May 4, 2007, Relator voluntarily dismissed all of his claims against Vandegrift, including the conspiracy claim that he had asserted against both PepsiCo and Vandegrift.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*9] Relator alleges that Vandegrift "acted as PepsiCo's attorney... filing FDA, Customs and relevant documentation for the importation of concentrate." Accordingly, Vandegrift stated on Customs Form 7501 that all of the prices, and all of the statements, contained in the invoice were true.

During a recall of a shipment of Diet Pepsi concentrate due to quality control concerns, Relator claims that his director, Mr. Molner, told him that the concentrate could be "'easily mixed' with carbonated water to produce the soda product sold to the U.S. Bottlers." P 187. Defendant disputes this and asserts that further manufacturing steps are necessary beyond the mere addition of water.

2003 RFI

On November 3, 2003, while employed at PepsiCo, Relator received a formal Request for Information ("RFI") from Customs, requesting a sample of concentrate from a shipment that was on hold in Charleston, S.C. Relator passed this information on to his manager Masucci. When Relator later asked Masucci about the status of the matter, Masucci stated that the PepsiCo executives "do not know what to do." Masucci also allegedly stated: " Scott, you know that request is really sending a shockwave through[*10] the PepsiCo executive, I even hear Treasury and Tax are getting involved in this... it is about time someone paid attention

3

to what is going on in this business importing concentrate." P 200. Masucci also told Relator that if he was asked about concentrate imports by someone outside of the company, to "play dumb" and reply, "I don't know". P 203. Relator claims that the resolution of this RFI was "suspicious", because, according to him, PepsiCo never provided a sample to the government, but instead performed its own testing. P P 199-200.

Customs Classifications at Issue in this Case

   Relator claims that PepsiCo knowingly and fraudulently entered and imported its concentrate under HTS subheading § 3302.10. The Explanatory Notes to this section state that the "odoriferous substances" covered by the section are "essential oils, resinoids, extracted oleoresins and synthetic aromatics." The notes further state that:

The heading also includes other preparations based on odoriferous substances, of a kind used for the manufacture of beverages. These preparations may be either alcoholic or non-alcoholic and may be used to produce either alcoholic or non-alcoholic beverages.[*11] They must have a basis in one or more odoriferous substances... which are used primarily to impart a fragrance and secondarily to give a flavor to the beverages. Such preparations generally contain a relatively small quantity of odoriferous substances which characterize a particular beverage; they may also contain juices, colouring matter, acidulants, sweeteners, etc., provided that they retain their character of odoriferous substances...

   The heading excludes compound alcoholic and non-alcoholic preparations of a  kind used for the manufacture of beverages, with a basis of substances other than odoriferous substances described in Note 2 of this Chapter (heading 21.06), unless they are more specifically provided for elsewhere in the Nomenclature). (emphasis in original).

   Relator argues that PepsiCo should have instead classified its concentrate under § 2106, which is entitled "Food preparations not elsewhere specified or included." The explanatory notes to that chapter state that this subsection includes:

Non-alcoholic or alcoholic preparations (not based on odoriferous substances) of a kind used in the manufacture of various non-alcoholic or alcoholic[*12] beverages... The preparations contain (in whole or in part) the flavouring ingredients which characterize a particular beverage. As a result, the beverage in question

can usually be obtained simply by diluting the preparation with water, wine or alcohol, with or without the addition, for example, of sugar or carbon dioxide gas. Some of these products are specially prepared for domestic use; they are also widely used in industry in order to avoid the unnecessary transport of large quantities of water, alcohol, etc. As presented, these preparations are not intended for consumption as beverages and thus can be distinguished from the beverages of Chapter 22...

   The heading excludes preparations of a kind used for the manufacture of beverages, based on one or more odoriferous substances (heading 33.02)" (emphasis in original).

   The notes also state that § 2106 covers:

Preparations for the manufacture of lemonades or other beverages, consisting, for example, of:

   ... syrup flavored with an added compound preparation of this heading... containing, in particular, either cola essence and citric acid, coloured with caramelised sugar, or citric acid and essential[*13] acid.

   The Amended Complaint alleges that:

On information and belief, PepsiCo and Defendants never used reasonable care in identifying the proper classification for the importation of its soda concentrate from Ireland. On further information and belief, PepsiCo and Defendants knew they were intentionally using the wrong HTS classification, but continued to do so because it was highly profitable and the Customs Service would not investigate their use of the HTS classification 3302.10.

Motion to Dismiss for Lack of Subject Matter Jurisdiction

   PepsiCo moves to dismiss pursuant to *Fed. R. Civ. P. 12(b)(1)*, arguing that the FCA specifically bars this Court's subject matter jurisdiction. Specifically, PepsiCo argues that *§ 3730(e)(4)(A)* divests this Court of subject matter jurisdiction over this case because Relator's FCA claims are based on publicly disclosed information of which Relator was not the original source. The relevant part of the statute reads as follows:

4

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, [*14]or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information. *31 U.S.C. § 3730(e)(4)(A).* (emphasis added).


PepsiCo contends that the 2003 RFI sent to PepsiCo was a "public disclosure", of the kind specifically enumerated in that section of the FCA in that it was an "administrative investigation." PepsiCo argues that "[i]t is the RFI itself that disclosed the question as to the proper classification of PepsiCo's concentrate to the Relator." (Def.'s Reply Br. 3, n.4).

The Court disagrees with PepsiCo's argument that the 2003 RFI sent by Customs constituted a "public disclosure" that bars this Court's jurisdiction under the FCA. The jurisdictional bar based on "public disclosure" of allegations of fraud was added to the FCA by Congressional Amendment in 1986. Our Court of Appeals explained the purpose of the Amendment in a decision written by Judge McLaughlin:

Because qui tam plaintiffs ("relators") are entitled to[*15] a portion of the proceeds of successful suits, there is the potential for parasitic lawsuits by those who learn of the fraud through public channels and seek remuneration although they contributed nothing to the exposure of the fraud. To discourage such chicanery, Congress carefully crafted a jurisdictional bar to qui tam claims that are based on publicly disclosed information.

*U.S. ex rel. Doe v. John Doe Corp., 960 F.2d 318, 319 (2d Cir. 1992).*


Our Court of Appeals reiterated in Doe its holding that "allegations of fraud are publicly disclosed when they are placed in the 'public domain.'" *Id at 322* (internal citations omitted). In that case, government investigators "explained to the employees that they were investigating allegations that John Doe Corp. was fraudulently overcharging the government under defense contracts. Several, but not all, employees questioned knew of the overcharging by the defendant." *Id at 320.* The Court of Appeals held that this constituted public disclosure, because those employees who were innocent were unaware of any fraud being perpetrated against the

government. ("Here... the allegations[*16] of fraud were not just potentially accessible to strangers, they were actually divulged to strangers to the fraud, namely the innocent employees of John Doe Corp." *Id at 322*.

PepsiCo is correct in its assertion that the RFI was publicly disclosed.-i.e., that it was in the "public domain." Where its argument fails is in regard to the content of the "public disclosure." The 2003 RFI simply requested PepsiCo to "provide a sample of the imported merchandise ... along with the lab sample label enclosed herewith to the US Customs Laboratory", and to "Submit descriptive information, including component breakdown with percentages by weight and CAS #'s (if available)." It also stated that it was in regard to "Soda Concentrate" imported from Ireland under an HTS subheading of 330210100. The 2003 RFI simply contained no allegations or suggestions of fraud that were accessible to the public. See *Rockwell Intern. Corp. v. U.S., 127 S. Ct. 1397, 1402, 167 L. Ed. 2d 190 (2007)* (the parties conceded that there was public disclosure when the media reported toxic leakage of Defendant's concrete blocks) *U.S. v. New York Medical College, 252 F.3d 118, 120 (2d Cir. 2001)* [*17](an audit by a public benefit corporation specifically found that Defendant had overcharged the corporation by over $2 million). The mere request for a sample of the imported substance, without more, is not sufficient to inform anybody of a fraud being imposed on the United States.

Because there was no public disclosure of the allegations of fraud, the Court does not reach the issue of whether or not the Relator was an "Original Source" of such information, within the 1986 amendment.

Motion to Dismiss for Failure to State a Claim

PepsiCo moves alternatively to dismiss Relator's Amended Complaint pursuant to *Fed. R. Civ. P. 12 (b)(6)*, arguing that 1) Relator has failed to plead a "false statement", as is required by the FCA; and 2) Relator has failed to meet the heightened pleading requirements of *Rule 9(b)*.

The requirements of *Rule 12(b)(6)* in this Circuit are so well known that no detailed citation is necessary. In order to state a claim under the FCA for a "reverse false claim", the Relator must allege (1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to[*18] the United States; (2) that the statement or record was false; (3) that the defendant knew that the statement or record was false; and (4) that the United States suffered damages as a result." *United States v. Raymond & Whitcomb Co., 53 F. Supp. 2d 436, 444-445 (S.D.N.Y. 1999)*(Motley, J.) (Internal citations omitted).

5

PepsiCo argues that the complaint should be dismissed because Relator has not pled the requisite false statement required by the FCA. PepsiCo argues that, "at best, [the complaint] challenges the ultimate classification, which is a legal interpretation based on a unique set of facts." Def.'s Mem. in Supp. 11. PepsiCo further states that "[a] disputed interpretation of a government regulation or contract provision about which reasonable minds can disagree cannot constitute a requisite false statement because it is not an objective statement of fact." Id at 12.

Liability under the FCA requires that Defendant " knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." *31 U.S.C. § 3729 (a)(7)* (emphasis[*19] added). Our Court of Appeals has noted that "the term 'false or fraudulent' is not defined in the Act." *Mikes v. Straus, 274 F.3d 687, 696 (2d Cir. 2001)*. However, the Supreme Court has held that the Act is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co., 390 U.S. 228, 232, 88 S. Ct. 959, 19 L. Ed. 2d 1061* .

PepsiCo certified, as it was required to do under the statute, that the statements made to Customs were true. *19 U.S.C. § 1485(a)*. As the United States argues in its Statement of Interest:

Pepsi's certification directly implied certain facts about the nature of the substance it was importing... [B]y certifying that its concentrates were properly classified under [3302.10.1000], Pepsi thereby certified that the concentrates were mixtures based upon odoriferous substances. If Pepsi was in fact importing soda concentrates that did not contain any odoriferous substances, or of such substances did not form the basis of the product, then Pepsi's certification would be 'false'". (10).

This Court agrees, and concludes that[*20] the certification of the concentrate under 3302.10. if false, is sufficient to constitute a "false statement" under the FCA. n4

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 After the Government submitted its Statement of Interest, PepsiCo appeared to have abandoned this argument, both at oral argument and in its reply brief.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Pleading Requirements Under *Rule 9(b)*

PepsiCo also argues that Relator's complaint fails to meet the heightened pleading requirements of *Fed. R. Civ. P. 9(b)*. PepsiCo argues that the Amended Complaint "is not founded upon factual allegations of particularized false or misleading statements, but rather, in a conclusory fashion, simply equates fraud with an allegedly erroneous HTSUS classification, supporting that conclusion with the allegation that it was "profitable to do so." Def.'s Mem. in Supp. 15.

*Federal Rule of Procedure 9(b)* requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Our[*21] Court of Appeals has held that, because "[i]t is self-evident that the FCA is an anti-fraud statute," the heightened pleading requirements of *Rule 9(b)* apply. *Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476 (2d Cir. 1995)*. In order to meet this standard, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)*.

Relator has identified the alleged false statements, and has identified when and where they were made. Specifically, Relator alleges that PepsiCo's import entry statements and records were false or fraudulent on each date they were certified and submitted with respect to various shipments at various points of entry. Relator has attached a list of every shipment of concentrate that he claims was incorrectly classified. In the list, Relator details, among other things, the port of entry, the declared value, and the date of arrival of each shipment. These allegations are adequate to satisfy *Rule 9(b)*.

This Court also[*22] concludes that the Amended Complaint adequately alleges the requisite intent required by 9(b), and alleges facts sufficient to raise the inference of fraud. Our Court of Appeals has held that the "requisite intent [for liability under the FCA] is the

knowing presentation of what is known to be false" as opposed to negligence or innocent mistake." *Mikes v. Straus, 274 F.3d 687, 703 (2d Cir. 2001)* (quoting *Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1478 (9th Cir.1996))*. The FCA provides that:

For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information--

  (1) has actual knowledge of the information;

  (2) acts in deliberate ignorance of the truth or falsity of the information; or

  (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

  *31 U.S.C. § 3729 (b)*

Reading the Amended Complaint in the light most favorable to Relator, as the Court must in a motion to dismiss, it tells us that PepsiCo executives purposely turned a blind eye towards the importation and classification[*23] of their concentrate, when they had reason to believe that the classification was incorrect. This allegation is supported by the statements attributed to Vandegrift President Mitch Scher, supra. If, as alleged, PepsiCo management purposely stayed aloof from the classification details, this could be evidence of scienter.

Less specific is Relator's allegation that PepsiCo did not provide a true sample of the imported product to Customs in response to the 2003 RFI. It is not fatal to the complaint that Relator does not specify who exactly made the certification on behalf of the company, or who in PepsiCo, if anyone, provided the sample to Customs in response to the RFI. As our Court of Appeals has held, "[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co. , 902 F.2d 169, 172 (2d Cir. 1990)*.

Doctrine of Primary Jurisdiction

PepsiCo argued in its initial brief in support of its motion that, even if the Court finds that the Amended Complaint satisfies the requirements of *rules [*24]12(b)(1)* and *12(b)(6)*, that the Court should dismiss this case as an exercise of its discretion under the doctrine of Primary Jurisdiction. PepsiCo argued that

because Customs investigated the issue of the classification of the concentrate twice, (in the RFI's of 2003 and 2006) and twice upheld PepsiCo's classification of the imported substance, that the action should be dismissed in deference to the expertise of Customs.

As the United States argues in its Statement of Interest submitted in this case, and as PepsiCo now seems to recognize, the doctrine of primary jurisdiction simply does not provide a basis by which this case can now be dismissed. "The doctrine's central aim is to allocate initial decisionmaking responsibility between courts and agencies and to ensure that they 'do not work at cross-purposes.'" *Ellis v. Tribune Television Co., 443 F.3d 71, 81 (2d Cir. 2006)* (quoting *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir.1996)* (emphasis added)). Application of the doctrine is appropriate where " preliminary reference of issues to the agency will promote that proper working relationship between court[*25] and agency that the primary jurisdiction doctrine seeks to facilitate." *Ellis at 82* (emphasis added). This is such a case. If the product was in fact correctly classified and properly entered under § 3302 as a "mixture of odoriferous substances used in the manufacture of non-alcoholic beverages," all the lurid allegations of the Amended Complaint fade into insignificance. It seems to this Court, informed in part by the necessity of reading and considering the so-called "Murphy Letter," n5  that the substance is exactly what PepsiCo claims it is, by the plain meaning of the Harmonized Tariff Schedule, and was properly entered under § 3302. If this is in fact is true, it does not matter if, as Relator suggests, he and some of his associates believed they were pulling a fast one on the Government. This ultimate fact may not be adjudicated on a motion addressed to the face of the complaint.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 This Court has held at Defendant's request that the Murphy Letter is the subject of attorney-client privilege, although Relator is in physical possession of a copy of it.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

[*26] PepsiCo points out that "Customs has investigated PepsiCo's classification not once, but twice-first, at the end of 2003 after PepsiCo began importing significant quantities of concentrate and once again, in 2006, after this action was filed under seal. In neither such instance did Customs alter PepsiCo's proposed classification under § 3302.10. On the contrary, in the most recent compliance report forwarded by Customs to PepsiCo, Customs expressly stated in its' remarks column that 3302.10 was the correct classification. (Def. Br. 21.) (emphasis in original)

Of course this Court cannot infer that Customs acted in 2006 because of knowledge of and in response to the fact that this case was filed under seal on November 1, 2005. For all we know both considerations were normal, routine inquiries, not informed by the existence of any controversy. This Court is unable to say with confidence that the rulings in 2003 and 2006, favorable to PepsiCo, are any more than routine enforcement, uninformed by Relator's dramatic tale of corporate intrigue.

Fairness and practicality demand that CBC have an opportunity to reassess the issue, informed by Relator's allegations. Import transactions[*27] in the product are continuing. It would border on the absurd for this Court to adjudicate the proper classification, at the risk that CBC thereafter could resolve the issue differently and be affirmed in the Court of International Trade. For this reason, and because adjudication requires special expertise, abstention in favor of the Primary Jurisdiction of CBC is indicated.

Conclusion

For the foregoing reasons, Defendants' motion to dismiss is denied. (Doc. 19). This Court defers in favor of the United States Customs and Border Patrol Agency under the Doctrine of Primary Jurisdiction for the purpose of permitting the agency to exercise its specific expertise in classification, to inspect and sample the next shipment of the product into the United States and determine whether it is properly classified. Defendant shall serve and file copy of this Memorandum and Order with the Agency, along with information as to the date and location of the next intended entry of the product into the United States.

All proceedings in the action are stayed until further order of the Court, for a reasonable time to permit the agency to exercise its primary jurisdiction to determine the proper customs[*28] classification.

Counsel for Defendant shall serve and file promptly in this action copies of all filings with the CBC in aid of its exercise of primary jurisdiction, and copies of all decisions, reports, orders, rulings or other documents issued by the CBC in connection therewith. In order to maintain docket control, a status report conference will be held on December 14, 2007 at 9:15 A.M.

SO ORDERED.

Dated: White Plains, New York

May 30, 2007

Charles L. Brieant, U.S.D.J.