EXHIBIT A — Declaration of Jerry V. Leaphart 3/3/08

February 23, 2008
About New York

http://www.nytimes.com/2008/02/23/nyregion/23about.htm?_r=2&oref=slogin&oref=slogin

# For Engineer, a Cloud of Litigation After 9/11

By JIM DWYER

To hear Ramon Gilsanz speak — voice calm and measured, even on a day when travel plans are tied in a knot by a snowstorm — you would never guess that he is being sued by thousands of people. And that does not count the man who is suing him on behalf of everyone in the United States.

What did he do to deserve this?

Mr. Gilsanz, a structural engineer with a small firm in Manhattan, was one of the legions of people who just showed up downtown after the Sept. 11, 2001, attack to help. Some made sandwiches. Others dug. Mr. Gilsanz engineered.

The two colossal towers had been turned into three and half billion pounds of rubble, piles that reached 12 stories high and 8 stories deep.

Buildings had partially collapsed. Any search for survivors would require heavy cranes set on treacherous ground. Someone had to figure out how and where to put them. Fragile walls had to be shored up.

Led by Mr. Gilsanz, a group of structural engineers talked their way past the barricades. They became indispensable in a world that suddenly had no recognizable geometry. Nine months later, the debris was cleared. Despite the fast pace and cruel terrain, no workers died because of structural failures or accidents during the recovery.

Now, however, thousands of people have filed lawsuits claiming that they became ill by breathing the air at the World Trade Center site while working on the recovery. Still others have sued not because they worked there, but because

they had jobs in places where the debris was stored. They say the exposure made them sick.

Finally, one man has sued on behalf of the United States, claiming that Mr. Gilsanz is part of a vast conspiracy to cover up the truth about 9/11, including the "so-called building failures." The lawsuit maintains that exotic weaponry actually destroyed the buildings, and that the airplanes were mass psychological trickery. "When you are sued by 8,000 people, your mind works in a different way," said Mr. Gilsanz, 53. "You totally disconnect. If you live on the West Coast, you can't always be thinking about earthquakes." Mr. Gilsanz is one of about 130 structural engineers from 30 firms who have been named as defendants in an enormous cloud of litigation that drifts, year by year, through the federal court. The engineers turned up at the trade center site as volunteers, but after a few days, the city established formal arrangements, and they were signed up as subcontractors. "We did not want to get paid for this work, but we were told we had to be paid in order to participate," said Joseph Tortorella, a former president of the Structural Engineers Association, who is also being sued. "Many of us ended up giving the money to charity."

Both Mr. Tortorella and Mr. Gilsanz say they had nothing to do with monitoring the air. "Air quality is out of our realm as structural engineers," Mr. Gilsanz said. "We were in the same atmosphere, exposed to the same substances. I took the training with all the workers. Everyone was told to wear the respirator. It was hard."

A lawyer for many of the people suing, Paul J. Napoli, said the structural engineers should have made sure that other workers were protected from contaminants in the air. Anyone who directs workers has a duty under long-established labor law not to send them into unsafe conditions without protection, he said. "They shirked their responsibility time and time again," Mr. Napoli said. The structural engineers agree that people who got sick from working at the site ought to be compensated, but they say they were on hand simply to figure out if a spot was stable enough to work in. They were not in charge of bossing anyone around, said Glenn Fuerth, a lawyer retained by Mr. Gilsanz's professional

liability insurers to defend him. He said it was still too early for the engineers to ask a judge to cut them loose because the lawsuit may be years from trial.

For his part, Mr. Gilsanz — whose firm recently did the structural design for an exhibit of cars suspended from wires at the Guggenheim Museum — has spent a great deal of time studying the failure of the buildings. The collapse of the two towers and the building at 7 World Trade Center after being ravaged by fire provided vivid evidence, he said, that building codes had become too relaxed on fire protection.

On Friday, he flew to California for a meeting of a national code group, intent on urging tougher requirements.

Whatever he does, the trade center lawsuits are likely to linger in his life as the event becomes an ever more distant memory. "You try to pay as little attention as possible," Mr. Gilsanz said. "It's the only way to function."