Jerry V. Leaphart #JL4468
Jerry V. Leaphart & Assoc., P.C.
8 West Street, Suite 203
Danbury, CT 06810
(203) 825-6265 – phone
(203) 825-6256 – fax
jsleaphart@cs.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DR. JUDY WOOD, on behalf of<br>The United States of America | : | |
| | : | |
| Plaintiff, | : | <u>ECF CASE</u> |
| | : | |
| vs. | : | March 21, 2008 |
| | : | |
| APPLIED RESEARCH ASSOCIATES, INC.,<br>et al | : | 07 CIV 3314 (GBD) |
| | : | |
| Defendants. | : | |

**Affirmation in Opposition to Defendant, Science Applications International Corp.'s
<u>Motion to Dismiss (Docket # 65)</u>**

I, JERRY V. LEAPHART, am an attorney at law, duly licensed to practice before

this and other courts and am attorney of record and Lead Counsel for plaintiff in the

above captioned matter.

1.      This affirmation is submitted in opposition to that certain motion to dismiss,

docket #65, and supporting memorandum of law and declaration, docket ## 66, 67,

respectively, filed on behalf of defendant, Science Applications International Corp.

(SAIC) on or about March 5, 2008.

The connection between the central claim of the plaintiff herein and the defendant, Science Applications International Corp. (SAIC) is clear and apparent. SAIC assigned John Eichner to lead SAIC's team assigned to the NIST, NCSTAR 1 project. The public record confirms that John Eichner has expertise in the development and testing of instrumentalities and apparatus that are used in directed energy weapons (DEW), as confirmed by a number of publicly available technical journals.[1] It is conceivable that John Eichner's work on thyratron devices was in connection with uses other than that of DEW, but, to date, SAIC, like all other defendants has not chosen to authoritatively refute the contention made by plaintiff, Dr. Judy Wood, that DEW destroyed the WTC. Certainly, John Eichner, SAIC's co-lead investigator, has the credentials that would enable him to confirm or deny that claim.

By way of introductory comment, it is noted that this affirmation, and the affidavit of plaintiff filed contemporaneously herewith are likely to be the last documents filed by plaintiff at this stage of the proceedings pertaining to motions to dismiss. It is fair and proper to acknowledge that this is a case that calls into question the standard version of what happened in New York City on 9/11/01 (9/11) and does so in a way that may seem as if plaintiff has a view of reality that is 180 degrees opposite that which most people firmly and fervently hold to be true. Because of that challenge to 'perceived' reality, plaintiff's case relies to a very high degree on visual information. Seeing is believing. This is a case, then, in which the howls of incredulity meted out by defendants is countered with information that simply says "look at this."

---

[1] See, for instance, "Design Optimization and Construction of the Thyratron/PFN Based Cost Model Modulator for the NLC" co-authored by John Eichner.

One defendant, SOM, goes so far as to urge this court to ignore everything plaintiff has submitted and adopt dicta from two cases as a sufficient finding of fact that everything plaintiff has demonstrated by way of evidence (much of it visual) simply should be disregarded altogether and ignored.

Several defendants filed motions for Rule 11 sanctions and one did so before plaintiff even filed her opposition to motions to dismiss, so sure were they of the rightness of their position and the wrongness of plaintiff's.  So, it is fair to acknowledge awareness that defendants herein simply do not see the facts in the same way the plaintiff does.  The parties to this case are seemingly not applying the same consistency of standards in analyzing all the facts.  For her part, plaintiff has relied upon contentions that are based upon extrinsic data that she has demonstrated in some tangible way and then applied her analytic skill as a materials engineering scientist.

From the starting point of this case to the present, it is fair to say that some modulation in the defendants' understanding of the facts has occurred.  For instance, one defendant, UL, has gone from asserting that plaintiff's claims were "unsupported by fact or law" to the position of maintaining, in one of its most recent filings, that "significantly Relator has not alleged that defendant would have any knowledge of the results of DEWs [directed energy weapons]."[2]  That is a significant departure from UL's initial utterances that claimed, in effect, that plaintiff was delusional for even mentioning, "directed energy weapons."  At the end of the day, UL has merely made a statement that is consistent with a technical answer, putting plaintiff to her proofs.

Obviously, at the motion to dismiss stage, defendants merely have to know what they are being accused of or what they are expected to defend against.  In the quoted

---

[2] See pg. 6 of UL's Reply Memorandum, docket # 76.

statement, UL clearly indicates that it knows what it is called upon to defend, thus
negating its entire reliance on Rule 9(b). And, defendant UL is not the only defendant
who has answered the plaintiff's complaint, so to speak, thus negating the viability of the
pending motions to dismiss.

Another defendant to have done so is ARA, see infra (starting at Para. 9); and
their answer to the complaint binds all those who have relied on ARA for motion to
dismiss purposes, in plaintiff's reckoning, including SAIC. ARA clearly knows as well
or better than anyone else, with the possible exception of SAIC, that DEW destroyed the
WTC. As to SAIC, that defendant has more involvement in directed energy weaponry
and in the cleanup after its use than any other single defendant. On that note, we turn
specifically to SAIC:

2.      Firstly, it is noted that the said motion to dismiss and supporting documentation
filed by SAIC join in the motion to dismiss filed on behalf of defendant Applied
Research Associates, Inc. (ARA)  (docket # 13).

3.      Secondly, the motion to dismiss filed by defendant ARA was subject to the filing
deadlines set forth in this court's order found at docket # 23, that mandated filing on or
before February 29, 2008. Docket # 65, SAIC's motion to dismiss, was not filed until
March 5, 2008, and may, therefore, be untimely filed. Plaintiff, Dr. Judy Wood here
asserts that defendant SAIC's motion to dismiss should therefore be denied on that basis.

4.      Alternatively, and as defendant SAIC merely adopts the motion to dismiss and
supporting documents submitted by defendant ARA and found at docket #13 and
following and at docket # 74, plaintiff hereby incorporates by reference, as if set forth in

full herein, her opposition filings that are found at docket ## 57 to 61, inclusive, as and for her response to SAIC's said motion to dismiss.

5.      In addition to the foregoing, it is to be noted that SAIC has been notified that plaintiff is aware of SAIC's involvement in the following activities, among other activities, that have a bearing upon this case:

A--SAIC has been present and involved in GZ cleanup from 9/11/01 to the present.

B--SAIC is a manufacturer, tester, and developer of Directed Energy Weaponry (DEW).

C--SAIC is involved in research, development and implementation of psychological warfare tactics and a wide variety of psychological operations (collectively, psy ops) and has been so engaged in such operations at all times relevant to this matter.

D--SAIC currently exercises control of ingress to and egress from GZ in its capacity of having control of the 'security' of the site.

E--SAIC is aware that GZ, which includes the Bankers Trust building site, has not been remediated and that what Dr. Wood refers to as 'fuming' is among the indicators of the need for ongoing remediation.

F--Administrative control of and responsibility for NIST's NCSTAR1 project was given over to SAIC[3].

6.      Annexed hereto as Exhibit A is a copy of correspondence sent to SAIC's counsel on or about March 6, 2008, containing the assertions, among others, set forth in paragraph 5, above.  Annexed hereto as Exhibit B is a document containing source information for the assertions included in items A to F of paragraph 5.

---

[3] See letter dated September 28, 2007 from NIST and addressed to Dr. Morgan Reynolds, copy annexed hereto as Exhibit A.

7.    By way of additional information, and as indicated at the outset, SAIC's co-lead investigator on the NIST NCSTAR 1 project, John Eichner, has direct expertise in scientific and technical areas that are, themselves, strongly related to and involved with the manufacture and the development of directed energy weapons (DEW).  As far back as 1999, records indicate that John Eichner, SAIC's said co-lead investigator on the NIST project, was publishing authoritative articles in the area of directed energy, involving, among other things, devices known as thyratrons that are used as trigger mechanisms for activating DEW.

8.    In the aggregate, there is no doubt that plaintiff herein either did not rely on publicly disclosed information; or, if she did, then she is the original source thereof. Moreover, and as amply demonstrated in all filings heretofore had herein, plaintiff, Dr. Judy Wood, a scientist, has  "direct and independent" knowledge of the information she is asserting in exactly the same way as any scientist has direct and independent scientific knowledge.  Annexed hereto as Exhibit C is but a portion of the Request for Correction dated March 16, 2007, that was filed by Dr. Wood with the National Institute of Standards and Technology, (NIST), that contains her analytical use of the Laws of Conservation of Momentum and of Energy, from which this is an even briefer extract:

> **"In reality, $(1/2)(m_1 * v^2{}_1)_I + (1/2)(m_2 * v^2{}_2)_I <$ (Pulverize) + (Fail Floor Supports),**
> **So, for conservation of energy, we must assume there is some additional energy such that,**
> **$(1/2)(m_1 * v^2{}_1)_I + (1/2)(m2 * v^2{}_2)_I +$ (Additional Energy) = (Pulverize) + (Fail Floor Supports),**
> **where  (Additional Energy) is the additional amount of energy needed to have the outcome we observed on 9/11/01."**

Dr. Wood has direct and independent knowledge of the use of the formula, exemplified above and more fully elaborated in her RFC (See Exhibit C) precisely because she is a

scientist and her ability to detect and then blow the whistle on fraud derives from that ability.  In contrast, the defendants herein completely and intentionally ignore the actual claims being made by Dr. Wood; and, instead, engage in intentional misrepresentation both of what she has claimed as well as the source and the content of her information.

Our Supreme Court has long held that the nature of the 'fraud' covered by the False Claims Act is intentionally broad and is  "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." United States v. Neifert-White Co., 390 U.S. 228, 232, 88 S. Ct. 959, 19 L. Ed. 2d 1061 (1968).

Defendants, in the aggregate, have basically disregarded that underlying premise of the False Claims Act and have, instead, sought to interpret it so as to limit its scope; minimize the way it can be invoked; curtail the qualifications of those who can bring such cases; and to constrict when and how the FCA can be utilized, all in a convenient way that involves an analytic approach of parsing facts, misrepresenting the nature of Dr. Wood's claim and in a variety of other ways that seek to define the FCA as if it can never be invoked successfully.  Chances are, give these defendants a fact scenario where the FCA is used and they will then argue that it does not apply; no matter what the circumstances are.

Precedent derived from case law is almost never totally identical to a subsequent case.  The FCA cannot be "intended to reach all types of fraud…" on the one hand, and then so limited as to be virtually inapplicable -- ever -- on the other.  Yet, that is exactly the premise that the defendants herein would have this court accept.  In all instances, they have basically made it seem as if the False Claims Act is intended to foster and allow fraud to be committed and to provide a basis for avoidance of the requirement to

defend charges of fraud, rather than the opposite; namely, a statutory mechanism for effectively countering fraud.

In furtherance, yet again, of the assertion that plaintiff herein complies in all respects with the jurisdictional prerequisites of the False Claims Act, an affidavit of the plaintiff has been simultaneously filed herewith in opposition to SAIC's motion to dismiss, setting forth additional, detailed and particularized information confirming the direct and independent nature of her knowledge as it relates, specifically, to SAIC. Furthermore, her complaint states a cause of action; and she has supplied defendants with more than enough particularity to enable them to answer.

In fact, defendant SAIC is bound by the same excess reliance placed on F.R.Civ.P Rule 9(b) as is ARA. It is well settled that a complaint satisfies the particularity requirements of Rule 9(b) if it identifies the circumstances of fraud with sufficient particularity that defendant can prepare an adequate answer. Semegen v.Weidner, 780 F.2d 727, 735 (9th Cir. 1985). Moreover, since this case alleges corporate fraud, the burden on plaintiffs is relaxed as to information particularly within the knowledge of corporate defendants. Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir. 1981). However, plaintiffs must still allege the time, place and content of an alleged false representation. Id. at 1440. Plaintiffs must also allege facts indicating why the statement is false. Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986). Plaintiff herein has done that with abundant detail.

9.    We come now, in this paragraph, to what might be considered an "outcome determining" event. In its reply, docket # 74, defendant ARA, to whom defendant SAIC has attached itself for motion to dismiss purposes, has actually put in an answer to

plaintiff's complaint, thus <u>waiving</u> and/or rendering itself, and those who joined with

ARA, <u>collaterally estopped</u> from pursuing a motion to dismiss.  Here is what ARA

asserts at pg. 6 of its Reply Memorandum, docket # 74:

> **"First, ARA categorically denies that any of the allegations contained in Relator's Complaint have any merit."**

That is an answer; ***albeit***, an <u>ambiguous</u> one.[4]  The complaint might not have "merit" in

the eyes of some defendants, but that is not the same as asserting that "directed energy

weapons did not destroy the WTC" which is what we have beseeched the defendants to

articulate **IF,** in good faith, they could have done so.  They have not done so.  ARA, and

now SAIC and all other defendants who have relied upon ARA, cannot put forward a

motion to dismiss based on Rules 12(b)1 and 6 and 9(b), on the one hand, and then seek

to take advantage of a narrowly tailored and technical "denial" of the merit (but not  the

truthfulness) of plaintiff's complaint, in the form of an "answer," on the other.

True, the word "merit" and the words "without merit" are commonly used in

legal parlance.  However, they generally attach to arguments and/or legal assertions; not

"facts."  As to the latter, the normal legal parlance is to admit or deny that such and such

facts are true.  Apart from the confines of this litigation, one would have thought that the

defendants herein would recognize that the public interest would be served by a clear

statement that "DEW did not destroy the WTC" assuming they could make that

statement in good faith.  They did, after all, work on a project entitled "Final Report on

the collapses of the Twin Towers of the World Trade Center."  Surely, they are in a

position to make some comment on the factual claims of Dr. Judy Wood, just to set the

---

[4] A denial that the claims in plaintiff's complaint "have any merit" is not the same as denying their truthfulness.  Commonly and typically the word "merit" means "claim to respect and praise; excellence; worth" and/or "something that deserves or justifies a reward or commendation; a commendable quality, act, etc.: The book's only merit is its sincerity."  See: http://dictionary.reference.com/browse/merit

record straight, assuming all of their expressions of righteous indignation have some validity to them and are not mere bluster, offered up precisely because that is what lawyers do when they have neither the facts nor the law on their side.

Facts are not usually commented on with the use of the word "merit" because that word can have the effect of admitting a fact and then merely qualifying its weight or its importance. In that respect, then, ARA may have offered up yet another judicial admission.

10.    This is highly pertinent here because the circumstances that ARA takes advantage of in "den[ying] that any of the allegations contained in Relator's Complaint have any merit" is a context in which ARA was addressing plaintiff's assertion that no defendant had denied that the World Trade Center was destroyed by directed energy weapons. In fact, defendant ARA makes this perfectly clear by the content of its footnote 4 also appearing on pg. 6 of its Reply Memorandum (docket # 74) and providing context in which ARA's legal and technical "denial of merit" is to be placed. Footnote 4 states:

> "4 Relator's Opposition makes much of the allegation that "[n]o defendant has denied that DEW destroyed the WTC at all," and concludes that "[s]ilence is an admission under circumstances like that." Opp'n 33. Defendants reiterate that the allegations contained in Relator's Complaint, including that "DEW destroyed the WTC," are wholly without merit…"

Clearly, ARA is <u>not denying the factual assertion</u> that the WTC was destroyed by DEW; and, instead, is making a "merit" assertion that is inherently ambiguous. We can readily see how the claim that DEW destroyed the WTC would be deemed to be "wholly without merit" by those who have sought to cover up that fact and/or those who have been willfully blind to it. That is not, however, a denial of the occurrence.. ARA has over-

reached itself in taking advantage of a technical denial "of merit", but not denying, as a factual assertion, separate and apart from plaintiff's complaint, that DEW destroyed the WTC.  This, then, comes close to yet another judicial admission made by ARA.

Certainly, a clear ambiguity is raised in a context where certainty of answer would have been expected.  After all, ARA has filed a motion for sanctions claiming the complaint is frivolous.  Now we know that that motion is not well grounded.  ARA, in fact, may be engaging in ongoing fraud.  How many admissions are we going to encounter before discovery even begins?

Before a numerical response to that rhetorical query can be put forward, we can also point to another similar admission made by another defendant who relied on ARA for substantive motion to dismiss purposes.  That defendant is UL.

11.    In docket # 76, UL's reply to plaintiff's opposition to motion to dismiss the following is found at pg. 4, footnote 1:

> "Notably, Relator concedes that "…NIST only investigated the factors leading to the initiation of the collapses of the WTC towers, not the collapses themselves" See Relator's Opp'n 7.  And, significantly, Relator has not alleged that defendant UL would have any knowledge of the results of DEW's."

Like ARA, UL has also put into the record the fact that it basically understands what it is being sued for.  Moreover, UL twists what plaintiff claims is evidence of fraud into what UL claims is a *"concession,"* no less, and thus merely signals that it will seek to defend itself by pleading ignorance of fraud rather than willful indifference to it, as plaintiff asserts.  Asking for more proof of UL's "knowledge of the results of DEWs," as UL put it, in the context of a motion to dismiss on Rule 12(b)1,(6) and 9(b), far exceeds the scope of such motions and is, instead, merely a reiteration of the purpose that would be fulfilled

by the discovery process. Accordingly, UL has simply acknowledged that it knows fully and well what plaintiff's complaint alleges and knows the basis of the fraud that is said to have taken place; and that by its own answering statement.

12.     ARA and UL could have, but did not, offer up affidavits or tangible information of some kind from its bevy of experts or from some of those who participated in the preparation of NCSTAR 1 saying or alleging, in substance, that DEW did not destroy the WTC, assuming their experts would say any such thing, backing such words with tangible proof. That is especially true in a case of this nature where the allegations of fraud have wide ranging implications that are not technically a part of this case, but which raise issues that are far more serious and far more intertwined with the public interest than would be the case if the qui tam relator herein were claiming overpayment of Medicare charges, a rather common occurrence; or engaging in improper listing of the source of the contents of Pepsi Cola; or, so one could argue. Indeed, the credibility of American jurisprudence could be placed in serious jeopardy if the False Claims Act can be deemed applicable to Medicare and Soda content, but not to fraud associated with 9/11; or, so one could argue.

    This is a case alleging directed energy weapons destroyed the World Trade Center and the claim has not been denied by those who provided expert technical input into determining what caused the destruction of the Twin Towers. The defendants have not even cast any doubt on the claim by even a single, tangible piece of information or an authoritative statement; other than slurs. Instead, ARA and all other defendants continue to hide behind the legal protections afforded by offering a highly technical and specifically parsed denial of merit, but not of the facts, of a pleading.

13.    In seeming recognition of the logical conundrum that ARA had created for itself by claiming that the allegations of plaintiff's complaint were without merit, ARA next asserts at the conclusion of its footnote 4 (docket # 74) that:

> **"However, the merits of Relator's allegations are irrelevant for the purposes of resolving Defendants' Motion to Dismiss."**

14.    If that is the case, then defendant should <u>not</u> have relied on the complaint for and should have relied on its own information to make any denial that it thought it could make, if it could do so in good faith.  As it did the former and not the latter, it and SAIC and all others who have relied on ARA, including UL, are now fully and collaterally estopped from asserting a motion to dismiss on any of the grounds they have relied on. Collateral estoppel is an equitable doctrine - not a matter of absolute right.  Its invocation is influenced by considerations of fairness in the individual case.  See Blonder-Tongue Labs., Inc. v. Univ. of IllinoisFound., 402 U.S. 313, 334, 28 L. Ed. 2d 788, 91 S. Ct. 1434 (1971) ("In the end, decision [on an issue of collateral estoppel] will necessarily rest on the trial courts' sense of justice and equity."); Conte v. Justice, 996 F.2d 1398, 1400 (2d Cir. 1993) (doctrine is "premised on notions of due process and fairness"); Nations v. Sun Oil Co. (Del.), 705 F.2d 742, 744 (5th Cir. 1983).  Due process and fairness simply will not allow the defendants to "deny" plaintiff's complaint on one hand, in a seeming effort to take credit for saying that DEW did not destroy the WTC, and then, on the other, not actually make that denial themselves; all the while seeking to advance a motion to dismiss based on a claim of lack of particulars and failure to state a claim.

13

15.    Issue has now been joined.  It can fairly and accurately be said that up to and including the time of filing of this last opposition response in this case, no defendant has directly denied the assertion that the Twin Towers of the World Trade Center were destroyed by Directed Energy Weapons, much less offer up even one jot or iota of publicly reassuring proof.  SAIC is not likely to deny the assertion given their involvement with such weapons, control of the NIST investigation, control of the cleanup of Ground Zero.  As to that cleanup, Dr. Wood has clearly and unequivocally asserted that it uses procedures associated with such weaponry.  It is also true that SAIC has directed or been involved with that process to this very day, according to plaintiff.

16.    Defendant, SAIC, is the ninth largest defense contractor in the USA and is said to employ more persons with so-called 'security clearances' than any other 'private employer' (that is, 'person') in the USA.  SAIC is also a founding member of the Directed Energy Professional Society.  Its lead investigator in the NIST NCSTAR 1 project, John Eichner, is an expert on known aspects of directed energy weaponry. SAIC is also a known participant in and facilitator of psychological operations; and a company that has had numerous challenges to its efficacy brought under the Environmental Protection Administration's Superfund provisions and under the False Claims Act in other contexts, all as was put into the record in plaintiff's NIST Appeal. And, SAIC had more of its employees assigned to the NIST NCSTAR 1 project than any other single defendant.  As well, it directed and funneled and controlled the NCSTAR 1 project based on the disclosure from NIST that SAIC "…was contracted by NIST to provide administrative support to the team conducting the investigation."[5]

---

[5] See letter addressed to Dr. Morgan Reynolds dated September 28, 2007, annexed as Exhibit C in docket # 131 in 1:07cv4612 Reynolds v SAIC.

SAIC is not a temp agency.  Whatever is meant by "administrative support" must be understood in context of what SAIC does; namely: Build, test and manage directed energy weaponry and engage in psychological warfare, including cyber warfare, rooted in the process of controlling the flow and the content of information.

Accordingly, there exists good reason to require SAIC to defend this case by putting in an actual answer to the complaint and proceeding to the discovery phase that will confirm, or not, that fraud was committed.  As things now stand, the assertions made by plaintiff, Dr. Judy Wood, that the WTC was destroyed by DEW and the defendants know that to have been the case and committed fraud by concealment, stand as validly asserted, properly put before this court and not denied by any defendant.

17.    Based upon all of the foregoing, SAIC's attempt to join the motion to dismiss (docket # 13) of ARA must be denied either because it is untimely filed or because it is not properly based and/or because it is bound by the "denial" of plaintiff's answer that defendant ARA has put in, thus negating the entire premise of any motion to dismiss this case.

18.    Plaintiff and her counsel know that the information that has been put into the record challenges the credibility of official, governmentally sanctioned (and acted upon) contentions about what happened on 9/11.  It is not impossible to square plaintiff's contentions with those of officialdom based on the earlier articulation that "19 Arabs with box cutters" could be "accurate," so long as "box cutters" is an acronym for DEW.

It is unlikely that those who are most often blamed for 9/11 had access to such weapons, which puts them in sharp contrast to the defendants herein who, through certain of their known activities, did have such access.

We have been prompt in saying that this case does not involve "whodunit" allegations. We are not saying the defendants herein used DEW to destroy the WTC. We are saying that DEW did, in fact, destroy the WTC and that the defendants herein knew or should have that that is the case because, among other areas of expertise, they manufacture and test such weapons. And they do. The fraud here consists in their participation in helping to make sure NCSTAR 1 was a false, fraudulent and useless document; which it is.

19.     Plaintiff, Dr. Judy Wood, has done her part. By way of closing analogy, information recently came to light strongly suggesting, if not actually proving, that revered (by me) president Franklin D. Roosevelt, "allowed" the December 7, 1941, attack on Pearl Harbor to happen based on his and other top officials of his administration having concealed information that the attack was imminent.[6] The information coming to light on Roosevelt allegedly allowing Pearl Harbor to happen has gained in acceptance in recent years and is a 'respectable' topic amongst historians and others, or so one can assert. However, more than 60 years have passed since the attack on Pearl Harbor occurred.

The framework of analogy involves placing ourselves in the year 1948, not 2008, making our time frame some 7 years beyond the attack on Pearl Harbor, just as we are now nearly 7 years beyond 9/11. In 1948, it is likely that a claim that Roosevelt "allowed Pearl Harbor to happen" would have been greeted with extreme skepticism and would have encountered resistance to the receipt of an open-minded hearing, had it been made at that time.

---

[6] See, for instance, Robert B. Stinnett, 'Day of Deceit: The Truth about FDR and Pearl Harbor'

Plaintiff and her counsel, assert that the reaction of the defendants in this case may be functionally equivalent to a claim brought in 1948 challenging the efficacy of Pearl Harbor.   Howls of protestation would have occurred then, as they have in this case.  Although painful to contemplate, Dr. Judy Wood has put forward facts that confirm that the issue must be confronted and dealt with, even if it is fresh in memory, and even if a lot of actions taken are premised upon the accuracy of the commonly accepted version of 9/11 events.  If 9/11 is a "false-flag" operation, then, in that event, those who did it, whoever they are, have made fools out of all of us, and that is undoubtedly painful to examine, let alone accept.

Moreover, the most that can be said about Roosevelt and his administration is that they "allowed Pearl Harbor" to happen, and not that they did it.  No one asserts that the Japanese who attacked Pearl Harbor were not actually "the Japanese."  The most that is being said is that Roosevelt and his administration knew an attack by significant elements of the Japanese Imperial Fleet was going to happen and allowed it to do so, thus inflicting mass casualties upon people who could have been warned.

That is bad enough; but with 9/11, the claim that defendants say plaintiff is making includes the claim that 9/11 was actually 'caused' by Americans against Americans.  We have taken pains to indicate that that is not actually what plaintiff claims and her complaint is clear in what it alleges.  However, we have also often stated that we are not naïve.  We know, full well, that one very strong implication of what we are saying is that America or some Americans, in any event, inflicted 9/11 upon ourselves as a "false-flag" operation.  We know that that is one very reasonable implication that can be drawn from the actual assertions made in this case.

We know, too, that those implications are difficult to fathom and that the natural inclination would be to reject them, if at all possible. However, this is a court of law. We have provided an overwhelming abundance of facts confirming the validity of plaintiff's claims and we are entitled to the procedural safeguards and the factual presumptions afforded to any other litigant at this stage of a case. We have read the cases on what is or is not an original source for qui tam relator purposes and we have put forward interpretations of them based on the ordinary meaning of the words and phrases used in applicable cases, statutes and regulations.

We are also clear in recognizing that we are not quite seven (7) years from the occurrence of the 9/11 event itself and we are equally clear in acknowledging that an abundance of public policy, including decisions to go to war, depend upon acceptance of the standard version of events that is here being indirectly challenged. We know all of that.

Moreover, proceeding with this case will not likely change any public policy; nor should it. This is merely a False Claims case. It is not even all that clear that media will even report on its outcome, irrespective of whatever that outcome might be.

It can also be noted, and certainly argued, that the "state of the Union" is not good. The war(s) deriving from the assumption that 9/11 was planned in a cave in Afghanistan is not going well, based upon the fact, if nothing else, that it is still going on with no end in sight, at a cost of an average of about 2 American soldier deaths per day and a further cost of about $3 billion per week. Much of the rest of the world considers the USA to be a pariah nation, and the economy is floundering. Personal freedom and liberty have been curtailed and people openly express fear and act

accordingly.  Indeed, information reveals that a majority of Americans do not believe the full truth about what happened on 9/11 has been made public.  They doubt the official story.  However, that does not mean, and we do not claim, that the public readily accepts that DEW destroyed the WTC.  That is not likely to be the case in connection with public perception.  What is true, however, is that the public believes information about what actually happened on 9/11 has been withheld.

Thus, on a certain level, the outcome of unquestioningly abiding in the standard version of events has been horrific.  Moreover, if the claims made by Dr. Judy Wood are, in fact, substantiated, say, by witnesses from among the defendants, then a path towards rectifying the horrible situation we are in could conceivably open up.  That is not the purpose of this case, but it is a not so farfetched possibility.  In any event, what happens assuming plaintiff proves her case is strictly limited to the parameters of this qui tam case, as far as we are concerned.

A more likely outcome is thought merely to be that the fraud occurring in connection with the defendants' participation in the NIST project can be rectified and it is by no means certain that anything else will happen beyond that.  We do not know and we make no predictions about that.  We hasten, yet again, to add that this case is narrowly tailored to proof of fraud in connection with the preparation of NCSTAR 1 and the input had by the defendants herein in that preparatory work, for which they were paid.

We note, however, that those who prepared it include those who are the cream of the crop of the so-called "Military Industrial Complex."  As well, the warning about the

influence of the MIC over public policy, issued by then President Dwight D.

Eisenhower in January 1961, requires that we take heed:

> "In the councils of government, we must guard against the acquisition of unwarranted influence, whether sought or unsought, by the **military-industrial complex**. The potential for the disastrous rise of misplaced power exists and will persist." President Dwight D. Eisenhower, January 17, 1961.

Then President Eisenhower's warning was issued to all of us as citizens. In connection

with the events of 9/11, Dr. Judy Wood has heeded that call and done her duty. Instead

of ridicule, the proper way forward is for discovery in this case to take place, such that

we can come closer to finding the truth of the matter; namely, that directed energy

weaponry destroyed the WTC and these defendants know that to be the case. This does

not mean they did it; but it does mean they know what caused that destruction. That

information, and the consequences to defendants of their engagement in willful

blindness in not bringing it to light, absent the compulsory process of this litigation,

needs to be judicially resolved. We can all do our part in that respect and we can do it

without rancor or name-calling.

The time is at hand for this case to go forward. It is validly brought and

comports with the requirements of Rules 12(b)1 and 6 and 9(b), as well as with the

jurisdictional requirements of the False Claims Act.


/s/ Jerry V. Leaphart
Jerry V. Leaphart


Dated: Danbury, CT
        March 21, 2008

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2008, a copy of the foregoing Affirmation was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_ /s/ Jerry V. Leaphart_____
Jerry V. Leaphart (jl4468)
JERRY V. LEAPHART & ASSOC., P.C.
8 West Street, Suite 203
Danbury, CT 06810
Tel. (203) 825-6265
Fax (203) 825-6256